**IN THE U.S. DISTRICT COURT FOR MARYLAND,
SOUTHERN DIVISION**

BEYOND SYSTEMS, INC. )
Plaintiff )
)
v. ) Case No.PJM 08 cv 0921
) **REDACTED DOCUMENT**
WORLD AVENUE USA, LLC, et al. )
Defendants )
______________________________ )

**DEFENDANT WORLD AVENUE USA, LLC'S SEALED MOTION TO CHALLENGE PLAINTIFF BEYOND SYSTEMS, INC.'S DESIGNATION OF 68,300 DOCUMENTS AS CONFIDENTIAL AND FOR SANCTIONS AND INCORPORATED MEMORANDUM OF LAW**

Defendant WORLD AVENUE USA, LLC ("World Avenue"), pursuant to the Stipulated Order Regarding Confidentiality of Discovery Materials ("Confidentiality Order") [DE 97] and Local Rule 104.13, hereby moves to challenge Plaintiff BEYOND SYSTEMS, INC.'s ("BSI") designation of approximately 68,300 e-mails produced during the course of discovery as confidential. The e-mails produced by BSI do not warrant a confidentiality designation under the Confidentiality Order and thus, should be de-designated as confidential. The concept of the emails being confidential is contrary to the gravaman of Plaintiff's allegation -- World Avenue sent or caused the emails at issue to be sent. Under that scenario, the information therein must be public, *i.e.,* known to World Avenue. If not, World Avenue must not have been part of the transmission. Moreover, BSI's engaged in a mass designation of confidentiality, and there is no evidence it made any effort to distinguish between emails. Accordingly, BSI's designation of the e-mails is demonstrably made in bad faith, sanctions are warranted. In further support thereof, World Avenue states as follows:

## I. INTRODUCTION

This is an action brought by a serial spam litigator masquerading as an internet service provider, BSI, for $134 million in supposed damages that it inflicted upon itself. BSI posits itself as a victimized internet service provider burdened by the added time and expense spent processing unsolicited commercial e-mail ("UCE"), and asserts that it did nothing to bring such UCE upon itself. BSI alleges that World Avenue initiated, conspired in the initiation, or assisted in the transmission of at least approximately 68,300 commercial electronic mail messages to its server(s) in Maryland between July 20, 2004 and September 3, 2005. *See* Amended Complaint, ¶ 67.

The discovery in this case, however, is demonstrating that BSI is far from an internet service provider, and that most of the e-mails at issue were sent to invented e-mail addresses created for purposes of manufacturing a claim. Importantly, the discovery in this case is demonstrating that BSI, a corporation headed by one Paul Wagner, conspired with a California based corporation, Hypertouch, Inc. ("Hypertouch") headed by Paul Wagner's brother, James Joseph Wagner a/k/a Joe Wagner, and other members and friends of the Wagner family, to funnel hundreds of thousands of e-mails from Hypertouch's computer servers in California to BSI's computer servers allegedly located in Maryland or elsewhere for the very purpose of manufacturing spam litigation. Hypertouch, much like BSI, is a spam litigation manufacturer masquerading as an internet service provider. In other words, World Avenue believes that the vast majority of the e-mails were not sent to Maryland or elsewhere, but re-directed to Maryland or elsewhere through Hypertouch's servers in California. *But for* Hypertouch's voluntary and intentional re-transmittal of the e-mails to Maryland or elsewhere, the vast majority of the e-mails would have never been received by BSI.

On August 26, 2009, on joint motion of the Parties, this Court entered an umbrella confidentiality order -- the Confidentiality Order -- which set forth the procedure whereby a party may designate material produced during the course of discovery as confidential. In this case, BSI produced approximately 68,300 e-mails -- the centerpieces of BSI's allegations -- and marked each such e-mail as confidential, pursuant to the Confidentiality Order. The Confidentiality Order provides that a party producing discovery material may designate such material as confidential "only when such person in good faith believes it contains sensitive personal information, trade secrets or other confidential research, development, or commercial information." (emphasis added).

However, the approximately 68,300 e-mails produced by BSI are not confidential by any stretch of the imagination. The information contained in each of the e-mails was supposedly generated by Defendants *themselves* and thus, is not *BSI's* confidential information. Moreover, the recipient e-mail addresses disclosed in each of the e-mails are not entitled to a confidentiality designation because such addresses implicate no privacy interest and are not "sensitive personal information." When weighed against the Fourth's Circuit's expressed policy of public access, *Virginia Dep't of State Police v. The Washington Post*, 386 F.3d 567, 580 (4th Cir. 2004) and *In re: Grand Jury Subpoena*, 836 F.2d 1468, 1475 n.11 (4th Cir. 1988), BSI's blanket cloaking of approximately 68,300 documents as "Confidential" is not only meritless, but abusive. Accordingly, pursuant to Section 4 of the Confidentiality Order, World Avenue hereby challenges BSI's designation of the e-mails as confidential and respectfully requests that the Court enter an Order de-designating the e-mails as confidential.

Prior to bringing this Motion, World Avenue made several efforts to convince BSI to produce the e-mails without the confidentiality designation, all to no avail.

## II. STATEMENT OF MATERIAL FACTS.

### A. Plaintiff's Amended Complaint.

BSI seeks relief under the Maryland Commercial Electronic Mail Act, Section 14-3001 *et seq*. ("MD-CEMA"), and the Florida Electronic Mail Communications Act, Section 668.60 *et seq*., Fla. Stat. ("FEMCA"). MD-CEMA and FEMCA create a right of action in favor of an "interactive computer service provider" and an "interactive computer service," respectively, where certain violations of MD-CEMA and FEMCA occur. *See* Md. Stat. § 14-3001, § 14-3003; § 668.602, § 668.606, Fla. Stat. MD-CEMA, among other things, regulates unsolicited commercial emails ("UCE") "sent to an electronic mail address that the sender knows or should have known is held by a resident of the state [of Maryland]." *See* Md. Stat. § 14-3002(b)(1). FEMCA, among other things, regulates UCE sent "from a computer located in this state [of Florida]." *See* § 668.603(1), Fla. Stat. Both MD-CEMA and FEMCA regulate such UCE if it, among other things, contains false or misleading information in the subject lines or contains false information in the routing information of the UCE.

However, MD-CEMA and FEMCA only protect *bona fide* internet service providers ("ISP"), and not businesses that re-direct e-mails for the purpose of churning spam litigation. *See* § 668.601, Fla. Stat. (stating FEMCA is "... intended to promote the integrity of electronic commerce and shall be construed liberally in order to protect the public and ***legitimate*** businesses from deceptive and unsolicited commercial electronic mail") (emphasis added). In an analogous context, the Ninth Circuit recently instructed district courts to closely scrutinize the "individual characteristics of the plaintiffs on a case-by-case basis and make a reasoned decision on whether a purported IAS [internet access provider] is truly the type of bona fide IAS provider adversely affected by commercial e-mail messaging..." *See Gordon v. Virtumundo, Inc.*, Case

No. 07-35487, 2009 WL 2393433, at *1, *10 (9th Cir. Aug. 6, 2009) (slip opinion) (affirming grant of summary judgment against another serial spam litigator who was not a *bona fide* ISP).[1]

**B. BSI Attempts To Characterize Itself As A Maryland Resident.**

BSI has engaged in an elaborate charade to place itself in Maryland in order to make claims under MD-CEMA. In an effort to invoke the protections of MD-CEMA, BSI's President and Sole Shareholder, Paul Wagner -- a resident of the District of Columbia living at 1837 R Street, NW, Washington, D.C. 20009[2] (the "Paul Wagner Residence") -- listed with the State of Maryland the address of "11160 Veirs Mill Road, Suite L-15-1000, Wheaton, Maryland 20902" as the "principal office" of BSI as of June 3, 2003[3] until February 13, 2008. The period from 2004 to 2005 is the relevant period for the vast majority of the e-mails. The Veirs Mill address is not a "principal office" at all but a Mail Boxes, Etc. mail box Store in Maryland.[4] The Mail Boxes, Etc. Store was under written instructions from Paul Wagner to forward BSI's mail back to the Paul Wagner Residence in Washington, D.C.[5] The Mail Boxes, Etc. records contain an

---

[1] The Ninth Circuit stated:

> Where, by comparison, a private plaintiff's status as an IAS provider is questionable and reasonably contested, courts should not only inquire into the plaintiff's purported Internet-related service operations but also closely examine the alleged harms attributable to spam. We have confidence in our district courts to review the individual characteristics of the plaintiffs on a case-by-case basis and make a reasoned decision whether a purported IAS provider is truly the type of *bona fide* IAS provider adversely affected by commercial e-mail messaging that Congress envisioned when it enacted the CAN-SPAM Act.

*Gordon*, 2009 WL 2393433, at *10.

[2] *See* Exhibit 1, Declaration of John L. McManus, Exhibit A, containing Property Tax Records for Residence owned by Paul A. Wagner, and reflecting that Residence is classified as receiving Homestead Exemption.

[3] *See* Declaration, Exhibit B (containing Resolution to Change Principal Office or Resident Agent filed June 3, 2003).

[4] *See* Declaration, Exhibit C (containing excerpted documents produced by The UPS Store f/k/a Mail Boxes, Etc. in response to a Subpoena Duces Tecum dated August 14, 2009.

[5] *Id.*

Application -- signed under penalty of criminal sanctions -- that the "business address" of the "Applicant" (Beyond Systems, Inc.) is in Washington, D.C.[6] These representations are inconsistent and this discrepancy belies BSI's claim to be a Maryland ISP.

### C. Joseph Wagner (Hypertouch) and Paul Wagner (BSI)'s Scheme To Re-Direct E-mails From California.

Joseph Wagner, the principal of Hypertouch in California, and Paul Wagner, the President of BSI (which purports to be based in Maryland), are brothers who conspire to file litigation over UCE. *See* Declaration, Exhibit D (reflecting e-mail communications between Paul Wagner and Joseph Wagner relating to UCE litigation). Since at least 2004, Joseph Wagner/Hypertouch operated email servers located in California. Joseph Wagner/Hypertouch configured some or all of the mail servers to, among other things, collect, receive, transmit, and/or store the emails over which it is suing in other litigation and, upon information and belief, at least a minimum of 98.4% of the emails over which BSI is suing in this action.

Sometime, prior to January 2005, Joseph Wagner approached Paul Wagner and asked Paul Wagner/BSI to receive and store certain emails that would be received by Joseph Wagner/Hypertouch.[7] Paul Wagner agreed to Joseph Wagner's request.[8] Joseph Wagner then configured the Joseph Wagner/Hypertouch email servers to send certain of the emails it received to Paul Wagner/BSI in Washington, D.C. and/or Maryland.[9] Specifically, Joseph Wagner configured the Hypertouch servers so that all e-mails sent to the hypertouch.com domain that

---

[6] *Id.*

[7] *See* Declaration, Exhibit E, Excerpted Deposition of Paul Wagner dated October 28, 2008 ("Paul Wagner Deposition"), p. 9: 9-22, p. 69: 5-21, p. 142: 18-22, p. 143: 1-14; Declaration, Exhibit F, Excerpted Deposition of Joseph Wagner dated October 7, 2008 ("Joseph Wagner Deposition"), p. 192: 12-20, p. 198: 21-25, p. 199: 1-25, p. 200: 1-3, p. 301: 4-25, p. 302: 1-16, p. 309: 13-21.

[8] *See* Declaration, Exhibit F, Joseph Wagner Deposition, p. 192: 6-20.

[9] *Id.*

were not specifically addressed to an actual Hypertouch.com account user or excluded by a pre-determined rule (the so-called "wild card account") were automatically sent to the beyondsystems.com domain.[10] Paul Wagner/BSI received and stored those emails.[11]

To further their scheme, Joseph Wagner created thousands of "wild card" e-mail addresses used to collect e-mail to churn spam litigation. As found by another Court in granting summary judgment against BSI's sister company, Hypertouch, 95% of the e-mails at issue by Hypertouch in that case "were sent to e-mail addresses not being utilized by a 'bona fide recipient,'" but were sent to "so-called 'wild card' e-mail addresses to collect commercial electronic mail sent to nonexistent e-mail addresses (i.e., e-mail addresses that were not created by Hypertouch for its end users)." *See* Notice of Entry of Order Granting Summary Judgment and Order Granting Summary Judgment in *Hypertouch, Inc. v. Valueclick, Inc. etc., et al.*, Case No. LC081000, Superior Court of the State of California for the County of Los Angeles, filed June 18, 2009, at p. 20, attached as Exhibit 2.

The emails that Paul Wagner/BSI agreed to receive and store from Joseph Wagner/Hypertouch consisted of "at least" 99% alleged "spam" since at least January 2005, according to Joseph Wagner.[12] Joseph Wagner/Hypertouch generally knew the content of the e-mails, and specifically, that the emails Joseph Wagner/Hypertouch sent and/or caused to be sent to Paul Wagner/BSI in Washington, D.C. and/or Maryland consisted of at least 99% alleged "spam" when Joseph Wagner/Hypertouch sent them to Paul Wagner/BSI.[13]

---

[10] *See id.*, p. 190: 7-20; p. 192: 6-20.

[11] *Id.*, p. 192:17-25.

[12] *See* Declaration, Exhibit F, Joseph Wagner Deposition, p. 195: 8-12.

[13] *Id.*, p. 189, 8-25; p. 195: 8-12.

### D. The Wagners Apply The Scheme To The "Confidential" E-mails.

The Wagners then used this same *modus operandi* to re-direct the very e-mails that they now ask this Court to designate as "Confidential." As an example, the source code of Hypertouch's corporate internet web site, www.hypertouch.com, contains a series of embedded e-mail addresses. *See* Exhibit 3, attached hereto, for the publicly-available source code on www.hypertouch.com website. One of those e-mail addresses which is publicly available is customersupport12004@hypertouch.com. *See* Exhibit 3. [REDACTED]

[REDACTED]

[REDACTED]. However, despite BSI claiming the e-mail address as its own supposedly confidential e-mail, in an action filed in California, Hypertouch sued over an e-mail sent to the same e-mail address (gotcha@hypertouch.com), not only publicly disclosing the e-mail address, but also claiming the e-mail address as its own, rather than BSI's.[14]

## III. SUMMARY OF ARGUMENT

Once a designation of confidentiality has been challenged, the burden of proving the confidentiality of the designated, yet challenged, material is on the party asserting such confidentiality. As such, BSI has the burden of proving that the e-mails produced in the course

---

[14] See Declaration, Composite Exhibit G (disclosing the e-mail at http://legal.hypertouch.com/dex.html, http://legal.hypertouch.com/dex-spam.pdf and http://legal.hypertouch.com/bidvantage-spam.pdf). *See also*, Declaration, Exhibit H (noting further public disclosure of e-mails).

of discovery are confidential. However, BSI will be unable to establish that the e-mails are confidential. First, the e-mails designated as confidential were allegedly generated by Defendants themselves and thus, the information contained in the e-mails cannot be deemed Confidential by BSI. Second, the remaining material contained in the e-mails, the e-mail addresses, do not constitute confidential information because they implicate no privacy interests and are not "sensitive personal information" under the Confidentiality Order. Accordingly, the e-mails should not be deemed confidential.

## IV. ARGUMENT

### A. BSI Has the Burden of Proving the Confidentiality of the E-mails.

The burden of proof to support a confidentiality designation of discovery material is on the party asserting confidentiality. In complicated cases where document-by-document review of discovery materials would be unfeasible, courts generally utilize "umbrella" protective orders, such as the one entered in the instant matter, to protect materials designated as confidential. *In re Alexander Grant & Co.*, 820 F.2d 352, 356 (11th Cir. 1987). At the outset, a party seeking entry of an "umbrella" protective order has the burden of proving the need for such order. *See id.*; *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1122 (3d Cir. 1986). Upon entry of the order, the "umbrella" protective order initially protects all documents that the producing party designates in good faith as confidential. *See Cipollone*, 785 F.2d at 1122. The burden of raising the issue of confidentiality with respect to the individual documents shifts to the other party, who may indicate which documents it does not believe are confidential. *See id.*; *In re Alexander*, 820 F.2d at 356. When a confidentiality designation is challenged, the party asserting confidentiality has the burden of proving such confidentiality. *See In re Alexander*, 820 F.2d at 356; *Cipollone*, 785 F.2d at 1122; *In re Parmalat Securities*, No. 04 Civ. 0030(LAK)(HBP), 2009 WL 1476300

at 3 (S.D.N.Y. June 1, 2009). Accordingly, the producing party, at all times, has the burden of establishing that discovery materials require protection as confidential. *See id.*

In the instant matter, the parties entered into the Confidentiality Order, which incorporates this legal standard. Section 2 provides that a party may designate discovery material as confidential only when the party *in good faith* believes the material "contains sensitive personal information, trade secrets or other confidential research, development, or commercial information." Moreover, Section 4 of the Confidentiality Order affords each party the right to challenge a confidentiality designation, and states that the "burden of the confidentiality of designated information remains with the person or party asserting such confidentiality," as is required by Local Rule 104.13. Accordingly, since World Avenue challenges BSI's designation of the e-mails as confidential, BSI has the burden of proving that each of the approximately 68,300 e-mails is confidential, under the Confidentiality Order.

**B. The E-mails Produced by BSI are Not Confidential.**

Courts have permitted Confidentiality Orders to cover information where the information consists of "trade secrets or other confidential research, development, or other commercial information that has economic value from not being generally known, and has been the subject of reasonable efforts aimed at secrecy, and the disclosure of which is likely to result in a clearly defined and very serious injury to the designating party." *Lockheed Martin Corp. v. Boeing*, Case No. 06:03-CV-796-ORL-28KRS, 2005 WL 5278461, at *1, *2 (M.D. Fla. 2005). The entry of a Confidentiality Order is appropriate where the party will experience harm upon the improper disclosure or use of information. *Contour Products, Inc. v. Albecker*, Case No. 08-60575, 2009 WL 196106, at *1 (S.D. Fla. Jan. 19, 2009). For the following specific reasons, the e-mails contain no confidential information.

The e-mails consist of three parts relevant to BSI's Confidential designation. First, the "header" of the e-mail that contains data relating to the transmission of the e-mail. *See*, *e.g.*, Exhibit 4. Second, the "From" line, "To" line, "CC" line, "Subject Line," and the date and time of the E-mail. *See*, *e.g.*, Exhibit 3. Third, the "body" of the e-mail, which contains the actual content of the e-mail below the "Subject Line" of the E-mail. *See*, *e.g.*, Exhibit 3.

**1. The Body or Content of Each E-mail is *Not* Confidential Because the E-mails Were Allegedly Generated by World Avenue.**

There is nothing confidential about the content or body of the e-mails produced by BSI because BSI alleges that it did not create the content of the e-mails. Rather, the e-mails at issue here are the very e-mails that BSI argues it received unsolicited from World Avenue, which serves as the foundation for BSI's purported claims. To the extent the e-mails were allegedly generated by World Avenue, and *not* BSI, the content of each e-mail is certainly known by others besides BSI, has no economic value to BSI and has not been the subject of any efforts by BSI aimed at secrecy. Thus, BSI cannot designate the content, including without limitation the From line, Subject line and body of the e-mails as confidential.[15]

**2. The Header Information on the E-mails is *Not* Confidential Because BSI Made No Efforts to Maintain the Secrecy of Such Information**

Likewise, there is nothing confidential about the recipient information on the e-mails. The recipient information on an e-mail refers to the "header" information, which registers the servers through which the e-mails at issue passed, the times of day, the name of such severs, and their IP (Internet Protocol) Addresses. The header information is what BSI configured its severs to place on an e-mail, which includes the fact that the e-mails were potentially forwarded or mirrored to BSI from its President's brother's company, Hypertouch. There is no legitimate

[15] Similarly, there is nothing confidential about the Sender line of the e-mails since BSI alleges that the sender is World Avenue of its affiliates.

confidentiality interest in the time of day, names of servers, and IP Addresses bound to such servers. The header information on each e-mail is disclosed and available to BSI's customer. Similar header information is disclosed and available to any and all of the persons to whom BSI alleges it provides internet and e-mail services. Accordingly, the header information is known by others besides BSI, has no economic value to BSI and is not the subject of any efforts by BSI aimed at secrecy. Thus, BSI cannot designate the header information on the e-mails as confidential.

### 3. The Recipient E-mail Address of the E-mails is *Not* Confidential Because Such Information Does Not Constitute Confidential Information

#### i. E-mail Addresses Implicate No Privacy Interests.

In addition, there is nothing confidential about the recipient e-mail address [redacted]

Second, a person's contact information, including one's email address itself, is generally not considered confidential information. *See Estate of Emily Rice v. City and County of Denver*, Civil Action No. 07-cv-01571-MSK-BNB, 2008 WL 2228702 at *4 (D. Co. May 27, 2008) ("[C]ommon experience is that most people do not adequately protect from disclosure their birth dates, home addresses or telephone numbers, so as to reasonably call them private or confidential); *see also Phillips v. Netblue, Inc.*, No. C 05-04401, 2006 WL 354002 at *1, *2 (N.D. Cal. Dec. 8, 2006) (finding that email addresses were not confidential where the email addresses were inactive, served no commercial value and the plaintiff had failed to offer any

support to show how disclosure of such email addresses would cause a "substantial risk of serious injury").

Moreover, this Court, as well as other courts, have generally noted that disclosure of one's contact information, including email addresses, does not implicate any privacy interest. *In re Application of U.S. for an Order Authorizing Installation and Use of a Pen Register and a Caller Identification System on Telephone Numbers*, 402 F. Supp. 2d 597, 601 n.8 (D. Md. 2005) ("[A]n e-mail address may be analogous to a dialed phone number, which implicates no privacy interest . . . ."); *U.S. v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) (finding that because a person has no expectation of privacy in information which is voluntarily turned over to third parties, "e-mail and Internet users have no expectation of privacy in the to/from addresses of their messages or the IP addresses of the websites they visit because they should know that this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information"); *Tomassi v. City of Los Angeles*, No. CV 08-1851 DSF (SSx), 2008 WL 4722393 at *1, *3 (C.D. Cal. Oct. 24, 2008) ("The disclosure of mere contact information, such as names and addresses, does not unduly interfere with one's right to privacy"). Accordingly, the recipient e-mail addresses on the e-mails do not constitute confidential information, nor does disclosure of such information implicate any person's privacy rights.

**ii. E-mail Addresses Are Not "Sensitive Personal Information" Under The Confidentiality Order and Relevant Law.**

Nor do the e-mail addresses qualify as "sensitive personal information." In this District, "sensitive personal information" must consist of "intensely personal information" or "highly sensitive information of a personal and commercial nature." *Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 121 (D. Md. 2009). Thus, while "actual medical information and detailed medical records" may be protected, "vague information" unsupported by "specific factual

representations justifying secrecy" is not protected. *Id.* at 122. Here, none of the approximately 68,300 e-mails contain any "intensely personal" or "highly sensitive information," and BSI has made no "specific factual representations justifying secrecy."

**iii. E-mail Addresses Belonging To Fictitious Persons That Are Created To Churn Spam Litigation Should Not Be Protected**

Even if the Court found that e-mail addresses implicate some negligible privacy rights, the recipient e-mail addresses on the e-mails at issue here serve no legitimate function other than to collect allegedly unsolicited email in order to manufacture spam litigation. As found by another Court, 95% of the e-mails at issue by Hypertouch in that case "were sent to e-mail addresses not being utilized by a 'bona fide recipient,'" but were sent to "so-called 'wild card' e-mail addresses to collect commercial electronic mail sent to nonexistent e-mail addresses (i.e., e-mail addresses that were not created by Hypertouch for its end users)." *See* Exhibit 2. To that end, such e-mail addresses are not utilized by any BSI clients for any real business or personal function.

By designating the emails as confidential, BSI has effectively certified to this Court that the emails contain "sensitive personal information", and therefore belong to real "persons" -- not e-mail addresses belonging to fictitious individuals. BSI also effectively certified to this Court that the e-mail addresses are not publicly-disclosed. If it elects to oppose this Motion, BSI should again certify to this Court that (i) each of the approximately 68,300 e-mails is held by a real "person" and is not simply an fictitious e-mail address created by Joe Wagner or Paul Wagner; and (ii) none of the approximately 68,300 e-mails were publicly disclosed. Accordingly, as in *Phillips*, the e-mail addresses at issue have no commercial value and disclosure of the same would not cause substantial risk of serious injury to anyone. Thus, BSI cannot designate the recipient e-mail addresses as confidential.

### C. The Public Interest Strongly Militates Against Confidential Treatment of the E-mails At Issue.

The Fourth Circuit has held that "proceedings in civil cases are traditionally open" and that "[s]ealing the discovery process in civil proceedings … sacrifices the traditional interest of the public in obtaining access to civil proceedings…" *Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 121 (D. Md. 2009) (*quoting Virginia Dep't of State Police v. The Washington Post*, 386 F.3d 567, 580 (4th Cir. 2004) and *In re: Grand Jury Subpoena*, 836 F.2d 1468, 1475 n.11 (4th Cir. 1988)). Indeed, this Court has recognized that "the mere existence of a confidentiality order protecting confidential information, does not guarantee a right to seal all documents claimed to be sensitive." *Minter*, 258 F.R.D. at 123.

Yet, this forbidden result is exactly what BSI's blanket designation of approximately 68,300 *documents* (and probably twice as many physical *pages*) requires. The designation of the approximately 68,300 e-mails at issue in this case as confidential creates heavy burdens on Defendants. Defendants must file the relevant e-mails under seal and carefully scour every written word in their submissions to the Court lest Defendants run afoul of disclosing the supposedly "confidential" e-mails that Defendants *themselves* supposedly authored and transmitted to allegedly "confidential" e-mail recipients for which Defendants *themselves* supposedly already had the e-mail addresses. In turn, the confidential designation requires Defendants to file references to the "confidential" e-mails under seal with further paperwork and motions that necessitate Court action, further adding to the burden upon the Court.

Weighed against the non-existent privacy interest in the e-mails at issue, the public has a strong interest in full and fair disclosure of BSI's activities. This District Court has recognized the public interest:

> This is not the type of sensitive business information or trade secrets that courts

> shield. What the movant is essentially saying-stripped to its essentials-is that it does not want the information it uses in defense of this case to be public, as it feels it would be detrimental to its financial interests in the business community. This urge for secrecy is incompatible with the public resolution of business disputes in our open judicial system. Lawsuits and their conduct are of interest to Main Street and Wall Street. Simply because information revealed or used in litigation is arguably detrimental to the financial or business interests of a party does not make that information "sensitive" or a trade secret.

*Minter*, 258 F.R.D. at 124.

BSI is a serial spam litigator, having *itself* filed in excess of twenty lawsuits claiming to be the innocent victim of UCE. When combined with the litigation proclivities of BSI's President's brother, Joseph Wagner, and his California company, Hypertouch, it is conservatively estimated that the two companies and the brothers have filed in excess of thirty lawsuits. BSI and Hypertouch would like to convert this Honorable Court into a Star Chamber, where their allegations and the supposed documents supporting them are shielded from public scrutiny by the cloak of a blanket confidentiality claim.

However, the Court should be aware that the blanket confidentiality designation for in excess of 100,000 pieces of paper [redacted] may serve a far more nefarious purpose. Prior to the designation of the approximately 68,300 e-mails as confidential, BSI was prepared to produce such e-mails without any confidentiality designation. Saunders Declaration, ¶ 2.[16] At a hearing before this Court on July 14, 2009, BSI represented that it wanted to produce the e-mails, but did not condition production

---

[16] The Declaration of Sanford M. Saunders, Jr. is attached as Exhibit 6.

on any need for confidentiality.[17] BSI's representation to the Court without asserting the need for Confidentiality is alone enough to compel de-designation.[18]

Indeed, before sending the e-mails, BSI asked ***Defendants*** whether ***the e-mails*** should be confidential, and was told that they should not be confidential. Saunders Declaration, ¶ 3.

BSI sent an e-mail containing the links to the e-mails without any claim of confidentiality, and then, within approximately 24 hours, terminated the links. *Id.*, ¶ 3. Counsel immediately inquired about the links. It was not until more than a week later that BSI raised confidentiality and claimed that some of the e-mails had been designated as Confidential in another BSI case pending in this Court styled *Beyond Systems, Inc. v. Kraft Foods, Inc.*, Case No. 8:08-cv-00409-PJM. Saunders Declaration, ¶ 5-7. Thus, some unknown number of the approximately 68,300 e-mails -- which BSI has not disclosed -- are supposedly being litigated in another case in this very Court, and possibly, other earlier, cases, and BSI is able to shield this

---

[17] At the July 14, 2009 hearing, BSI stated the following through its counsel:

> MR. ROTHMAN: We did ask for discovery. We've
> propounded discovery on them, but we spent the bulk of the
> time -- recently, Mr. Ring and Mr. Saunders, they've been trying
> to flush out the 26(b) -- I'm sorry, the Rule 26 initial
> disclosures that need to happen. **We wanted to go ahead, give**
> **them all the e-mails at issue**, have them come back to us with
> their initial disclosures, and then we could dig down into the
> meat of the issue.

*See* Excerpted Transcript of July 14, 2009 hearing, attached as Exhibit 7 (emphasis added).

[18] *See, e.g.*, *Ruggiero v. Nursery*, Case No. 3:99000083, 2000 WL 888111, at *1, *1 (D. Conn. 2000) (granting motion to dismiss as a sanction where, among other things, plaintiff represented to the Court that she would produce documents 5 days later, plaintiff failed to comply with her representation to the Court) (unpublished); *Sunrich, Inc. v. Pacific Foods of Oregon, Inc.*, Case No. 01-1108-HA, 2003 WL 21088528, at *1, *1 (D. Or. 2003) (granting motion to compel and for sanctions where party represented to the court that a hundred boxes of documents would be produced for inspection, but party only permitted inspection of selected documents) (unpublished); *Naples Community Hospital, Inc. v. Medical Savings Ins. Co.*, Case No. 2:04CV280FTM-33SPC, 2005 WL 2405840, at *1 (M.D. Fla. 2005) (granting motion to compel discovery party agreed to produce, and reasoning "Defendant should not be permitted to garner an extension of time with its representations to the Court, and then retract from such statements when the production of documents is due") (unpublished); *In re: Patchell*, Case No. 02-45551-JBR, 2005 WL 3276377, at *1, *1 (Bankr. D. Mass. 2005) (unpublished) (compelling discovery in accordance with party's representations to the court).

fact from World Avenue, this Court, and the public by cloaking the e-mails in each case under a claim of Confidentiality. BSI's actions are an abuse of process.

Weighed against the public interest and the potential for misuse of the Confidential designation, BSI's interest in protecting the e-mails is non-existent and its Confidential designation should not be permitted.

## V. CONCLUSION

Based upon the foregoing, the e-mails produced by BSI in the course of discovery in the instant matter do *not* contain any confidential information and thus, should be de-designated as confidential. Moreover, based on the abusive conduct described herein, BSI had no valid reason to designate these e-mails as confidential, and thus, it should be forced to bear all attorneys' fees and costs incurred in the bringing of this Motion.

**WHEREFORE,** World Avenue USA, LLC respectfully requests the entry of an Order de-designating the e-mails produced by BSI as confidential, and granting an award of attorneys' fees and costs incurred in litigating the Motion, together with such other and further relief that this Court deems just and proper.

Dated: October 15, 2009.

Respectfully submitted,

_________/s/________________

Sanford M. Saunders, Jr., Esq.
USDC, MD #4734
saunderss@gtlaw.com
Nicoleta Burlacu, Esq.
BurlacuN@gtlaw.com
*Admitted Pro Hac Vice*
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone: 202-331-3100
Facsimile: 202-331-3101

--and--

Kenneth Horky, Esq.
Florida Bar No. 691194
horkyk@gtlaw.com
John L. McManus, Esq.
Florida Bar No. 0119423
mcmanusj@gtlaw.com
*Admitted Pro Hac Vice*
GREENBERG TRAURIG, LLP
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, FL 33301
Telephone: 954-765-0500
Facsimile: 954-765-1477

*Attorneys for World Avenue USA, LLC*