# IN THE U.S. DISTRICT COURT
## DISTRICT OF COLUMBIA

WORLD AVENUE USA, LLC, et al. )
                                    )
     Petitioner,           )
     v.                      )     Miscellaneous No. 09-557 (HHK/AK)
WILLIAM J. WAGNER,      )
                                      )
     Respondent.        )
_____ )

## WORLD AVENUE USA, LLC'S OPPOSITION TO NON- PARTY, WILLIAM J. WAGNER'S RENEWED MOTION FOR SANCTIONS

Pursuant to Local Rule 7(b), WORLD AVENUE USA, LLC ("WAUSA"), by and through undersigned counsel, hereby files its Opposition to Non-Party William J. Wagner's ("Mr. Wagner") Renewed Motion for Sanctions ("RMS") on the grounds, as demonstrated below, the motion is procedurally and substantively fatally flawed. The discovery taken from Mr. Wagner was relevant and proper. However, Mr. Wagner by and through counsel withheld numerous material facts and failed to properly disclose relevant case law in violation of the DC Canons of Ethics. WAUSA also moves to strike Mr. Wagner's Supplemental Opposition to Motion to Compel on the grounds it is an improper surreply filed five months after the Court has ruled on the underlying motion.[1]

## I.  PRELIMINARY STATEMENT

As a threshold matter, the Court should deny Mr. Wagner's RMS for failure to comply with the "meet and confer" requirements of Local Civil Rule 7(m). Pursuant to Federal Rule of

---

[1] *See* DE 8.

Civil Procedure 45 (c)(1), the RMS is a non-dispositive motion and counsel was obligated to "meet and confer" prior to filing.

The RMS should also be denied on the merits. Specifically, Mr. Wagner fails to demonstrate that WAUSA's conduct was in bad faith and patently improper or that it imposed undue burden on him. *See, infra* at pp. 10-12; 17-18. The deposition of Mr. Wagner and the video inspections of his prior and current residences clearly were within the scope of Rule 45 as the deponent is a witness in a parallel case in the United States District Court for the District of Maryland: *BSI v. World Avenue USA, et al.*, No. 08-cv-921 (the "Maryland BSI Litigation"). Contrary to the representation in the RMS, WAUSA counsel questioned the deponent regarding whether he had documents responsive to the subpoena and relevant to the BSI Maryland Litigation.[2] Furthermore, counsel questioned Mr. Wagner regarding his relationship with BSI including housing BSI commercial operations in his prior and current residences and one of BSI's primary vendor accounts being in his name. *See, infra* at pp. 13-17. Although Mr. Wagner now claims the home inspections and video taping were overly intrusive, neither he, nor his counsel, objected to either. They simply requested the inspections be limited to the areas in commercial use, to which WAUSA quickly acquiesced. *Id.* at p. 6.

Furthermore, the RMS is an affront to the court in that Mr. Wagner fails to inform this Court of controlling law and dispositive facts that render it fatally defective.[3] For example, Mr. Wagner failed to inform the Court: (a) that the issue of whether BSI has used the Wagner residences to manufacture jurisdiction artificially in order to avail itself to Maryland law is a key

---

[2]    The use off the information obtained from Mr. Wagner through the deposition and inspections, in support of WAUSA's Partial Summary Judgment Motion shows the undisputed relevancy of this discovery. *See, infra* at pp. 17-18.

[3]    WAUSA requested Mr. Wagner's counsel withdraw his Motion for Sanctions, but no response has been forthcoming. Saunders Declaration at ¶4, Exhibit 7.

issue in the Maryland BSI Litigation,[4] (b) he voluntarily agreed to the deposition and the home inspections and that WAUSA agreed to his requested restrictions or (c) that the purported "harassing" deposition and office inspection of BSI's accountant was conducted pursuant to Maryland Court Order issued in response to a WAUSA Motion to Compel. *See* DE 192, BSI Maryland Litigation; *see, infra* at p. 6. In addition to withholding information, Mr. Wagner misrepresents various facts in the RMS, including the allegations about WAUSA's involvement in other litigation or it being the subject of several attorneys general investigations. *See, infra* at pp. 7-8.[5]

Finally, Mr. Wagner fails to cite the Court to applicable standard of review for the requested relief or to one case supporting same. These salient citations are omitted because the case law cuts against the requested relief. This lack of candor permeates the RMS and provides a basis both to deny the motion and impose sanctions against Mr. Wagner.

## I. FACTUAL BACKGROUND

### A. ALLEGATIONS AGAINST WAUSA IN THE MARYLAND BSI LITIGATION

BSI is a serial spam litigator masquerading as both a Maryland resident and an internet service provider. *See* DE 34, Amended Complaint, ¶8, BSI Maryland Litigation. BSI seeks in excess of $100,000,000 based on WAUSA's alleged transmission of approximately 70,000[6]

---

[4]     Two days after the filing of the RMS, WAUSA filed a Partial Summary Judgment Motion on the issue of Maryland residency in the Maryland BSI litigation. Mr. Wagner's testimony and the two inspections are cited throughout in support of the motion. For the Court's convenience, attached to Saunders Declaration as Exhibit 1 is a sealed copy of the Motion and Memorandum in Support, and a CD with a copy of the interactive brief filed with the Maryland District Court. DE 266-67, BSI Maryland Litigation.

[5] These allegations are also irrelevant and so far afield from the issue before this court as to probably fall outside the scope of immunity for in court statements.

[6] The Amended Complaint alleged that BSI received 68,300 unsolicited commercial electronic mails, but BSI has produced 70,000.

allegedly unsolicited commercial electronic mails ("E-Mails At Issue") that purportedly violate Maryland and Florida law.[7] BSI posits itself as a victimized Maryland resident burdened by the added time and expense spent processing unsolicited commercial e-mail, and asserts that it did nothing to bring such e-mail upon itself. *See* Am. Compl., ¶ 64, BSI Maryland Litigation.

The touchstone of liability under MD-CEMA is that an electronic mail be "sent to an electronic mail address that the sender knows or should have known is *held* by *a resident* of the state [of Maryland]." *See* Md. Code, *Commercial Law*, § 14-3002(b)(1)" (emphasis added). Once the plaintiff meets this threshold residency requirement, among others, MD-CEMA confers a claim upon a recipient of such email or an interactive computer service provider[8] that processes such e-mail. In an attempt to meet the threshold residency requirement, BSI has engaged in an elaborate charade to establish a legal presence in Maryland. Particularly, BSI has claimed to have had up to four (4) offices in Maryland (hereinafter "Maryland Addresses"), two of which are current and former Mr. Wagner's residencies. However, none of these Maryland Addresses qualify BSI as a Maryland resident either at the time of the transmission of the E-Mails At Issue or at present and WAUSA moved for summary judgment in Maryland District Court on BSI's MD-CEMA claim because the undisputed material facts show that none of the E-Mails At Issue were received by an electronic mail address "held" by a "resident" of Maryland.

---

[7]    Maryland Commercial Electronic Mail Act, Md. Code, *Commercial Law*, § 14-3001 *et seq.* and the Florida Electronic Mail Communications Act, Section 668.60 *et seq.*, Fla. Stat. ("FL-CEMA").

[8]    Under MD-CEMA, an "interactive computer service provider" is an "information service, system, or access software provider that provides or enables a computer access by multiple users to a computer service;" and "interactive computer service provider" includes a "service or system that provides access to the internet and systems operated or services offered by a library or educational institution." Md. Code, *Commercial Law*, § 14-3001(c)(1) and (2).

## B.  WAUSA'S SUBPOENA TO MR. WAGNER

WAUSA will avoid burdening the Court with the repetition of the facts preceding its issuance of the Order to Compel.  *See* DE 1-8.  Pursuant to the Court's Order on March 22, 2010, WAUSA issued a subpoena on Mr. Wagner commanding him to appear for a deposition on April 5, 2010 and to permit inspection of "portion of 38 Maryland Avenue, Unit 333, Rockville, Maryland 20850-0341 which contains a server or Point of Presence or serves as an office of beyond Systems, Inc." on April 1, 2010.[9]  A true and correct copy of the Subpoena is attached as Exhibit 2 to Saunders Declaration.  A second subpoena issued on the same date, commanded Wagner to permit inspection of "portion of  1612 Sherwood Road, Silver Spring, Maryland 20902 which contains a server a server or Point of Presence or serves as an office of beyond Systems, Inc." on April 2, 2010.[10]  A true and correct copy of the Subpoena is attached as Exhibit 3 to Saunders Declaration.  WAUSA sent Notices of Inspections and Deposition to Plaintiff, Beyond Systems, Inc. ("BSI").  True and correct copies of the Notices are attached as Exhibit 4 to Saunders Declaration.

Mr. Wagner never objected to the relevance of the inspections or the deposition.  Rather, on March 22, 2010 counsel for Mr. Wagner, confirmed that "Mr. Wagner will comply with the requested inspections."  *See* Sanders Declaration at ¶4; Exhibit 5.   Counsel continued cooperation on the inspections being limited to a reasonable time and scope (confined to the relevant areas of premises, limited to the room(s) where BSI-related equipment is housed), the

---

[9] The Court's March 22, 2010 Order provided:  "[if] Defendants questions the veracity of Mr. Wagner's statements, they can subpoena him for a deposition under Rule 45(a)(1)(B) and make further inquiries into the matter."

[10] Paul Wagner had testified in the Maryland BSI Litigation that BSI stored and maintained equipment at the Sherwood Road and Rockville residences.  *See* Transcript Deposition of Paul Wagner, taken on September 17, 2009 at  53:09 - 59:12.

identification of individuals conducting the inspections 24 hours in advance, and WAUSA using its own electric sources, without need to plug in for power. *Id.* WAUSA agreed.

The two inspections and deposition of Mr. Wagner were conducted as noticed. The information obtained from Mr. Wagner during the deposition and the inspections of the two premises allowed WAUSA to file its Partial Summary Judgment Motion which plays a key role in the disposition of this matter. *See* Saunders Declaration at ¶4, Exhibit 1.

## C. FACTS WITHHELD FROM THE COURT

The RMS sets forth the numerous alleged facts which supposedly demonstrate WAUSA's unreasonable tactics. However, Mr. Wagner failed to disclose material facts that place WAUSA's conduct in context. Specifically, Mr. Wagner failed to disclose:

1. BSI's use of the two Wagner residences is a key issue in the Maryland BSI litigation.

2. Mr. Wagner voluntarily agreed to the home inspections and the deposition and he never sought a Protective Order. Saunders Declaration at ¶2.

3. The deposition and office inspection of BSI's accountant was conducted pursuant to Maryland Court Order issued after WAUSA filed a Motion to Compel. *See* DE 192, BSI Maryland Litigation.

4. The inspection of the alleged BSI's office in the District of Columbia was agreed upon and has not been challenged by the BSI and the Plaintiff did not move for a Protective Order. Saunders Declaration ¶3.

5. Some of the individuals whom Mr. Wagner asserts are being harassed are active participants in BSI's business actions and are also named third party defendants in the BSI Maryland Litigation, *i.e.*, James Joseph Wagner. *See* RMS at p. 5; DE 86, BSI Maryland Litigation. "Joe" as Mr. Wagner refers to him, is not simply a "PhD candidate engaged in the

final steps towards his degree," but a co-conspirator of Paul Wagner and BSI who is engaged in manufacturing litigation with BSI or on behalf of his own company created for this purpose, Hypertouch. *Id.*; *see also Beyond Systems, Inc. v. Kraft Foods, Inc.*, No. 08-cv-409-PJM (D. Md. filed Feb 14, 2008).

6. The deposition of Mr. Wagner not only "reached the issue of Mr. Wagner's possession of documents sought," but unveiled their existence and Mr. Wagner's failure to produced them in response to subpoenas. RMS at p. 9; *see, infra* at pp. 12-17.

7. Mr. Wagner's name and the Sherwood Road address is on the Verizon account that BSI illegally uses to provide alleged internet services to third parties. *See* Transcript of Deposition of William J. Wagner, taken on April 5, 2010, at 115:4-22; 116-118:2; 186-187 (Exhibit A-5 to RSM); Composite Exhibit 8 to Saunders Declaration, containing the relevant pages of the Transcript of Deposition of Verizon representative, taken on March 12, 2010, filed under seal per Confidentiality Order, DE 94-2, BSI Maryland Litigation.

8. Mr. Wagner incorrectly asserts WAUSA is motivated to engage in "the current scorched earth campaign[11]" by BSI's recent acquisition of the Florida Attorney General's papers. RMS at p. 9. However, contrary to the argument WAUSA produced the documents from the Florida Attorney General voluntarily, on January 29, 2010, before BSI received them in response to its inquiries. Saunders Declaration at ¶4, Exhibit 9.

9. Contrary to the assertion in the RMS, there are no pending or former "inquiries form attorneys general in Pennsylvania, Ohio, Wisconsin, Maryland, Idaho and other states, and

---

[11]    The argument that WAUSA has improperly engaged in a "'scorched earth" *in terrorem* campaign ... to harass and intimidate BSI, in the underlying litigation ...[where, *inter alia*] WAUSA has served document subpoenas on non-parties (more than 50 to date)" is hypocritical since Mr. Wagner's counsel, in his capacity as counsel for BSI has filed notice of the intent to serve 85 subpoenas on non-parties. *See* RMS at p. 4; DE 157; 212, Maryland BSI Litigation.

several private anti-spam or consumer protection actions." Mr. Wagner's allegations are deceptive and unsupported by any facts.

10. There was only one WAUSA attorney present at the inspection of Mr. Wagner's Sherwood Road residence in Silver Spring, and a videographer, whereas BSI and two attorneys were present, as well as Paul Wagner on behalf of Mr. Wagner. RMS at p. 9; Saunders Declaration at ¶2.

11. WAUSA counsel asked Mr. Wagner about documentation of BSI providing internet service to him. *See* Transcript of Deposition of William J. Wagner, taken on April 5, 2010, at 13-14; 73; 152-157 (Exhibit A-5 to RMS). Mr. Wagner waffled and ultimately acknowledged having checks but has refused to contact the bank to produce them. *Id.*, *see, infra* at pp. 12-16.

Finally, Mr. Wagner fails to cite the Court to any case law on the applicable standard of review for the requested relief. The only case cited by Mr. Wagner is a New York state case on abuse of process that is inapposite. RMS at p. 9. Even if the law would apply to the present case, it would grant dismissal of Mr. Wagner's RMS. Specifically, in *Board of Ed. v. Farmingdale Classroom Teach. Ass'n,* 38 N.Y. 2d 397, 404 (N.Y. 1975), the court found that the plaintiff sufficiently stated a claim for abuse of process because "on its face an allegation that defendants subpoenaed 87 persons with full knowledge that they could not and would not testify and that was done maliciously with the intent to injure and to harass plaintiff spells out an abuse of process." Further, the court noted that "the deliberate premeditated infliction of economic injury without economic or social excuse or justification is an improper objective with will give rise to a cause of actions for abuse of process." *Id.* at 405.

8

Here, Mr. Wagner's RMS lacks any such allegations, beyond bare conclusions, that would demonstrate existence of an intent to harass. Moreover, all the facts that Mr. Wagner deceived form this Court demonstrate WAUSA's legal basis for discovery on Mr. Wagner.

## II.  ARGUMENT

### A.  MR. WAGNER'S MOTION FOR SANCTIONS SHOULD BE DENIED FOR FAILURE TO COMPLY WITH LOCAL CIVIL RULE 7(m)

Local Civil Rule 7(m) provides that "[b]efore filing any non-dispositive motion in a civil action, counsel shall discuss the anticipated motion with opposing counsel, either in person or by telephone, in a good-faith effort to determine whether there is any opposition to the relief sought and … to narrow the areas of disagreement." LCvR 7(m). "The purpose of the Local Rule is to promote the resolution of as many litigation disputes as possible without court intervention, or at least to force the parties to narrow the issues that must be brought to the court." *Ellipso, Inc. v. Mann*, 460 F.Supp. 2d 99, 102 (D.D.C. 2006). Failure to comply with the rule will result in denial of the motion. *See, e.g., Abbott GmbH & Co. KG v. Yeda Research & Develp.*, Co., 576 F. Supp. 2d 44, 48 (D.D.C. 2008) (denying motion under Local Civil Rule 7(m) where the movant waited until the day of filing to call opposing counsel regarding the motion); *U.S. ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 456 F. Supp. 2d 46, 52 (D.D.C. 2006) (denying a motion to strike for failure to comply with Local Civil Rule 7(m)); *Ellipso*, 460 F.Supp. 2d at 102 (denying discovery motion absent "any hint that [the parties] discussed the motions in person or by phone as required").

This court has held that motions for discovery-related sanctions are non-dispositive motions for purposes of Local Civil Rule 7(m). *See U.S. ex. rel. Tenn. Valey Marble Holding Co. v. Grunley Constr.*, 433 F.Supp. 2d 104, 111-12 (D.D.C. 2006) (observing that "it is clear that a motion for sanctions is a non-dispositive motion" and therefore subject to the meet and

confer requirements of the Local Civil Rules); *Sokos v. Hilton Hotels Corp.*, 283 F.Supp.2d 42, 55 (D.D.C. 2003) (denying the plaintiff's motion for sanctions because of the plaintiff's failure to comply with Local Civil Rule 7(m)).

A motion for sanctions in the form of attorneys' fees as under the Federal Rule of Civil Procedure 45 (c)(1) is a non-dispositive motion to which Local Civil Rule 7(m) applies. *Alberts v. HCA Inc.*, 405 B.R. 498, 502 (D.D.C. 2009). The relationship between a motion for sanctions and the motion to quash does not transform the former application into a dispositive motion. *Neidermeier v. Office of Baucus*, 153 F. Supp. 2d 23, 26 (D.D.C. 2001) (rejecting the plaintiff's effort "to read into [Local Civil Rule 7(m)] an exception for motions that are 'closely intertwined' with dispositive motions").

Here, contrary to the requirements of Local Civil Rule 7(m), Mr. Wagner failed "to meet and confer" with WAUSA before filing his Motion for Sanctions. Moreover, before filing his Motion for Sanctions, Mr. Wagner had not objected or disagreed with the discovery for which now it seeks sanctions. Mr. Wagner made no good faith effort to discuss any of the argument made herein. Therefore, Mr. Wagner's Motion for Sanctions should be denied for failure to meet the requirements of the Local Civil Rule 7(m).

## B. MR. WAGNER FAILED TO DEMONSTRATE THAT WAUSA'S BEHAVIOR IMPOSED AN UNDUE BURDEN

Federal Rule of Civil Procedure 45(c)(1) provides that a party issuing a subpoena has a duty "to take reasonable steps to avoid imposing undue burden or expense" on the person subject to the subpoena, and that "the issuing court must enforce this duty and impose an appropriate sanction-which may include lost earnings and reasonable attorney's fees-on a party or attorney who fails to comply." Fed. R. Civ. P. 45 (c)(1). Whether an undue burden has been imposed

must be determined according to the acts of the case. *See Linder v. Dep't of Defense*, 133 F.3d

17, 24 (D.C. Cir. 1998).

Furthermore, the party seeking sanctions must prove existence of bad faith on the part of

issuing party. *See Scott v. Burress,* 2008 WL 585072, at *6-7 (E.D.Mich. Mar.3, 2008) (holding

that the magistrate judge improperly awarded sanctions despite the fact that the subpoenas were

improper because "there is no indication in his memorandum opinion that he found [the]

subpoena to have been issued in bad faith"); *Builders Ass'n of Greater Chi. v. City of Chicago,*

215 F.R.D. 550, 554 (N.D.Ill. 2003) (vacating the magistrate judge's award of sanctions under

Rule 45(c)(1) absent a determination that the quashed subpoenas were issued in bad faith).

For example, bad faith has been found when a party refuses to withdraw the subpoena

that sought information regarding an entity that was no longer a party to the case and which was

issued for a patently improper purpose of obtaining information for a separate state court

proceedings. *See Night Hawk Ltd. v. Briarpatch Ltd., L.P.,* 2003 WL 23018833, at *9 (S.D.N.Y.

Dec. 23, 2003). Similarly, sanctions were properly imposed after determining that "the subpoena

issued by plaintiff's counsel was blatantly improper on the grounds, *inter alia*, the failure to give

notice to defendant and the seeking of documents already ruled outside the scope of discovery,

and those were indicia that plaintiffs had no proper basis for the subpoena and were acting in bad

faith. *Kenney, Becker LLP v. Kenney,* 2008 WL 681452, at *2 (S.D.N.Y. Mar. 6, 2008).[12] "This

type of blatant abuse of the subpoena power is a common thread running through decisions in

which sanctions have been awarded under Rule 45(c)(1)." *Alberts*, 405 B.R. at 503. Conversely

sanctions are not warranted when the subpoena is not plainly overbroad and the motion to

---

[12] *See also Am. Int'l Life Assurance Co. of N.Y. v. Vazquez,* 2003 WL 548736, at *3 (S.D.N.Y. Feb.25, 2003) (awarding sanctions and finding that demanding counsel to appear with "any and all records" pertaining to his client's interpleader action one business day before trial was *prima facie* improper and patently unreasonable.).

11

compel is not brought in bad faith. *Alexander v. FBI*, 186 F.R.D. 188, 196-97 (D.D.C. 1999). Further, a subpoena is "facially invalid" when it is not issued from the court or should not have been issued. *Caretolive v. Von Eschenbach*, 2008 WL 552431 *8 (S.D. Ohio Fed. 26, 2006).

Here, WAUSA clearly has not acted in "bad faith". It initially sought documents and later testimony and video taped evidence on issues unquestionably material to the Maryland BSI Litigation. Nothing Mr. Wagner has alleged, particularly placed in the context of the Maryland BSI Litigation and the facts withheld from the court indicates the type of "blatant abuse of the subpoena power" present in *Night Hawk* or other cases in which sanctions were warranted. *Alberts v. HCA, Inc.*, 405 B.R. 498, 503 (D.D.C. 2009).[13]

First, the subpoenas were not "facially invalid" because they were issued pursuant to this Court's Order [DE 8] and Mr. Wagner did not challenge their legitimacy, but rather voluntarily complied with the noticed deposition and inspections. Mr. Wagner did not file a Motion to Quash the subpoenas or a Motion for Protective Order. *See* Saunders Declaration ¶2; *supra* at pp. 5-6. The RMS is the first time Mr. Wagner raised concerns with "intimidation" and "suffer[ing] of indignity" caused by the discovery process.[14] *See* RMS at pp. 3-4, 10.

Second, Mr. Wagner failed to demonstrate that WAUSA's subpoenas and the motion to compel were issued in bad faith. Mr. Wagner's testimony revealed he had documents responsive to the subpoena in his possession and concealed it from this Court and WAUSA. Contrary to his previous assertions and statements under oath, during the deposition, Mr. Wagner testified that

---

[13]    It is BSI's conduct that is subjecting and involving its President's family members and friends in the litigations, by using them to create the appearance of a legitimate ISP, where in fact all BSI does is litigating, having already manufactured at least 24 lawsuits involving commercial emails similar to the BSI Maryland Litigation. *See* http://www.beyondsystems.net/spam_cases.html.

[14]    Similarly, Plaintiff, BSI who was properly noticed with all the subpoenas has not objected to the subpoenas. *See* Saunders Declaration ¶4, Exhibit 4.

he, in fact, had responsive documents to WAUSA's original subpoena.  Specifically, he stated in

relevant part the following:

//-//-//-//
20    Q    Do you pay BSI?
21    A    Yes.
22    Q    How much do you pay them?
0014
1    A    I don't know.  I don't remember.
2    Q    Do you pay -- in -- in what intervals?
3    A    In what?
4    Q    Do you pay them in intervals?
5    A    Yes.  Well, roughly six months or a year,
6  something like that.  When I get a bill, as I recall.
7    Q    Do you recall when you last got a bill from
8  BSI?
9    A    Oh, maybe six -- no, I don't really.
10  Something probably over six months ago maybe.
11    Q    How much was it?
12    A    I don't know.
//-//-//-//
9    Q    When did he first start sending you bills?
10    A    I don't know that, when it was.
11    Q    Do you recall -- were the -- were the bills
12  in Paul's name or BSI's name?
13    A    BSI's name.
14    Q    Do you recall whether BSI charged you more
15  or less than your previous Internet hookup?
16    A    I don't know that.  I think it was
17  probably -- he probably gave his dad a deal.  I don't
18  know.  No.  There are services too and stuff, so I
19  don't know if it was go- -- it was probably about the
20  same, I think.
21    Q    When you say services involved, what
22  services?
0073
1    A    Well, you know, advice or something.
2    Q    What type of advice?
3    A    Just computers or how to -- how to find
4  things, how to surf, how to -- when Google started up,
5  you know, how you use that.
//-//-//-//
21  BY MR. SAUNDERS:
22    Q    Dr. Wagner, have you had a chance to look
0152

13

1   at William Wagner No. 8?

2      A     Yes.

3      Q     Do you recognize this document?

4      A     Uh-huh.  Excuse me.  That's a yes.

5      Q     This is a -- an affidavit you prepared --

6      A     That's correct.

7      Q     -- in connection with responding to the

8   subpoena, correct?

9      A     Yes.

10     Q     Now, in here you represented that you did

11  not have any documents responsive to the subpoena,

12  correct?

13     A     There was a bunch of stuff.  I don't know

14  if we've -- is that a "to" -- I don't think -- no,

15  that's correct, yeah.  To the subpoena, right.

16     Q     Earlier you referenced that BSI sent you

17  bills for services that it provided you?

18     A     They didn't -- I don't have any bills from

19  them.  I find out from Paul what I owe BSI.  I don't

20  think I have any bills from them.

21     Q     Okay.  I -- I thought earlier you said that

22  they sent you bills for services.  But if I'm

0153

1   mistaken, then let's go back --

2      A     No.

3      Q     -- let's clarify that point.

4      A     Well, to clarify it, I don't have bills

5   from them.  I have written -- not written.  I have

6   spoken bills from them, you know.  You owe me this or

7   that every six months or year, something like that.  I

8   don't think I have bills.  I'm sure I don't have

9   bills.

10     Q     So can you tell me -- when was the last

11  time Paul told you that you owed money to BSI?

12     A     I think I said earlier that it was probably

13  over six months ago, maybe.

14     Q     Okay.  What did he say to you?

15     A     You owe BSI so-and-so dollars.

16     Q     How much?

17     A     I don't remember what it was.

18     Q     How did you pay him?

19     A     By check.

20     Q     Who did you make the check out to?

21     A     BSI.

22     Q     On what account?

0154

14

1    A    Our joint account, joint -- my wife and I.
2    Q    Joint checking account?
3    A    Yes.
4    Q    And is that account still open?
5    A    Yes, it is.
6    Q    You're still using that account?
7    A    Yes, we are.
8    Q    How many times have you paid BSI out of
9  that account?
10    A    I don't know the answer to that.
11    Q    What did Paul -- what did Paul tell you
12  that you were paying the money to BSI for?
13    A    It wasn't really discussed.  The assumption
14  was, on both parts, I think, that it was for ISP
15  services or ISP and services or something like that.
16  It was to keep my Internet and mail going.
17    Q    Anything else?
18    A    Not that I can think of.
19    Q    Now, since you've moved into the Rockville
20  condo, how many times has Paul asked you for a check?
21    A    I don't know that.  If it's six months or a
22  year or something like that, then it would have been a
0155
1  couple or four or six.  I can kind of remember the
2  time frame being that long and just -- I just don't
3  know.  But it would be on that order.
4    Q    Did he ask you for the -- the last time he
5  asked you for money for BSI --
6    A    Uh-huh.
7    Q    -- did he ask you -- how did he ask you?
8    A    It's time to pay BSI, I guess.  Something
9  like that.  I don't remember exactly.  He let me be
10  aware that I should pay BSI a certain amount of money.
11    Q    Did he call you on the phone or ask you in
12  person?
13    A    No.  He asked me in person.
14    Q    I guess he could have sent you an e-mail?
15    A    Right.  I would have thought it was spam.
16  That's the kind that cost you money.
17    Q    So your -- so he asked you in person?
18    A    Uh-huh.  I think so.
19    Q    Did you write him a check right away?
20    A    I think I probably did.
21    Q    Have you ever mailed him any of the checks
22  for BSI?
0156

15

```
1       A    I don't know -- I don't know that.  I don't
2   know why I would.  I -- I can't be sure.  If he was
3   away or something and needed it, I -- I don't know.
4   Don't remember.
5       Q    And I take it from your affidavit, William
6   Wagner No. Exhibit 8, then you're saying that you have
7   no written description of the services BSI provides
8   for which you write these periodic checks?
9       A    That's true.
10      Q    When you lived back in the Silver Spring
11  house --
12      A    Uh-huh.
13      Q    -- did Paul ask you for money to pay BSI in
14  the same manner?
15      A    Probably, yes.
16      Q    Was it this same approximately-every-six-
17  months-or-a-year frequency?
18      A    Yeah.  That's about the time centers.
19      Q    And did you pay him by check?
20      A    I believe so.  That's probably the only way
21  I ever paid him.
22      Q    Was it the same checking account --
0157
1       A    Probably.
2       Q    -- that you paid him --
3       A    Yes.
4       Q    -- out in the Rockville condo?
5       A    That's the only checking account I've had
6   for 20 years.
7       Q    That's the account you have with your wife?
8       A    Yes.
```

*See* William J. Wagner Deposition Transcript at 13-14; 73; 152-157, (Exhibit A-5 to RMS).

Following the deposition, counsel for WAUSA requested Mr. Wagner provide copies of

the checks paid to BSI. [Mr. Wagner omits noting that he did not provide his supplemental

response before WAUSA requested it]. Saunders Declaration at ¶4, Exhibit 6.   Moreover,

WAUSA discovered additional relevant information to its defenses after the Court issued its

Order denying Motion to Compel.  Specifically, testimony of Verizon witness revealed that Mr.

Wagner's name and addresses are being used by BSI in its Verizon FIOS account.   *See*

Composite Exhibit 8 to Saunders Declaration, containing the relevant pages of the Transcript of Deposition of Verizon representative, taken on March 12, 2010, filed under seal per Confidentiality Order, DE 94-2, BSI Maryland Litigation.  WAUSA questioned Mr. Wagner about these facts and obtained further incriminating evidence against BSI, including the questions regarding the illegal operation of BSI's business from Mr. Wagner's residence.  RMS at pp. 5-8; Transcript of Deposition of William J. Wagner, taken on April 5, 2010, at 115:4-22; 116-118:2 (Exhibit A-5 to RMS).

Thus, any allegation of harassment as baseless because of relevancy and reasonableness of the inquiry into the issue of BSI's office operations and lack of any complaints as to the abusive conduct during the deposition.   Interrogation also revealed that Mr. Wagner has responsive document in its possession, custody and control, such invoices and checks regarding his receipt of services from BSI but failed to produced them.  Following the deposition, on May 12, 2010, WAUSA sent an email to Mr. Wagner's counsel requesting him to produce all the responsive information he previously omitted.   Saunders Declaration at ¶4, Exhibit 6.  Mr. Wagner again, submitted an affidavit claiming that he has no responsive documents.  RMS, Exhibit A-4.  Thus, conversely to Mr. Wagner's allegations, not only the deposition was not "a complete waste of time," but it provide relevant information on BSI's status a Maryland ISP which is central to the dismissal of BSI's case.  RMS at p. 4; *see, infra* at pp. 17-18.

Third, the property inspections revealed key information in support of WAUSA's Partial Summary Judgment Motion.  Inspections of both of these Maryland addresses revealed an unconventional non-business setup and feature commingling of personal property belonging to the homeowners, Paul Wagner's parents, Mr. and Mrs. Wagner.   The evidence obtained through discovery on Mr. Wagner conclusively shows that BSI parks computer equipment at

17

the Mr. Wagner's homes in Maryland, and then remotely accesses that equipment from Washington, D.C. using remote access software.   Mr. Wagner's argument that it was "forced to suffer the indignity of having opposing counsel (two attorneys) and a videographer inspect the areas of his current residence in Rockville, and his prior residence in Silver Spring" is meritless since, as stated above, Mr. Wagner never objected to it and the inspections were limited to the areas designated for BSI's related business, as noted in the subpoenas and communication between counsel. *See* Saunders Declaration at ¶¶2,4, Exhibit 4; Exhibit A-1 to RMS.   Thus, Mr. Wagner failed to prove that WAUSA's subpoenas were issued and the Motion to Compel was filed in bad faith.   WAUSA's discovery was reasonable and proper and Mr. Wagner failed to demonstrate the contrary.

## D. MR. WAGNER'S CONDUCT WARRANTS SANCTIONS

The Mr. Wagner deposition demonstrated that he failed to produce copies of the checks he allegedly paid BSI and these documents are in his possession, custody or control. Contempt is a fitting remedy for his misconduct. *See* Rule 45(e), Fed. R. Civ. P. ("The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena"). "Indeed, the judicial power to hold a non-party in contempt is the primary mechanism by which a court can enforce a subpoena . . . Thus, the court has power to now issue an order of civil contempt under Rule 45(e), although the powers of a magistrate judge in that regard are limited by 28 U.S.C. § 636(e)." *See Mauro v. Countrywide Home Loans, Inc.*, Case No. 2009 WL 3463570, at *1, *1 (E.D.N.Y. 2009). As the *Mauro* court explained:

> An order of civil contempt may issue pursuant to 18 U.S.C. § 401, which authorizes the court to punish "by fine or imprisonment, or both, at its discretion" any contempt of the court's authority, such as "misbehavior of any person in the court's presence or so near thereto as to obstruct the administration of justice," or "[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." Three elements must be established before a party can be held in civil contempt: (1) there must be

an order that is clear and unambiguous; (2) the proof of non-compliance with that order must be clear and convincing; and (3) it must be shown that the contemnor has not been reasonably diligent and energetic in attempting to accomplish what was ordered.

28 U.S.C. § 636(e)(1) provides that "[a] United States magistrate judge serving under this chapter shall have within the territorial jurisdiction prescribed by the appointment of such magistrate judge the power to exercise contempt authority as set forth in this subsection." 28 U.S.C. § 636(e)(2) provides: "A magistrate judge shall have the power to punish summarily by fine or imprisonment, or both, such contempt of the authority of such magistrate judge constituting misbehavior of any person in the magistrate judge's presence so as to obstruct the administration of justice."

Mr. Wagner's repeated refusal to produce responsive documents to WAUSA's subpoena, including his denial under oath of having such documents indicates his bad faith in responding to WAUSA's subpoena.  WAUSA subpoenaed him nine months ago, at the inception of discovery in this case.  The information WAUSA sought from Mr. Wagner was important to WAUSA's discovery plan and to the gathering of evidence in WAUSA's defense. However, Mr. Wagner's bad faith delayed WAUSA's finding of responsive information.  Mr. Wagner's tactics prejudiced WAUSA and forced WAUSA incur unnecessary costs associated with deposing Mr. Wagner and inspecting the relevant premises.  Therefore, WAUSA seeks the Court impose sanctions against Mr. Wagner under its "inherent powers" and order Mr. Wagner pay WAUSA costs and attorney's fees associated with the taken of deposition and filing the Motion to Compel, as well as Opposing the current RMS.  *See Roadway Express, Inc. v. Piper*, 447 U.S, 754, 766 (1980); *Cruz v. Meachum*, 159 F.R.D. 366, 368 (D.Conn. 1994).

Furthermore, Mr. Wagner's filing of the RMS is baseless and filled with misinformation - either in the form of affirmation misrepresenting, *e.g.*, WAUSA never inquired about documents, or commission, *e.g.,* the Maryland Court Order for the alleged "harassing" deposition of BSI's accountant. *See*, *supra* at pp. 12-16. Accordingly, if any sanctions are warranted here, they should be against Mr. Wagner.

### III.CONCLUSION

For all theses reasons, World Avenue, USA, LLC respectfully requests that the Court deny Non-Party William J. Wagner's Renewed Motion for Sanctions and order William J. Wagner to pay the costs and attorney's fees associated with the taken of deposition and filing the Motion to Compel, as well as Opposing the current Motion.


Dated:  June 30, 2010

Respectfully submitted,

*Attorneys for World Avenue USA, LLC*

GREENBERG TRAURIG, LLP

_____/s/_____

Sanford M. Saunders, Jr., Esq.
USDC, MD #4734
saunderss@gtlaw.com
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone:  202-331-3100
Facsimile:  202-331-3101

Of counsel:

Nicoleta Burlacu, Esq.

BurlacuN@gtlaw.com
*Admitted Pro Hac Vice in Maryland Action*
GREENBERG TRAURIG, LLP

20

2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone: 202-331-3100
Facsimile: 202-331-3101

--and--

Kenneth Horky, Esq.
Florida Bar No. 691194
horkyk@gtlaw.com
John L. McManus, Esq.
Florida Bar No. 0119423
mcmanusj@gtlaw.com
*Admitted Pro Hac Vice in Maryland Action*
GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, FL 33301
Telephone: 954-765-0500
Facsimile: 954-765-1477