## IN THE U.S. DISTRICT COURT FOR MARYLAND,
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BEYOND SYSTEMS, INC.** | * | |
| Plaintiff | * | |
| | * | |
| v. | * | **Case No. PJM 08 cv 0921** |
| | * | |
| **WORLD AVENUE USA, LLC** | * | |
| successor by merger to NIUTECH, LLC., | * | |
| **DBA "THE USEFUL," ET AL.** | * | |
| Defendants | * | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT WAUSA'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, Beyond Systems, Inc. (BSI) opposes the Motion for Partial Summary Judgment

filed by Defendant, World Avenue USA, LLC (Docket Entry 266; "Motion;" "WAUSA").

I.   INTRODUCTION.

II.  MARYLAND RESIDENCY AND MCEMA.

    A.  BSI is a Maryland resident.

    B.  The law on residency.

    C.  MCEMA allows corporations to be "recipients" and plaintiffs.

    D.  The email addresses are "held" by BSI as a service provider and a "recipient."

III. WAUSA MISAPPLIES THE STANDARDS FOR RESIDENCY.

    A.  WAUSA ignores the state of incorporation factor.

    B.  Diversity jurisdiction is already admitted.

    C.  The "nerve center" analysis is inapposite.

IV.  MULTIPLE DISPUTED FACTS.

V.   Ownership of the domain names castalia.net, linkcenter.net and hypertouch.com.

1

VI.  CONCLUSION

# I.  INTRODUCTION

Since 1996 BSI, a Maryland corporation, has provided a variety of services pertaining to computers and the Internet.  BSI has consistently maintained a Maryland "principal office" and a Maryland registered agent, as required under Maryland law.  All of the emails that give rise to this suit were received on BSI's servers physically located in Maryland.

The Motion argues that BSI lacks standing to sue under MCEMA[1] because it is not a "living, breathing" person and is not a "resident" of Maryland.  The statute does not define "resident."  WAUSA has therefore assembled a patchwork of definitions borrowed from various sources, starting with the federal standard for diversity jurisdiction.  However, WAUSA conspicuously ignores the state of incorporation as a determining factor.   As demonstrated below, WAUSA's interpretations as to residency are erroneous, and are counter to the letter and intent of MCEMA.

# II.  MARYLAND RESIDENCY AND MCEMA

MCEMA creates a private right of action arising from certain emails, including emails sent to a "recipient" who is a "resident" of  Maryland.  The statute leaves the word, "resident" undefined. It does not require that the receiving email address be "held by a living, breathing individual" as WAUSA contends.  It creates a private cause of action for service providers, awarding them twice the recovery as a mere "recipient."  Most service providers are corporations rather than "living, breathing" individuals, and despite the vibrant Internet industry in Maryland, it can be readily ascertained via public information that most service providers are based outside

---

[1] Maryland Commercial Electronic Mail Act, §14-3001 et seq., Commercial Law Article of the Annotated Code of Maryland.

the relatively small geographic bounds of Maryland.   There is no language in MCEMA that requires that the destination email address be "held" by an individual rather than a corporation, and no language that would refute the notion that a single email address can be "held" by both a service provider and an end recipient.  The word, "held" is not defined in MCEMA.

### A.  BSI is a Maryland resident.

BSI was incorporated in 1996 in Maryland, at that time listing its principal office address, as 1612 Sherwood Road in Silver Spring, Maryland 20902 in its filings with the state Department of Assessments and Taxation (SDAT). (See WAUSA's "Exhibit 1."[2] See also, stamped copy of Articles of Incorporation, attached hereto as Exhibit G-2.)  BSI's original founder, president and registered agent was Paul A. Wagner.  The Silver Spring address was the residence of his parents, William and Diane Wagner until they moved to a condominium at 38 Maryland Avenue, Unit 333, Rockville, Maryland 20850 in 2007.  Paul Wagner lived at the Silver Spring address for approximately two years before moving to the Washington, D.C. house in August, 1995 where he rented a room.   In November 1996, Mr. Wagner formed BSI at the Silver Spring address.  Between 1996 and 2000, BSI provided Internet and technology services to IBM Corporation in Falls Church, Virginia, the National Association of Securities Dealers  in Rockville, Maryland, and Motorola Corporation in Schaumburg, Illinois.  BSI personnel and subcontractors performed this work primarily in Maryland and Virginia.

---

[2]  The numbering of the exhibits to the sealed Motion is confusing.  The docket entries display a filing of 55 exhibits, entered as DE 266-1 through 266-55.  The docket entries are styled, "Exhibit 1 Saunders Exhibit 1" (running from Saunders 1 to Saunders 15) and "Exhibit 1 Krawetz Exhibit 1" (running from Krawetz  1 to Kraewtz 29) with no further descriptive information for those two series.  The face sheets inserted before the pdf copies of the exhibits provided to BSI do not follow that same format.  Instead, the face sheets show one series entitled "BSI Exhibit  1" through "BSI Exhibit 29," and another series entitled "Exhibit 4" through "Exhibit 35."   BSI has asked WAUSA for a master list of the exhibits so they may be properly cross-referenced to the docket entries, to no avail. We therefore refer to WAUSA's exhibits by the information on their face sheets.

In February, 2000 Mr. Wagner purchased the D.C. house, which is a 3-story brownstone built in 1908.  This much is undisputed.

BSI has at all times since its founding in 1996, maintained computer servers, including mail servers, at the Sherwood Rood address in Maryland. The emails claimed in this suit were received by BSI on its mail servers at the Silver Spring and Rockville addresses.  Exhibit G-3, Paul Wagner Declaration (PWD) at ¶3.

Over the past 13 years BSI has changed its "principal office" registered with SDAT to two other locations in Maryland, and has likewise changed the listing for the name and address of its resident agent, at all times in compliance with Maryland law as to both sets of information. The corporation's current principal office in Maryland is listed with SDAT as 9501 Anchorage Place, Bethesda, Maryland 20817. WAUSA "Exhibit 3."   This is the address of BSI's current resident agent, Alton Burton, CPA, JD, MBA, whose office is attached to his residence off MacArthur Boulevard across from the David Taylor Model Basin in the Palisades area, near Glenn Echo, Montgomery County, Maryland.  Mr. Burton's expansive office, built on the second floor of one of his structures, was video taped in exquisite detail by WAUSA's counsel in May, 2010.  It is undisputed that since 1996, BSI has consistently listed a Maryland principal office and a Maryland resident agent on record with SDAT, as required by law for Maryland corporations.

Under the applicable provision of the Annotated Code of Maryland, a corporation's "principal office" is "The place in this State filed or recorded with the Department as the principal office of a corporation or domestic limited partnership; or if there is no principal office designated, the main office of the corporation or domestic limited partnership in this State for the

transaction of business." Md. Corp. & Assoc. § 1-101(r).   BSI has at all times designated a "principal office" under this definition.

Since 1996 BSI has provided a variety of services pertaining to computers and the Internet.   Exhibit G-3, PWD, at ¶2.

**B.  The law on residency.**

In the Motion, WAUSA urges this Court to apply a newly announced federal standard for diversity of citizenship, as the test for "residency" under MCEMA.   The new test under the second prong of the diversity test is intended to fill a dire need for consistency among the federal circuits.[3]   Hertz Corp. v. Friend, 559 U.S. ___, 130 S. Ct. 1181, 175 L. Ed. 2d 1029, 2010 U.S. LEXIS 1897 (February 23, 2010). Variation among the circuits had led to forum shopping and the artificial manipulation of corporate "citizenship" to create or spoil federal diversity jurisdiction.   The plaintiff in Hertz lived in California.   The Hertz Corporation was formed in Delaware, maintained its executive offices in New Jersey, and conducted a large share of its business in California simply by virtue of the large population there.   If Hertz was found to be a citizen of California, diversity would be spoiled and the case would remain in state court.   The Supreme Court adopted the "nerve center" test to determine the "principal place of business" under the second prong of the diversity test, and found that Hertz was a citizen of New Jersey and not California, and therefore federal diversity jurisdiction existed.

In Hertz, the Supreme Court cleared away a thicket of inconsistent tests for determining a corporation's principal place of business, establishing a single test: a fact-driven determination

---

[3]  The various circuits had developed disparate standards: the 9th circuit test was the "substantial predominance of activities;" the 5th, 6th, 8th, 10th and 11th circuits applied a "total activity" test; the 1st, 2nd and 4th circuits used a variation of that test; the 3rd circuit applied a "center of corporate activity" test; and only the 7th circuit used the "nerve center" test.  Id.

of the corporation's "nerve center." The <u>Hertz</u> opinion does not contain any of the words, "resident," "residence" or "residency."

WAUSA has essentially admitted diversity in this case, and there is no need for any further application of a diversity test.   Diversity is determined at the time the complaint is filed. *LeBlanc v. Cleveland*, <u>248 F.3d 95</u> (2nd Cir. 1999) (". . .the applicable law as to what amount must be in controversy, and as to how diverse the parties must be, will be that in effect at the time of the filing of the relevant complaint. . . . ")   Thus, even if it a diversity test were applicable here, the ruling in  <u>Hertz</u> would have no application due to its date.

A federal diversity test has no direct application to a determination of residency under Maryland law.  As shown below, the case law demonstrates firmly that determination of a corporation's residence is largely based on the state of incorporation. The legislative history of MCEMA contains no analysis or discussion of the use of the term "resident," that would indicate that the General Assembly intended to deviate from established law on point, or that any more restrictive interpretation of "residency" should be applied.. (See Exhibit G-1, legislative history.)

It has been generally recognized for many years that a "corporation . . . has its residence in the state of its creation."  18A Am. Jur. 2d, Corporations § 256, p. 132.  "The residence of a corporation is created for it by act of law .... . A more permanent residence than that of a domestic corporation in the State which created it can hardly be conceived." <u>Greenough v. Board of Police Comm'rs</u>, 30 R.I. 212, 220 (R.I. 1909); see also *Fletcher Cyclopedia of the Law of Corporations* § 4025 ("**The legal existence, the home, the domicile, the habitat, the residence, and the citizenship of the corporation is generally deemed to be in the state by which it was created**.") [Emphasis added.]; <u>Flowers Industries, Inc. v. F.T.C.</u>, 835 F.2d 775,

6

777 (11th Cir. 1987) (noting that until Congress modifies the venue statute in question (28 U.S.C. § 1391(e)(4)) to broaden the meaning of "residence," the well-settled meaning applies: a corporation resides in its state of incorporation); see also Aro Mfg. Co. v. Automobile Body Research Corp., 352 F.2d 400, 404 (1st Cir. 1965) (regarding service under federal antitrust statute, "The word 'inhabitant' is synonymous with 'resident.' A corporation is a resident of the state in which it is  incorporated."); Smith v. Arundel Co-op., Inc., 660 F. Supp. 912 (D.D.C. 1987) ("Defendant has been properly established in accordance with Maryland's laws, and unless and until such time as Maryland revokes its charter for failure to pay taxes, defendant is properly deemed a resident of that state.")

Even where a diversity test is applied, courts have equated citizenship with residency: In Smith v. Arundel Co-op., Inc., 660 F. Supp. 912 (D.D.C. 1987) the court tested diversity using residence as a synonym for citizenship, but gave defining weight to the state of citizenship, under the first prong of the test.  ("Defendant has been properly established in accordance with Maryland's laws, and unless and until such time as Maryland revokes its charter for failure to pay taxes, defendant is properly deemed **resident** of that state.") [Emphasis added.] Id at 916.

It is noteworthy that the principles stated above are rooted in cases dating back to the 1800's.  In Railroad Co. v Koontz the Supreme Court stated:

> By doing business away from their legal residence they [corporations] do not change their citizenship, but simply extend the field of their operations. They reside at home, but do business abroad. . . . but [a corporation] may transact business wherever its charter allows, unless prohibited by local laws. Such has been for a long time the settled doctrine of this court. '**It must dwell in the place of its creation**, and cannot migrate to another sovereignty;' 'but its residence in one State creates no insuperable objection to its contracting in another.' Bank of Augusta v. Earle, 13 Pet. 519, 520. Corporations do not change their citizenship by doing business away from their legal residence,.

[Emphasis added.]  104 US 5, 14 Otto 5, 26 L Ed 643 (1881).  In <u>Bank of Augusta v.</u>

<u>Earle</u>, Chief Justice Taney said :

> It is very true that a corporation can have no legal existence out
> of **the boundaries of the sovereignty by which it is created** .. . .
> But although **it must live and have its being in that State only**, yet
> it does not by any means follow that its existence there will not be
> recognized in other places; and its residence in one State creates no
> insuperable objection to its power of contracting in another. It is
> indeed a mere artificial being, invisible and intangible, yet it is a
> person for certain purposes in contemplation of law . . .
>  In Louisville, etc., Railroad Company v. Letson, 2 How. 497, prior cases
> were reviewed; and  this doctrine laid down:
> "That a corporation created by and doing business in a particular state, is to be
> deemed to all intents and purposes as a person, although an artificial person, * * *
> capable of being treated as a citizen of that state, as much as a natural person."
> And "when the corporation exercises its powers in the state which chartered it,
> that is its residence, and such an averment is sufficient to give the Circuit Courts
> jurisdiction."

[Emphasis added.] 13 Pet. 519 at 588.  BSI is incorporated in Maryland.  See WAUSA Exhibit 1;

Exhibit G-2.   Thus, under §well-established law, rooted in our early jurisprudence, this factor

alone is sufficient to establish BSI as a resident of Maryland.  In addition, BSI maintains several

servers in Maryland, receive the critical emails there, and conducts operations there as described

later in this memorandum.

**C.  MCEMA allows corporations to be "recipients" and plaintiffs.**

The text of MCEMA reads as follows:

§ 14-3001 Definitions

(a) In general.- In this subtitle the following words have the meanings
indicated.

(b) Commercial electronic mail.-
(1) "Commercial electronic mail" means electronic mail that advertises
real property, goods, or services for sale or lease.

8

(2) "Commercial electronic mail" does not include electronic mail to which an interactive computer service provider has attached an advertisement in exchange for free use of an electronic mail account.

(c) Interactive computer service provider.-

(1) "Interactive computer service provider" means an information service, system, or access software provider that provides or enables computer access by multiple users to a computer service.

(2) "Interactive computer service provider" includes a service or system that provides access to the Internet and systems operated or services offered by a library or educational institution.

§ 14-3002 Unauthorized, false, or misleading information through electronic mail

(a) Application.- This section does not apply to an interactive computer service provider or a telecommunication utility to the extent that the interactive computer service provider or the telecommunication utility merely handles, retransmits, or carries a transmission of commercial electronic mail.

(b) Prohibition.- A person may not initiate the transmission, conspire with another person to initiate the transmission, or assist in the transmission of commercial electronic mail that:

(1) Is from a computer in the State or is sent **to an electronic mail address that the sender knows or should have known is held by a resident of the State**; and

(2) (i) Uses a third party's Internet domain name or electronic mail address without the permission of the third party;

(ii) Contains false or misleading information about the origin or the transmission path of the commercial electronic mail; or

(iii) Contains false or misleading information in the subject line that has the capacity, tendency, or effect of deceiving the recipient.

(c) Presumption.- A person is **presumed to know** that the intended recipient of commercial electronic mail is a resident of the State if the information is available on request from the registrant of the Internet domain name contained in the recipient's electronic mail address.

(d) Blocking.- An interactive computer service provider:

(1) May block the receipt or transmission through its interactive computer service of commercial electronic mail that it reasonably believes is or will be sent in apparent violation of this section; and

(2) May not be held liable for an action under item (1) of this subsection that is voluntarily taken in good faith.

9

§ 14-3003 Penalty
A person who violates this subtitle is liable for reasonable attorney's fees and for damages:
(1) To the recipient of commercial electronic mail, in an amount equal to the greater of $500 or the recipient's actual damages;
(2) To the third party without whose permission the third party's Internet domain name or electronic mail address was used, in an amount equal to the greater of $500 or the third party's actual damages; and
(3) **To an interactive computer service provider**, in an amount equal to the greater of $1,000 or the interactive computer service provider's actual damages.
[Emphasis added.]

The statute is devoid of any language that would exclude corporations as plaintiffs for purposes of the private cause of action, and grants twice the damages to service providers, versus end recipients.  This would appear to create a powerful incentive for service providers to sue to enforce the law.  The Court may take judicial notice under Fed. R. Ev. 201 that most service providers are corporations.  Likewise, there is no provision in MCEMA that requires that the "recipient" of an email be a "living, breathing" individual before that email can give rise to a cause of action, contrary to WAUSA's argument.

In statutory interpretation, the court's primary goal is "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules." Barbre v. Pope, 402 Md. 157, 172, 935 A.2d 699, 708 (2007); Gen. Motors Corp. v. Seay, 388 Md. 341, 352, 879 A.2d 1049, 1055 (2005). See also Dep't of Health and Mental Hygiene v. Kelly, 397 Md. 399, 419-20, 918 A.2d 470, 482 (2007).

The analysis begins with consideration of the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that "'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'" Barbre, 402 Md. At 172, 935 A.2d

at 708, quoting Kelly, 397 Md. at 420, 918 A.2d at 482. See also <u>Kane v. Bd. of Appeals of</u> <u>Prince George's County</u>, 390 Md. 145, 167, 887 A.2d 1060, 1073 (2005). If the language of the statute is clear and unambiguous, the court need not look beyond the statute's provisions and the analysis ends. <u>Berber</u>, 402 Md. at 173, 935 A.2d at 708-09; <u>Kelly</u>, 397 Md. at 419, 918 A.2d at 482; <u>City of Frederick v. Pickett</u>, 392 Md. 411, 427, 897 A.2d 228, 237 (2006); <u>Davis v. Slater</u>, 383 Md. 599, 604-05, 861 A.2d 78, 81 (2004). "Occasionally we see fit to examine extrinsic sources of legislative intent merely as a check of our reading of a statute's plain language." <u>Robey v. State</u>, 397 Md. 449, 454, 918 A.2d 499, 502 (2007), citing <u>Stanley v. State</u>, 390 Md. 175, 185, 887 A.2d 1078, 1084 (2005). "In such instances, we may find useful the context of a statute, the overall statutory scheme, and archival legislative history of relevant enactments." Id.

The legislative history of MCEMA further demonstrates, by its silence on the point, that the General Assembly had no intention to exclude corporations as plaintiffs, or to require that a "recipient" be an individual, for the viability of the private cause of action. See Exhibit G-1, attached.

**D.  An email is "held" by its host and by its subscriber.**

MCEMA clearly intends that both the host and the "recipient" be regarded as "holders" of an email address.

The Court may take judicial notice that Google is a major email service provider through its "Gmail" service, the features of which can be ascertained by anyone using the Internet.   Google owns the domain name, "gmail.com."   All email to any email address that ends in "@gmail.com" is handled by Google's servers.   In that sense, Google "holds" millions of email addresses.   At the same time, Google allows others, both

individuals and corporations, to create and use email addresses by filling in a simple form online, which entails picking a set of characters and inserting them in front of the "@" sign in the string of characters, "@gmail.com."  Once Google accepts the proposed new name, the end user "holds" the email address.  Thus, it is to be expected that a given email address will be "held" by both the service provider and the end user.  This two-level set of rights is consistent with MCEMA's private cause of action awarding $500 per violation in favor of the recipient, and $1,000 per violation in favor of the service provider, with no comment on whether the same email may be actionable by both.

World Avenue's interpretation of MCEMA, requiring a "living, breathing" recipient in Maryland (versus requiring that the email address be held by an individual or corporate resident of the state) for an email to be actionable, would deny the private enforcement action to corporate recipients whose employees might reside in different states at different times, even if the corporation itself resided in Maryland.  It would also deny protection to Maryland ISPs for any email they handled on behalf of customers whose state of residence was outside Maryland or unknown to the ISP.  For example, the service provider advertised at "http://somd.com/somd.us" (see Exhibit G-4, attached) conducts business within Maryland and offers free email accounts.  However, somd.US does not necessarily know where its customers reside (versus work), and thus would not have protection if such knowledge about the end recipient were required. Clearly the Maryland legislature intended for Maryland service providers to have the right to sue under MCEMA based on emails directed to their non-Maryland customers, not just to their Maryland customers, that violate the falsity and deception provisions of MCEMA.

This implies that both the end recipient and the service provider can "hold" the email address.

A service provider "holds" all the email addresses it hosts.  For example, the email address jsmith@gmail.com is primarily held by Google, and is assigned to the user who has chosen to list the name "jsmith" by agreement between Google and that user.  As another example, some Maryland-based ISPs offer nationwide dial-up access, as can be seen at www.olg.com. See Exhibit G-5.   The Maryland legislature surely did not intend that only the OLG accounts that it handled on behalf of Maryland customers be protected by MCEMA, and not the others. In the same way the Florida legislature, in enacting the Florida Commercial Electronic Mail Act, Florida Statutes, §§668.603, and 668.606 (FL-CEMA), intended to protect all of GMail's, Hotmail's and Yahoo's email addresses, and the businesses themselves, not just those few email "holders" that GMail/Hotmail/Yahoo were able to prove were Florida residents. From an ISP's perspective, and the wording of the law, the service provider is the "holder" of its email addresses.

The commentary by WAUSA's expert, Dr. Krawetz, on the role of the email host, may shed some light on who "holds" an email address:

> Each email address contains two required components: an account name and a host. The host may be a specific computer or a domain name where the account is located. The account represents an individual mailbox (recipient) located at the host. . . .
> Email is transmitted by a set of relays, called Mail Transport Agents (MTA). An MTA may receive emails from other MTAs (relaying) or from a sender's Mail User Agent (MUA).
> . . . an MTA may pass a message to another MTA or save it on the system (mail spool). The recipient's MUA eventually retrieves the email from the mail spool. For example, I can send an email from my Gmail account to my YahooMail account. Gmail's web interface acts as the sender's MUA. The email is sent from the MUA to Gmail's MTA (the first relay hop). Gmail then sends the email to YahooMail (second relay hop) where it is stored in Yahoo's mail spool. I

> can then use Yahoo's web interface as the recipient's MUA in order to receive the
> email. The path becomes MUA→MTA→MTA→MUA. It is very possible to
> route an email through multiple MTAs. . . .
> The normal delivery case relies on mail exchange records (MX records in DNS,
> see RFC 974). The owners of each MTA domain create these records. In general,
> the sender has no control of the email's delivery route. The route is determined by
> the recipient's MX records, <u>as determined by the host in the email address</u>.12  . . .

[Emphasis added.] Exhibit G-6, Krawetz report, March 31, 2010 excerpts at 14-15.  From this

description, it is apparent that the host of the email domain at which the specific email address is

located plays an essential role in the delivery of incoming emails, and in that sense can be said to

"hold" the email address, along with the account holder.

        Under MCEMA, the sender is presumed to "know" that the recipient is a Maryland

resident "if the information is available on request from the registrant of the Internet domain

name contained in the recipient's electronic mail address."   The registrant of the relevant domain

names here is BSI, who has "the information" as to its Maryland address "available on request."

Upon request, BSI would accurately state its information, as registered with SDAT, in

accordance with Maryland law.   See Exhibit G-3, PWD at ¶50.

        The scope of MCEMA as regulating activity tied to Maryland was addressed by the

Maryland Court of Special Appeals in a challenge to the constitutionality of the statute under the

dormant commerce clause of the U.S. constitution.  The Court stated,

> CL section 14-3002(c) states that Maryland residency is presumed if the sender of
> UCE can discover that an email address is registered to a Maryland resident.  In
> this case, First Choice could have done so.

<u>Marycle v. First Choice Internet</u>, 166 Md. App. 481, at 525 890 A.2d 818 (2006). The court went

on to address the significance of a defendant's <u>intent</u> in connection with conduct targeted toward

the forum jurisdiction:

. . . because the exercise of jurisdiction requires that the defendant have purposefully directed some action towards the forum, "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant <u>purposefully directed</u> toward the forum State." Id., 480 U.S. at 112, 107 S.Ct. at 1032. . . . [H]owever . . . jurisdiction could be justified if "[a]dditional conduct of the defendant   indicate[s] <u>an intent or purpose to serve the market in the forum State, for example ... advertising in the forum State, ... or marketing the product through a distributor</u>[.]"

Id. at fn. 22.  Thus, the language in MCEMA creating a presumption of "knowledge"

may be taken as a clarification of the element of <u>intent</u> for purposes of establishing

"purposeful availment" where personal jurisdiction is at issue.

BSI's Maryland address in its domain registrations can be verified by using a

WHOIS lookup, a standard investigative tool invoked repeatedly by both sides in this

case, as to the domain names in the emails.  An  example is the lookup for

hypertouch.com in Exhibit G-7, attached.   This tool has been validated by the Court of

Special Appeals in <u>Marycle</u>, *supra,* stating "MaryCLE then utilized the free 'WHOIS'

feature on www.networksolutions.com, a website on which any member of the public can

find contact information for the registrants of domain names. . ."  id. at 839; and ". . . as

we said earlier, First Choice could have determined that MaryCLE was a Maryland

resident by accessing, inter alia, www.networksolutions.com., and then excluded

MaryCLE from its mailing list." Id at 844.

### III. WAUSA MISAPPLIES THE STANDARDS FOR RESIDENCY.

BSI disagrees that the diversity test applies here. (See section II. A., *supra*.)  But even if

applied, it would not support WAUSA's position.

**A.  WAUSA ignores the state of incorporation factor.**

WAUSA promotes the test for diversity of citizenship under 28 U.S.C. §1332, which serves as the basis for the diversity jurisdiction that places this case in this Court rather than state court, as a test for residency under MCEMA.  That section of the U.S. Code provides:

28 USC § 1332. Diversity of citizenship; amount in controversy; costs

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—

(1) citizens of different States;
. . .
(c) For the purposes of this section and section 1441 of this title—

(1) a corporation shall be deemed to be **a citizen of any State by which it has been incorporated and of the State where it has its principal place of business**
. . .
[Emphasis added.]

WAUSA ignores the first prong: the state by which the corporation "has been incorporated." There is no dispute that BSI was created as a Maryland corporation in 1996 and has remained so ever since.

The case law firmly establishes that once a party presents incorporation status, the inquiry is over -- the court does not second-guess the State's decision to permit incorporation under state law. See, e.g., Fritz v. American Home Shield Corp., 751 F.2d 1152, 1154 (11th Cir. 1985) ("We therefore hold that for diversity purposes, the requirement that 'a corporation shall be deemed a citizen of any State by which it has been incorporated' refers to the state in which the appropriate regulatory agency has issued a certificate of incorporation or other legal document signifying that the corporation has been properly established pursuant to that state's law, and that no further inquiry is appropriate."); Smith v. Arundel Cooperative, Inc., 660 F. Supp. 912, 913 (D.D.C. 1987) (granting motion to dismiss because no diversity of citizenship; "Defendant has

16

been incorporated by the state of Maryland, and while it is currently not in good standing in that state, Maryland has not seen fit to revoke its corporate charter. . . . Defendant has been properly established in accordance with Maryland's laws, and unless and until such time as Maryland revokes its charter for failure to pay taxes, defendant is properly deemed a resident of that state.").

Thus, if the diversity test were used, the analysis of "residency" should end here: BSI is a Maryland resident by virtue of its incorporation in this State and its current status as a Maryland corporation.

**B.  Diversity is Already Admitted.**

WAUSA has already admitted diversity in its Answer.  The Amended Complaint (at DE 34) reads in relevant part:

> 8. This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction). Plaintiff is a resident of Maryland. Defendant WAUSA is a limited liability company formed and existing under the laws of the State of Delaware; Defendant WAH is a limited liability company formed and existing under the laws of the State of Florida, and Defendant JI is a resident of the State of Florida and regularly conducts business in the State of Maryland. Plaintiff claims more than $75,000 in damages, exclusive of costs, interest and attorney's fees.

The Answer filed at DE 76 reads in relevant part:

> 8. World Avenue admits that the Court has subject matter jurisdiction over this matter in that Plaintiff avers there exists diversity among the parties and the amount in issue is over $75,000. World Avenue denies that it regularly conducts business in the State of Maryland, and is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations concerning other Defendants set forth in Paragraph 8 and therefore the allegations should be deemed denied.

The Answer does not contain any other denials or averments that would weigh against diversity jurisdiction.  Diversity jurisdiction is established.

17

### C.  WAUSA's "nerve center" analysis is inapposite and erroneous.

WAUSA has bypassed the first prong, directing the Court instead to the second prong of the federal diversity jurisdiction standard, which essentially fixes residency at the corporation's "principal place of business," which, after February 23, 2010, means its "nerve center," in cases where the diversity test applies.  Hertz Corp. v. Friend, 130 S. Ct. 1181, 175 L. Ed. 2d 1029, 2010 U.S. LEXIS 1897 (February 23, 2010).

The bulk of the Motion is concerned with the accumulation of minutia to place the "nerve center" of BSI at Paul Wagner's residence in D.C.  Among other flaws, this protracted exercise is myopic in its view of remote access software used by BSI, in several ways: First, BSI installed the software on its computers so that both BSI, and certain clients for limited purposes, could access them from remote computers.  Second, the remote computers communicating with each other could be across the country, or could be in the same room.  Service providers like Yahoo commonly run remote access software on their servers, obviating the need for a separate monitor, keyboard, mouse and cables for every computer.  See Exhibit G-8, photo of Yahoo data center.   WAUSA likewise employs remote access in order to monitor and control servers.  See Exhibit G-9, excerpts from Schlotter deposition, non-confidential sections.[4])  Third, BSI has

---

[4]    Q   And what are the steps involved in your            169
accessing that information?
     A   I would just need to log in to the server and
see -- look in the directory, see if I could find the
data.
          . . .

     Q   And you would be looking at a server that is         170
located where?
     A   As I stated before, in FiberMedia.
     Q   And you would be viewing that server or
communicating with it in some fashion through another
server located at Sunrise, correct?

remote access software installed on its computers in DC as well, for similar reasons as in Maryland. See Exhibit G-3, PWD at ¶¶13 – 22.. World Avenue seems to believe that one must sit at a "control center" at the D.C. location in order to gain remote access to the Maryland servers.  In fact, the D.C. location is not essential to the functionality of the Maryland servers.

In addition to physical visits to the Maryland locations by Paul Wagner, BSI uses its remote access software to control its Maryland servers via laptop from the same Local Area Network or from distant locations, including Colorado, California, Florida and overseas, across the Internet.  PWD at ¶33.   World Avenue also makes unfounded assumptions about the time and effort spent at the D.C. location to operate or manage the Maryland servers, versus time and effort exerted from other locations directed at those same servers.

Along with the Motion, WAUSA has filed selected photographs and videos of the servers at the two Maryland POP locations, as well as Mr. Burton's Maryland address and Mr. Wagner's D.C. address.  If the place of incorporation is established as Maryland, the accumulation of facts in an effort to convince the Court as to a particular "nerve center" as a matter of law is sorely misdirected, and a colossal waste of time and energy.   But even this accumulation of facts only serves to strengthen BSI's status as an ISP operating servers in Maryland.

World Avenue misrepresents the law.  First, it states that a corporation's "'Principal Office' is the location where corporate documents must be inspected.  See Md. Code,

---

A   Not necessarily another server, but for assuming purposes, yes, it would be in Sunrise.
Q   But you would need a computer to access the remote computer.
A   Yes.
Q   And is that connection made via the Internet?
. . .                                                                        171
A   Well, yes, technically, yes, it is.  Sorry.

19

Corporations & Associations, § 2-512 (c)(2)."   That section of the law says no such thing.

Corporations & Associations § 2-512(c)(2) states that for the "Inspection of stock records":

> Any stockholder or holder of a voting trust certificate in a corporation other than an open-ended investment company may present to any officer or resident agent of the corporation a written request for a statement showing all stock and securities issued by the corporation during a specified period of not more than 12 months before the date of the request [and that] [w]ithin 20 days after a request is made under this subsection, the corporation shall prepare and **have available on file at its principal office a sworn statement of its president or treasurer or one of its vice-presidents or assistant treasurers which states [the number of shares and consideration paid]**.
> [Emphasis added.]

This provision imposes no obligation that the "principal office" be the "location where corporate documents must be inspected."

Second, World Avenue claims that "[u]nder Maryland law, a 'Principal Office' is 'the office in the State where the business of the corporation is directed and managed.'  See Md. Code, Tax-Property, § 1-101(x)(1) (emphasis added)."  Reply at 3.  Under the relevant section of the Maryland Code, Corporations & Associations §101 - Definitions, "Principal Office" is defined as "The place in this State **filed or recorded with the Department** as the principal office of a corporation or domestic limited partnership; or if there is no principal office designated, the main office of the corporation or domestic limited partnership in this State for the transaction of business."  Md. Corp. & Assoc. § 1-101(r).  Thus, the mere designation of an address that is "filed or recorded" with the Department of Assessments and Taxation is sufficient to establish the principal office.  BSI has "filed or recorded" the address of 9501 Anchorage Place, Bethesda, Maryland as its principal office, clearly meeting the definition.  WAUSA "Exhibit 3."  World Avenue conspicuously avoided using the more appropriate definition in the

Corporations Article, intentionally directing the Court to the wrong section, and then mischaracterizing the clear language in the off-topic Taxation-Property Article § 1-101(x)(1). Under that section, the distinct term, "Principal office of a domestic corporation" means: "the office in the State where the business of the corporation is directed and managed; if there is no office in the State where the business is directed and managed, the place in the State where the principal business of the corporation in the State is transacted; or if there is no office or place that meets the requirements of item (1) or (2) of this subsection, the principal office named in the corporation charter **or reported to the Department**." It is not simply and solely the office where the business of the corporation is directed and managed, if that is even relevant. Thus, World Avenue has grossly misstated the law in an attempt to misdirect the Court.

Third, World Avenue attempts to claim that the "principal office" is the operative issue for determining whether a Maryland ISP can sue on spam it receives on its servers in Maryland. This is yet another misrepresentation of the law. World Avenue states "BSI's cause of action can only be based on electronic mail that is 'held by a resident of the state [of Maryland].' See Md. Stat. § 14-3002(b)(1)." However, § 14-3002 makes clear that the operative element is the presumption that "the intended recipient of commercial electronic mail is a resident of the State if the information is available on request from the registrant of the Internet domain name contained in the recipient's electronic mail address." § 14-3002(c). The "registrant" is BSI and can be reached at the points of contact provided in the registration data for the domain names. However, registration of a domain name to a Maryland resident does not establish whether the intended recipient of a particular email is a resident of Maryland; rather, the residency question

21

is to be directed to the registrant.  If the registrant can answer the question, the presumption  of residency arises.

World Avenue's penchant for misstating the facts and law belie its desperation to avoid the serious liability it faces as the orchestrator and facilitator of its massive marketing schemes that rely on false and deceptive email advertising.

## IV.   MULTIPLE DISPUTED FACTS.

The Motion, which effectively highlights the quantity of disputed facts and exposes the erroneous speculations of WAUSA and its expert witness, is in effect an effort to obtain additional discovery.  By spraying out a wide array of alleged "facts," WAUSA hopes to elicit admissions and other evidence from BSI that might be used in later filings.  Unfortunately for WAUSA, the actual facts it presents (aside from its mischaracterizations and erroneous assumptions and speculations) only serve to confirm a) that BSI is a bona fide ISP, and b) that the bulk of BSI's primary mail server operations are in Maryland.   Key facts as to BSI's presence in Maryland are addressed below.

- The servers that received and processed the emails at issue are physically located in Maryland.  Exhibit G-3 at ¶3.

- The relevant IP addresses are registered with Maryland addresses. Exhibit G-10, sample of IP assignments at Sherwood by Speakeasy.

- The relevant domain names are registered with Maryland addresses.  PWD at ¶¶11, 50, 52.

- Paul Wagner visits BSI's POP locations in Maryland frequently  PWD at ¶7.

- BSI pays Maryland personal property taxes on its equipment in Maryland, Maryland income taxes, and other Maryland taxes as required. PWD at ¶5.

- BSI provides services in Maryland in addition to its mail servers.  PWD at ¶2.

The facts as presented by WAUSA are distorted and in some instances outright erroneous, consistent with its overall presentation in this case.  WAUSA relies in many instances on advocacy by Dr. Krawetz, stating speculation and argument as "facts." BSI relies on the attached Declaration of Paul Wagner, with exhibits, for rebuttal s as to specific facts.   The following table is intended to summarize most of the disputed facts.

WAUSA contends:                                        BSI responds:

| WAUSA contends: | BSI responds: |
| --- | --- |
| p. 3 "The email addresses contained in the E-Mails At Issue do not belong to real people ..." | PWD at ¶25.  BSI, as a Maryland corporation, is a real person. |
| p. 4: BSI history as ISP | PWD at ¶3. |
| p. 5: "The Mail Boxes, Etc. records contain an Application, signed under penalty of criminal sanctions, that the "Applicant Home Address" and the "Business Address" for BSI was in Washington, D.C." Exhibit 1 | The document  is MBE's "Application for Delivery of Mail through an Agent;" such forwarding is a routine service of MBE. The notation by Paul Wagner under "Business Address" was: "Forward to Home."  The R Street address is that home address. PWD ¶30 |
| p. 5 Burton unaware of mail box. | PWD at ¶30, 33. |
| p. 6 William seldom sees Paul Wagner | PWD at ¶34 |
| pp. 4-10  physical addresses in MD for resident agents and principal office in Maryland | PWD at  ¶7-20. |
| p. 7 access through windows | PWD at ¶36 |
| p. 7 William did not authorize Paul to list Sherwood with SDAT | PWD at ¶35 |
| p. 7 no monitor or keyboard | PWD at ¶37 |
| p. 8 tell William of business; insurance | PWD at ¶40 |
| p. 10 condo workstations | PWD at ¶44 |
| p. 11 visit Burton | PWD at ¶45 |
| At 13:  BSI can access servers in MD by remote access from DC. | PWD at ¶13-20.  BSI routinely accesses all servers using remote access from various locations, not limited to DC. |

| | |
|---|---|
| p. 14 manufacture claims | PWD at ¶48. |
| p. 14: recipients not real people | PWD at ¶49.  BSI owns the domain names; all emails to those domain names are received by BSI.  This is not unusual among ISP's. |
| p. 15 the email addresses do not belong to any real person. | PWD at ¶49. BSI is Maryland corporation, and therefore a "person" under Maryland law.  "Real" is undefined.  The word "natural" would mean a human being, but that term is not used. |
| p. 15: BSI owns the domain name, hypertouch.com | PWD at ¶50.   BSI originally registered this domain name and has always owned it, along with several others that are not obvious but can be verified via WHOIS lookup. |
| p. 18 domain names, registrant | PWD at ¶52. |
| pp. 24-25: "BSI conducts all its purported business from the DC Residence of Paul Wagner" | WAUSA speculates, presenting no evidence as to where BSI spends time working, or what tasks are performed by machines at any particular location. BSI has more servers in Maryland than in DC.  See PWD ¶53. |
| At  p. 25:  Paul Wagner neither lives nor works in [Maryland] | Paul Wagner does in fact conduct work in Maryland, specifically directed at BSI's equipment and services based in Maryland.  The nature of BSI's operations allows Paul Wagner to do "work" for BSI from any location having Internet access or cellular phone coverage.  PWD at ¶54. |
| At 26: Hypertouch.com, Castalia.net, and LinkCenter.net Domains registered to Paul Wagner | All of these domains are registered to BSI.  PWD at ¶56 |
| | |

**V.  Ownership of the domain names castalia.net, linkcenter.net and hypertouch.com.**

WAUSA argues that BSI should not be regarded as the owner of the domain names castalia.net, linkcenter.net and hypertouch.com,, and that BSI should therefore not be entitled to sue for emails sent to email addresses at those domains.

WAUSA points out that Paul Wagner originally registered castalia.net and linkcenter.net in 1997 in his own name, using his Washington, D.C. address; and that sometime "between 2003 and 2006" the registration was changed to BSI in Maryland.  Actually, Domain Tools reveals that linkcenter.net was registered to BSI at its Silver Spring address as of 2003-06-22.  See Domain Tools lookup for Linkcenter.net, Exhibit G-11.   Emails from the domain name registrar BSI used, Joker.com, show BSI's change of the Owner contact information for linkcenter.net and castalia.net in early 2003.  See Exhibits G-12 and G-13.  These two domain names account for approximately 432 emails among those claimed in this case.  PWD at ¶52.

As for hypertouch.com, the Network Solutions 1997 record cited by WAUSA shows the registrant was Beyond Systems, although using Joe Wagner's physical address in California.  See Exhibit G-14, Joseph Wagner Declaration.  By February of 2004, hypertouch.com was registered to BSI at its 11160 Veirs Mill Road address in Wheaton, MD.  See Exhibit G-7.  Thus, BSI has been the registrant of hypertouch.com, castalia.net and linkcenter.net at all relevant times.  In any case, information about the residency of the intended recipient was available on request from the registrant of the domain names contained in the recipient's electronic mail address.

WAUSA argues that third-party defendant Joseph Wagner's federal trademark for "Hypertouch" (as distinct from the domain name,"hypertouch.com") in 1997 somehow indicates ownership of the domain name by Joe Wagner personally, relying on WAUSA Exhibits 14 and

15. Hypertouch, Inc. did not exist at that time, and "Hypertouch" was simply a trade name. The first use of the name, Hypertouch, in commerce coincides with the day Hypertouch.com was registered by BSI. Hypertouch used the domain name with BSI's permission. See Declaration of Joe Wagner, Exhibit G-14. Line 3A of the registration listing, the REGISTRANT, has always shown "Beyond Systems." The Network Solution "Internic Contact Handle" record (JW6885) in Joe Wagner's trademark application is not the domain name record for Hypertouch.com. Exhibit G-14.

## VI. CONCLUSION

For all of the reasons addressed above, the Motion should be denied.


_____/s/_____
Stephen H. Ring
**STEPHEN H. RING, P.C.**
506 Main Street, Suite 215
Gaithersburg, Maryland 20878
MD Bar Id. No. 04731764; USDC, MD: #00405
Telephone: 301-563-9249


_____/s/_____
Michael S. Rothman
401 E. Jefferson Street
Suite 201
Rockville, MD 20850
Phone: (301) 251-9660
Fax: (301) 251-9610

*Attorneys for Plaintiff*


## Certificate of Service

I certify that a copy of the foregoing documents was served on the date of ECF filing, via the ECF system, on all counsel of record.


_____/s/_____
Stephen H. Ring


Exhibits

G-1    Legislative history of MCEMA

G-2    Articles of Incorporation of BSI, 1996, stamped by SDAT

G-3    Declaration of Paul A. Wagner, July 2010

G-4    Website at http://somd.com/somd.us

G-5    Web page at www.olg.com

G-6    Krawetz report, March 31, 2010, pp. 14-15

G-7    Whois lookup, hypertouch.com

G-8    Yahoo servers, website

G-9    Schlotter deposition, pp 1, 169, 170, 171

G-10   Server registration with Speakeasy showing Sherwood

G-11   Domain Tools, linkcenter

G-12   Joker.com confirmation of ownership of linkcenter.net, change

G-13   same, Castalia.net

G-14   Declaration of James Joseph Wagner, July 16, 2010

G-15   Copies of hard mail forwarded from Wheaton

G-16   Burton deposition excerpts, pp. 1, 42, 43, 56, 62, 63, 69

G-17   William Wagner deposition excerpts, pp. 1, 133-134

G-18   Paul Wagner deposition excerpts, pp. 1, 131, 132