**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

_____

BEYOND SYSTEMS, INC.

     Plaintiff

       v.

World Avenue USA, LLC, *et al.*

     Defendants.
_____

World Avenue USA, LLC,

     Third-Party Plaintiff

       v.

JAMES JOSEPH WAGNER, *et al.*

     Third-Party Defendants
_____

Case No. 8:08-cv-00921 (PJM)

**REPLY MEMORANDUM IN**
**SUPPORT OF THIRD-PARTY DEFENDANTS' MOTION TO DISMISS**
**PURSUANT TO FRCP 12(b)(6**

Third-Party Defendants James Joseph Wagner ("Joe Wagner") and Hypertouch,

Inc. ("Hypertouch"), through counsel, file this reply memorandum in support of their

motion to dismiss the third-party complaint for indemnification or contribution filed by

Defendant/Third-Party Plaintiff World Avenue USA, LLC ("World Avenue" or

"WAUSA").  (Motion at DE 263; Opposition at DE 332.)

This memorandum is organized as follows:

I.  OVERVIEW
II.  WORLD AVENUE MISCONSTRUES CDA IMMUNITY AND IGNORES
STATE-CREATED IMMUNITIES
III. NO ALLEGATIONS THAT HYPERTOUCH CREATED CONTENT
IV. THE KRAFT RULING
V. AUTOMATED ROUTING OF EMAILS FROM HYPERTOUCH TO BSI
VI.  WILD CARD/CATCH-ALL ADDRESSES.
VII.  LATE ALLEGATIONS OF CONDUCT BYBSI, NOT HYPERTOUCH.
VIII. SENDERS' GATHERING AND INSERTION OF EMAIL ADDRESSES.
IX. NO 'REVIEW AND FORWARDING OF "INTERESTING" EMAILS

## I.  OVERVIEW

World Avenue argues in its opposition that the Third-Party Defendants actually

"sent" the emails claimed in this suit to BSI; that immunity under the Communications

Decency Act ("CDA"), 47 USCS § 230 does not apply because World Avenue's claim is

based on the transmittal and not the content of the emails; that Hypertouch is not an ICS

("interactive computer service") under the CDA because it "manufactures litigation" and

does not "routinely deliver email to its customers;" that the Third-Party Defendants added

original content to the emails claimed in this suit, further spoiling immunity; that World

Avenue's participation is passive rather than active; and that there are factual issues that

prevent dismissal under the motion.  World Avenue inserts several additional points in

passing.

This memorandum rebuts each of World Avenue's contentions, which completely

ignore the concept of immunity under the Maryland and Florida anti-spam statutes

themselves.  Both of these statutes explicitly provide immunity for an ISP that

"retransmits" email to another party. This immunity is fatal to the TPC.

## II.  WORLD AVENUE MISCONSTRUES CDA IMMUNITY AND IGNORES STATE-CREATED IMMUNITIES.

The reported decisions establish that unless the service provider participates in creating the actionable content, CDA immunity is almost impenetrable.  Regardless of World Avenue's contention that its claims are not based on content, in fact it is the content (and in particular, its false and deceptive features), that creates the basis for this action, and thus the basis for any conceivable claim for indemnification.  The allegations as to who created and inserted that content must be considered.  There is no allegation in the TPC that it was Wagner/Hypertouch.

In Zeran v. AOL, 129 F.3d 327 (4th Cir. 1997), cited by both sides, immunity was upheld against claims that AOL unreasonably delayed removal of defamatory messages posted by a third party, failed to post retractions, and failed to screen for similar postings. AOL's contract allowing it to modify or remove such content from the site did not make AOL the "information content provider" because the content was created by an independent contractor. Congress made a policy choice by "providing immunity even where the interactive service provider has an active, even aggressive role in making available content prepared by others."  See also Blumenthal v. Drudge, 992 F. Supp. 44, 49-53 (D.D.C. 1998).  Likewise, in Carafano v. Metrosplash.com, 339 F.3d 1119 (9th Cir. 2003) the court upheld immunity for an Internet dating service provider from liability stemming from a third party's submission of a false profile, allegedly defaming the plaintiff.  Because the content was created by a third party, the website was immune, even though it had provided options for creating the profile.

3

In <u>Batzel v. Smith</u>, 333 F.3d 1018 (9th Cir. 2003), immunity was upheld for a website operator for distributing an allegedly defamatory email to a listserv. The Court found immunity proper "under circumstances in which a reasonable person in the position of the service provider or user would conclude that the information was provided for publication on the Internet or other 'interactive computer service'."

In <u>Green v. AOL</u>, 318 F.3d 465 (3rd Cir. 2003), the court upheld immunity for AOL against allegations of negligence. Green claimed that AOL had failed to police its services adequately, thereby allowing third parties to defame him and inflict intentional emotional distress. The court upheld CDA immunity, as AOL was not liable for "decisions relating to the monitoring, screening, and deletion of content from its network -- actions quintessentially related to a publisher's role."

In one of the rare rulings denying CDA immunity at the motion to dismiss stage, in <u>MCW, Inc. v. badbusinessbureau.com</u> (RipOff Report/Ed Magedson/XCENTRIC Ventures LLC) 2004 WL 833595 (N.D. Tex. April 19, 2004), the court ruled that the plaintiff's allegations that the defendants themselves created content that included disparaging editorial messages about the plaintiff, rendered them information content providers.   In <u>Hy Cite Corp. v. badbusinessbureau.com</u> (RipOff Report/Ed Magedson/XCENTRIC Ventures LLC), 418 F. Supp. 2d 1142 (D. Ariz. 2005), the court rejected immunity and found the defendant was an "information content provider" under Section 230 using much of the same reasoning as the MCW case.

In <u>Gentry v. eBay, Inc.</u>, 99 Cal. App. 4th 816, 830 (2002), eBay's CDA immunity was upheld for claims based on forged autograph sports items purchased on the auction site.  In <u>Ben Ezra, Weinstein & Co. v. America Online</u>, 206 F.3d 980, 984-985 (10th Cir. 2000), cert. denied, 531 U.S. 824 (2000),  immunity for AOL was upheld against liability for a user's posting of incorrect stock information.  In <u>Goddard v. Google, Inc.</u>, C 08-2738 JF (PVT), 2008 WL 5245490, 2008 U.S. Dist. LEXIS 101890 (N.D. Cal. Dec. 17, 2008),  Google's CDA immunity was upheld against claims of fraud and money laundering. Google was not responsible for deceptive advertising created by third parties who bought space on Google's pages.

In <u>Doe v. America Online</u>, 783 So. 2d 1010, 1013-1017 (Fl. 2001),[13] cert. denied, 122 S. Ct. 208 (2000) the court upheld immunity against state claims of negligence based on "chat room marketing" of obscene photographs of a minor by a third party.  In <u>Doe v. MySpace</u>, 528 F.3d 413 (5th Cir. 2008), the court upheld immunity for a social networking site.

From the reported decisions, it is thus clear that the immunity afforded a service provider under the CDA is extremely broad and seldom voided.  Even where the publisher has participated in managing or altering content, immunity has been upheld. There are no allegations in the TPC that would vitiate CDA immunity for Wagner/Hypertouch.

While CDA immunity alone disposes of the TPC, both the Maryland and Florida anti-spam statutes are explicitly likewise fatal to all claims World Avenue brings to bear

in the TPC. In particular, unlike the broad immunity covered by the CDA, there is explicit immunity for ISPs that transport, handle, or retransmit email messages under Maryland Commercial Law Code § 14-3002(a) and Florida Electronic Mail Communications Act, Florida Statutes Annotated § 668.606 (2). The very foundation in World Avenue's TPC's two causes of actions is World Avenue's assertion that "Joseph Wagner, Hypertouch, World Avenue, and others share a common obligation to refrain from sending emails that violate Section 668.60 et seq., Florida Statutes and Maryland Commercial Law Code § 14-3002." (paragraph 30) Yet the TPC causes of action, i.e., alleging that Joseph Wagner and Hypertouch automatically retransmit email to BSI, is precisely the ISP activity that is explicitly protected under Maryland and Florida law. World Avenue is surely well aware of these two double fatal flaws to their lawsuit as they desperately omit any discussion or rebuttal of state immunity in the TPC or their opposition.

### III. NO ALLEGATION THAT HYPERTOUCH  CREATED CONTENT

World Avenue argues in its Opposition at p. 2 that its TPC is based on the transmittal and not the content of the emails.   This would undermine the grounds for indemnification, as the original claims by BSI are based on falsity and deception in the emails. There would be no need for indemnification if there were no falsity or deception.

In struggling to support its TPC, World Avenue is thus caught between a rock and a hard place: either no indemnification is needed because the emails contain no falsity or deception, or World Avenue admits that the emails are false and deceptive and makes the

far-fetched contention that the Third-party defendants are somehow responsible for these features and for the initiation of the emails.  World Avenue has apparently chosen the second avenue.

World Avenue also argues on page 2 that the CDA does not immunize a party that adds content to emails.  This general principle is flushed out in the case law, but no facts are alleged in the TPC that would justify its application here.  World Avenue's arguments on creation of content are understandably vague, as there are no facts that can be alleged to support them. The allegations as to the addition of actionable content must be in the TPC, and they must be stated with specificity to pass muster under <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007).

The Third-Party Defendants acknowledge that certain markings were added to the emails claimed in this case during transmission and as part of the document management process.  Both Hypertouch and BSI's servers add "Received" and other normal headers while routing the email, pursuant to SMTP standards.  Dr. Neal Krawetz admits that Eudora and other Mail User Agent ("MUA") programs prepend a line called a "From separator" that is distinct from the email, to separate the emails being stored,  Prior to producing the emails giving rise to the suit, BSI added a header after each From separator containing the Bates number of each email.  All of these markings are easily distinguished from the original content.  (See Declaration of Paul Wagner at Exhibit H-8.)

World Avenue does not allege that Wagner/Hypertouch created the content that gives rise to BSI's claims.  In fact, the word, "content" appears exactly once in the TPC, at pp. 4-5: "Joseph Wagner/Hypertouch <u>generally</u> <u>knew the content</u> of the e-mails, and specifically, that the emails . . . consisted of at least 99% alleged "spam" when Joseph Wagner/Hypertouch sent them to Paul Wagner/Beyond Systems."  [Emphasis added.] This bare allegation of "knowledge of spam" is insufficient under <u>Zeran</u> to spoil immunity. Even so, the suggestion that Wagner/Hypertouch "knew the content" (which must mean the falsity and deception in the content for the emails to be actionable) of each of the thousands of emails at the instant it was routed to BSI is clearly fantastic. The routing happens immediately, passing a huge volume of emails along the chain of  mail transfer agents (MTA's), including Hypertouch's servers in California and possibly others, to one of BSI's servers in Maryland.  There is no time for human intervention or review of the content during that instantaneous and automatic process.  Any evaluation to try to identify the responsible parties and to determine falsity as to a particular email can only be undertaken later. The TPC does not allege that Wagner/Hypertouch had specific knowledge of the contents of any individual email message; rather it only alleges general knowledge about the totality of the emails being spam.  However, all ISPs that host email accounts have this same general knowledge — that the vast majority of email today is spam.

World Avenue argues at p. 10 that CDA immunity does not apply because Wagner/Hypertouch added and changed the original content of the emails, citing

Krawetz excerpts that are gathered into World Avenue's Exhibit 7.  However, a review of those excerpts reveals that they do not attribute any such content to Hypertouch.  In Exhibit 7, Dr. Krawetz, mentions "Hypertouch" only three (3) times, none of which implicate Hypertouch in altering the content.  Furthermore, the modifications (the addition of minor header information inserted by an automated function in software used to save or view the emails, or dividers between the emails so they can be distinguished from each other, or page numbering in the style of Bates numbers), is not deceptive, and therefore not at issue.

Moreover, Dr. Krawetz ascribes IP addresses and host names, such as 69.33.227.202, 69.33.227.203, mail.reasonabledoubt.com, flunky.hypertouch.com and mail.hasit.com, to the wrong company, i.e., to BSI rather than Hypertouch.  See P. Wagner Declaration  at  .  Such errors call into question the validity of his email analyses.

World Avenue argues at p. 11 that its TPC alleges that Hypertouch is not an "interactive computer service provider" within the meaning of the CDA.   The TPC does not mention "CDA" or "Decency."  However, the TPC does recite:

> 14. Since at least 2004, Joseph Wagner/Hypertouch operated email servers located in California. Joseph Wagner/Hypertouch configured some or all of the mail servers to, among other things, collect, receive, transmit, and/or store the emails over which it is suing in other litigation and, upon information and belief formed after an inquiry reasonable under the circumstances, some of the emails over which Beyond Systems is suing in this suit as described below.

TPC at ¶14.  This admission by World Avenue, that Hypertouch operated email servers

in California, may be sufficient, by itself, to confirm that Hypertouch is an ICS or an ISP.

World Avenue argues further at p. 11:

> In turn, courts, including the Fourth Circuit, have limited the definition of
> ICS to an entity that engages in the exercise of a publisher's traditional
> editorial functions, such as deciding whether to publish, withdraw,
> postpone, or alter content. Zeran, 129 F. 3d at 329 (4th Cir. 1997).

We agree that <u>Zeran</u> allows publishers to make some alterations to content without loss of

CDA immunity.  See also, <u>Blumenthal v. Drudge</u>, 922 F. Supp. 44, 52 (D.D.C. 1998) (§

230 immunity retained by a service provider despite the exercise of editorial and self-

regulatory functions); 141 Cong. Rec. H8460-01, H8470 (1995) (statement of Rep.

Barton) (Congress enacted § 230 to give interactive service providers "a reasonable way

to . . . help them self-regulate themselves without penalty of law.")   But the key point

here is that there is no allegation in the TPC that Wagner/Hypertouch inserted <u>any</u>

content, no contention in the Opposition that they inserted any content other than some of

the  markers described above, and no contention anywhere that they inserted <u>actionable</u>

content.

World Avenue harps on its familiar refrain again at pp.12-13, that, "Hypertouch is

not a legitimate internet service provider and has no legitimate business purpose. Instead,

Hypertouch's primary business activity is suing internet advertisers . . . over alleged

illegal commercial emails that it collects" (TPC ¶ 13) and considers that has thus alleged

"specific facts showing that Hypertouch's use of computers to manufacture lawsuits does

not involve a publisher's traditional editorial functions, such as deciding whether to

10

publish, withdraw, postpone, or alter content within the meaning of the CDA as interpreted by Zeran or any other court." Actually, these allegations are bare, and do not meet the Twombly standard for specificity by any stretch.  World Avenue appropriately placed the allegations just quoted under the heading, "General Allegations" in the TPC.

World Avenue misreads Zeran in the quote above, mischaracterizing the permissible role of an ICS exercising editorial functions.  The safe harbor is for the ICS to undertake no editorial role, as Hypertouch has done.  Zeran clarifies that a publisher may exercise certain roles that affect content without spoiling immunity.  World Avenue's statement, "courts . . .  have limited the definition of ICS to an entity that engages in the exercise of a publisher's traditional editorial functions . . ." suggests that an ICS must engage in "traditional editorial functions."  It is more accurate to say that an ICS may refrain entirely from any such "traditional editorial functions" and enjoy CDA immunity.   The Zeran discussion of editorial functions simply addresses the outer reaches of publisher involvement that will nevertheless leave immunity intact.

The TPC refers in paragraphs 19-20 to one sample email, attached to the TPC as Exhibit 3, in the context of routing emails to BSI and ownership of the domain names in its headers.  There is no mention of any content that might have been added or altered by Hypertouch.  Again, the TPC asserts no specific facts about Hypertouch exercising editorial functions or adding content.

The CDA states, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information

content provider."   Wagner/Hypertouch are not the "publisher" or "speaker" with respect

to the emails that give rise to this suit, the content of which promote World Avenue's

lead-generation business and not any venture of Wagner/Hypertouch.

World Avenue argues at p. 3 of the Opposition that Wagner/Hypertouch   ". . .

claim[ed] a hot [sic] of absurdities including that process was served on a five-year-old

child."  In response, we must point out that World Avenue named Sara FitzGerald as the

individual served; she was indeed 5 years old. Prior to World Avenue's service on Sarah

FitzGerald, World Avenue similarly served process on another minor. See August 19,

2009 letter to World Avenue from the Vietnam Forum Foundation (Exhibit H-19.) stating

"the service of process was improper because Co Tran, who was served is a minor and is

not authorized to accept service."

## IV. THE KRAFT RULING

World Avenue argues at p. 4 of the Opposition that "the same issues" were

addressed in the <u>Kraft</u> case and the motion was denied.[1]  There are significant differences

here:

1)  At the motions hearing in the companion case of <u>BSI v. Kraft</u> the Court inquired

whether Hypertouch had been previously adjudicated an ISP.  The responsive

information was not immediately available, and the Court proceeded to rule without a

clear response.  That clear response is now provided in the Motion and reasserted in this

---

[1] World Avenue repeats this same argument on pp. 13 and 19 of the Opposition.

reply memorandum: Hypertouch was indeed adjudicated an ISP after briefing and a contested hearing, in no uncertain terms.

2)  Unlike the TPC in Kraft, the TPC here does not allege that Wagner/Hypertouch added content, which is essentially the only ground on which CDA immunity can be upset, after ISP status is established.  World Avenue argues about content in the Opposition, but only refers to the ordinary, automated addition of header entries created by a mail server, dividers inserted by Eudora or Bates numbers added later by BSI. Those markings simply comply with SMTP standards or facilitate document management during litigation, are not part of the actionable content, and do not interfere with the viewing of that content.

## V. AUTOMATED ROUTING OF EMAILS FROM HYPERTOUCH TO BSI

World Avenue argues at p. 6 that "approximately 99% of the Emails at Issue in the underlying litigation filed by BSI were received by Paul Wagner/BSI directly from Wagner/Hypertouch." (TPC, ¶16).   The final percentage may be other than 99%, as discovery is still underway, and motions to compel are pending as to key information by which World Avenue's promotional emails can be identified.  Regardless, over 95% of email traffic is spam in the general population.   It is not clear why World Avenue feels the percent that reached BSI via an upstream MTA (Hypertouch) should be any different. The automated routing of all emails by Hypertouch as an MTA was in place for years, was not tailored to World Avenue or any other particular sender or advertiser, and was used for volume management purposes.

World Avenue argues at p. 6 that if Wagner/Hypertouch had not routed the emails, this litigation would not exist.  A better point: if World Avenue had not run its email-based marketing scheme, no violative emails would have been initiated in the first place.  Further, blaming the recipient in this "but for" analysis simply does not work.  It is clear from the complaints received by attorneys general in several states that World Avenue's promotional emails were broadcast to a large number of recipients across the US. (It would be natural that they would also have reached around the world, given the nature of bulk email distribution.)  World Avenue has been sued by others for its spam-based activities, including the attorneys general of Florida and Texas.  Indeed, World Avenue, its precursors, and its alter-ego entities have been constantly in litigation over their deceptive marketing practices since 2006 or earlier.  Does World Avenue contend that Hypertouch and BSI "pulled" the emails from World Avenue's marketers, or forced those marketers to send them to domain names owned by BSI?  The absurdity of World Avenue's "but for" argument is clear.

World Avenue argues at  p. 7 that Wagner/Hypertouch received and stored all emails, and that BSI utilizes a server on Hypertouch's site in California that is the "primary mail server for BSI," citing  P .Wagner Deposition at 8:7.  In fact, that server is "a" primary server, not "the" primary server.  See P. Wagner Declaration at     . "Primary server" is a term of art meaning the point of delivery for a domain's email but the not the ultimate mail server. For example Postini runs the primary mail servers for Steptoe.com and PerkinsCoie.com yet the ultimate destination for each domain's email

14

are those firm's internally run mail server.  See J. Wagner Declaration at        But this is a

minor point.  The emails were ultimately received by BSI on servers in Maryland as part

of the normal routine for routing of emails from an MTA to the end server in the line-up.

See P. Wagner Declaration at        As can be confirmed by a Whois lookup, BSI owns the

domain name, hypertouch.com.  See http://whois.domaintools.com/hypertouch.com.

This point has been demonstrated in prior filings.

     Although it is one of many side issues tossed in by World Avenue, the practice of

"storing" emails, *vel non*, appears to be one of its favorite topics.   World Avenue faults

the Wagners and their respective entities for "storing" the emails, as this makes them too

litigious; and then turns around and faults them for <u>not</u> storing the emails properly.

(World Avenue argues that all graphics that were temporarily available for retrieval from

World Avenue's servers, for loading into the promotional emails, should have been

retrieved promptly by BSI or Hypertouch after receipt of the emails.  Never mind that a

particular email among the thousands received from a limitless number of sources might

not be recognized as a promotion for World Avenue until a year or more after receipt,

long after the links to World Avenue's graphics servers have gone inactive.)

## VI.  WILD CARD/CATCH-ALL ADDRESSES.

    World Avenue argues at p. 8 that "BSI uses wild card addresses," citing

P. Wagner Depo. at 144-145, 244; and TPD at ¶15.  A "catch-all address" is a "wildcard

address."  See P. Wagner Declaration at      .  This is a "*de minimis*" argument for

purposes of CDA immunity.  It does not make or break ICS status. The functionality of

the "wild card" feature can nevertheless be plumbed if needed.  The use of a wild card or catch-all address to route email messages is a common practice for many ISPs. Indeed many of the ISPs that World Avenue uses offer this service to their customers including DNS Made Easy, eNom, Google's Postini, Yahoo, Network Solutions, GoDaddy, Register.com, etc. See Exhibit  H-9, J. Wagner Declaration,  for a list of 51 ISPs offering catch-all email accounts. These ISP will optionally route emails collected by the catch-all addresses on to other ISPs; 95% to over 99% of the emails would be actionable spam, as is all email. These ISPs may offer that in part because the CDA, CAN-SPAM and state spam laws all protect ISPs from liability.

Only Hypertouch's server enables the wild card addresses for emails to @hypertouch.com and delivers messages sent to matching email addresses to a single email account on BSI's server.  See J. Wagner Declaration at      .

World Avenue argues at p. 10 that Hypertouch routed the emails to BSI to manufacture a lawsuit and not in its role as an ISP.  This is contrary to the facts as presented by BSI and by Hypertouch, does not ruin CDA immunity, and in any event, is simply argument by World Avenue that should be saved for the jury.

## VII.   LATE ALLEGATIONS OF CONDUCT BY BSI, NOT HYPERTOUCH.

Dr. Krawetz devotes considerable space to purported deficiencies in some of the emails claimed, but does not attribute such deficiencies to Hypertouch.  Exhibit 7, which contains the Krawetz excerpts, mentions "Hypertouch" only three (3) times, none of which implicate Hypertouch in altering the content.  At p. 7 of 77 he speculates,

16

"The provided email archives contain modified contents and evidence of deleted data, and BSI/Hypertouch performed these non-reversible modifications."  Also, "the encapsulation performed by Eudora is non-reversible."  In fact, only BSI used the Eudora client program in connection with the emails at issue; Hypertouch used only its email server programs.

Dr. Krawetz mentions "Hypertouch" again at p. 14 of 77 as follows:  "Although BSI and Hypertouch claim to have server logs (see Expert Report Section 5.5.4), BSI has only provided logs that pre-date the emails at issue (see Expert Report Section 8.1)."  This commentary ignores BSI's offer to allow a view of its servers; but in any event is not relevant to the issue of CDA immunity and does not suggest that Hypertouch added or altered content.

Hypertouch is mentioned a third time at p. 15 of 77:  "In effect, BSI and Hypertouch are using the wrong tool for filtering alleged undesirable email."  Again, this criticism of choice of tools does not make or break ISP status, and has nothing to do with CDA immunity or content.

Dr. Krawetz states in the first paragraph of Section 4: "Email Archive Analysis" on Page 26 of 228, attributes the "alarming" defects in emails entirely to BSI, not to Hypertouch.  The content troubling Krawetz was allegedly "generated by BSI," "caused by BSI," and "performed by BSI."

Dr. Krawetz launches numerous additional criticisms, all aimed at BSI, and not at Hypertouch.  At p. 35 he speculates: "After receiving the email from the sender, BSI

17

appears to forward some of the emails multiple times," and refers to "failure re-tries" as

a normal server function.  There appears to be no dispute on this point, which has nothing

to do with CDI immunity.  "Failure retries" by BSI's server after a crash or power

interruption are a normal part of its function as an ISP.  Another instance of multiple

sends would be where there are multiple Bcc's (blind copies). See P. Wagner Declaration

at    .  Again, the topic of "retries" by BSI servers has nothing to do with Hypertouch.

Krawetz incorrectly finds that multiple Hypertouch servers -- e.g., mail.hasit.com

and mail.reasonabledoubt.com -- belong to and/or are controlled by BSI, at p. 37.  He

criticizes BSI for "splitting" an email but remains silent as to Hypertouch.  At p. 38 he

attributes purported alterations to BSI, not to Hypertouch: "The total count of duplicate

emails, including those with different Received headers . . . that were added by BSI . . .

are as follows: . . ."   Nowhere in his reports do we see Dr. Krawetz attributing the

insertion of "headers" or any other material to Hypertouch.

## VIII.  NO 'REVIEW AND FORWARDING OF 'INTERESTING' EMAILS

World Avenue argues at p. 13 that the routing of emails here was like that in Doe

v. City of New York, 583 F. Supp. 2d 444, 449 (S.D.N.Y. 2008), where one party  ". . .

merely forwarded emails containing third-party content that it found 'relevant or

interesting,' and noted that such activity was not 'akin to a blog, website, or listserv.'"

The facts in Doe obviously involved the forwarding party's review of the emails to

determine if they were "relevant or interesting" prior to forwarding them.  The defendants

in <u>Kraft</u> and here have repeatedly seized upon the fact pattern described in <u>Doe</u> and tried to apply it here, despite the gross disparity in the facts.

Here, in contrast with <u>Doe</u>, all emails to certain of BSI's domains were routinely and automatically routed from a Hypertouch server in California to a BSI server in Maryland.  This arrangement was set up for management of emails due to their large and growing volume, utilizing robust servers where needed.  The quantities of emails so routed have numbered up to a million a day.  There was no human intervention between receipt in California and immediately routing to Maryland; there was no review of emails by a human to select some for forwarding to BSI.  And the arrangement commenced long before either Hypertouch or BSI filed a suit arising from commercial email.

It must be understood that all of the emails claimed in this case were sent to email addresses held by BSI.  The fact that they were passed from server to server by MTA's (as explained by Dr. Krawetz in his initial report, Section 3.2 "How Email Works") in ordinary course, and in that process were routed from a Hypertouch server to a BSI server, does not detract from the fact that there were intended for BSI.  In order for the emails to reach BSI, someone acting as the "sender" must insert into an address field in a bulk email sending program, an email address held by BSI.  One example for the BSI domain "castalia.net" would be [paul@catalia.net](mailto:paul@catalia.net).  Thus, in order to cause an email to arrive at the BSI server that handles mail addressed to email addresses that end in the BSI-owned domain name, "castalia.net," it is necessary that the sender insert an email address that ends in "@castalia.net" in its bulk emailer program.  This function may be

automated, but it remains under the control of the persons on the sending end of the operation.

## IX. GATHERING AND INSERTION OF EMAIL ADDRESSES.

The gathering and insertion of email addresses from the sending end of the email operation can involve several steps.  While largely automated, they are obviously ultimately controlled by humans who design their functions to fulfill particular goals. Email addresses can be harvested from websites across the Internet using "bots" that recognize strings of characters as email addresses (as, for example, strings containing the "@" sign, followed by a word, then a dot, then a suffix like "com" or "net." These bots compile huge lists of email addresses.  These lists are marketed and are used by spammers.  The CAN-SPAM act describes and outlaws email harvesting.  See 15 USC Sec. 7704 (b)(1). If BSI's domain names are on such lists (and by the volume of spam received to addresses like wagner@linkcenter.net or nospam_domains@beyondsystems.net, they apparently arrived by means other than opting in.  Other lists, such as those compiled by legitimate businesses such as L.L. Bean or Ameritrade, consist of customers who have entered their email addresses along with other personal information for the express purpose of receiving communications from the vendor in an existing business relationship.  These true "opt-in" lists are clearly different than a list used to tease a consumer through multiple screens by an anonymous marketer under the promise of a "free laptop." Hypertouch and BSI deny opting in their addresses

to any list promoting World Avenue or its associated entities.  See P. Wagner Declaration

at      .

## X.  WORLD AVENUE'S ADDITIONAL ARGUMENTS

World Avenue argues at p. 14:  "BSI alleges that it is an internet service provider

itself, thereby making any claim that it needs Hypertouch's alleged ICS services

(specifically internet services) dubious at best. (Am. Com. ¶ 2.)  This does not follow.

Providers of services commonly engage other service providers for redundancy,

management of large volumes of data, and for a variety of other reasons.   For example,

World Avenue engages services by DNS.com (Tiggee, LLC), UltraDNS.com (NeuStar,

Inc. – see http://www.domaintools.com/hosting-history/?q=superbrewards.com),

Terremark Worldwide data centers

(https://ws.arin.net/whois/?queryinput=WORLD+AVENUE+LIMITED) and Reliance

Globalcom Services, Inc. (https://ws.arin.net/whois/?queryinput=66.7.179.198).   These

sites were last visited July 30, 2010.

World Avenue argues at p.14 that "BSI agreed to receive from Hypertouch virtually

all of the emails over which BSI is suing in response to a specific request from

Hypertouch that BSI archive certain  emails that Hypertouch supposedly could no longer

archive itself, and not because BSI needed Hypertouch to provide any alleged ICS

services to BSI."  The phrase, "agreed to receive" suggests that the "agreement" was

focused on World Avenue emails.  In reality, and as is alleged in the TPC, the servers

were configured to route all emails from a Hypertouch server in California to a BSI

server in Maryland based solely upon the particular recipient email address, and not about the content of any particular email.  Hypertouch needed and arranged for the service from BSI to help manage the volume of emails, and such sharing of resources among servers is not unusual.

World Avenue argues at p. 16 that the TPC does not seek to hold Wagner/Hypertouch liable for the content in the emails but instead for sending the emails, raising the "but for" argument again. : "[B]ut for the actions of Joseph Wagner/Hypertouch in sending or causing to be sent the Hypertouch Emails, Beyond Systems would not have received the Hypertouch Emails . . ."  The actual cause of the emails was their initiation as part of World Avenue's promotional campaigns, in which World Avenue assisted, participated, and paid compensation to the marketers.  The automated processing of the emails during transit and receipt was not part of their "cause" any more than a pedestrian lawfully crossing the street "causes" a speeding car to strike him.

World Avenue argues at p. 17 that " the TPC alleges that World Avenue is  entitled to indemnification and contribution because Wagner/Hypertouch sent to BSI the emails in the first place and not for the information in the emails." In fact, the TPC claims that Wagner/ Hypertouch have an "obligation to refrain from sending emails that violate" the Florida and Maryland statutes and "a duty to refrain from sending ... illegal email," and that Joe/Hyp "breached the duties described above by sending to Beyond Systems the Hypertouch Emails, ..."  Thus, World Avenue argues that by routing the emails,

Hypertouch is "sending" them, and that this conduct is illegal because their <u>content</u>

violates the state statutes.  This distorted contention by World Avenue, while

misconstruing "sender," is clearly content-based.  Further, this is a tacit admission by

World Avenue that its own promotional emails contain false or deceptive content.

World Avenue argues at  p. 17, "In an analogous case, the court denied a motion

to dismiss plaintiff's claims . . .  [and] held that the CDA did not shield an ISP from such

allegations '[b]ecause [the plaintiff] posits that Yahoo!'s manner of presenting the

profiles—not the underlying profiles themselves—constitute fraud[.]' Id. at 1263

(emphasis added). Therefore, as in Anthony, the CDA does not immunize Hypertouch

insofar as its wrongdoing is unrelated to the content itself."

World Avenue misrepresents the holding in <u>Anthony v. Yahoo, Inc.,</u> 421 F. Supp.

2d 1257 (N.D. Cal. 2006).  While the user profiles themselves, created by the users, were

not ascribed to Yahoo, plaintiff had alleged there were accompanying representations <u>by</u>

<u>Yahoo</u> that <u>were</u> deceptive.  A more complete quote from Anthony is the following:

> Anthony alleges that Yahoo! <u>creates false profiles</u>, not merely fails
> to delete them. . . . In addition, Anthony claims that Yahoo! <u>sends users</u>
> <u>false profiles for the purpose of luring them into renewing their</u>
> <u>subscriptions</u>. . . . No case of which this court is aware has immunized a
> defendant from allegations that it <u>created tortious content</u>. . . . If, as
> Anthony claims, Yahoo! <u>manufactured false profiles, then it is an</u>
> <u>'information content provider' itself</u> and the CDA does not shield it from
> liability.
>
>     In addition, the CDA does not defeat Anthony's allegations that
> Yahoo! sent 'profiles of actual, legitimate former subscribers <u>whose</u>
> <u>subscriptions had expired and who were no longer members of the service,</u>
> to current members of the service.' Admittedly, third parties created these
> profiles. . . . Because Anthony posits that Yahoo's manner of presenting

the profiles — not the underlying profiles themselves — constitute fraud,
the CDA does not apply."

Id. at 1263 [Emphasis added.] Thus, the court in <u>Anthony</u> refused to dismiss because the

plaintiff had alleged false representations <u>by Yahoo</u>, making it a content provider. The

nature of the content was indeed a factor, contrary to World Avenue's assertions.

On the Ralsky issue, World Avenue argues at p. 17 that ". . . neither BSI, nor

Wagner/Hypertouch was able to link the alleged Emails at Issue to World Avenue and

thus even if Ralsky had any involvement in this matter there is no evidence connecting

him to World Avenue."  In fact, as alleged in the Amended Complaint, BSI attributes all

the emails claimed in this suit to World Avenue (as well as its co-defendants), and further

contends that 593 of them were sent by the notorious spammer Alan Ralsky.  (See

Motion at 8.)  The 593 were sent on April 14, 2005.  All of them promote one of World

Avenue's trade names, reciting, "If you no longer wish to receive Consumer Incentive

Promotions emails, visit the unsubscribe page on the Consumer Incentive Promotions

site, or you can write us at: Consumer Incentive Promotions, 14545 J Military Tr. #189,

Delray Beach, FL 33484, USA."  These 593 emails are substantially identical, except for

the precise transmission times and random variations in the "sender" information.  See P.

Wagner Declaration at    .  The street address is actually a UPS store.  See Exhibit  H-21.

Another means of tracking the 593 emails is their identical sales links.  They all contain

the link "http://garthbreth.info/9sudd9u," which redirected to a site at

http://**yoursmartrewards.com**/, a World Avenue domain name.  See P. Wagner

Declaration at    .  Since the 593 emails redirected to World Avenue's

yoursmartrewards.com web site, and were assigned the identifier "a=CD772," World Ave

should be able to identify who participated in creating and sending these emails.

Another feature that ties the emails to Mr. Ralsky is the domain, "jriad.info"

which appears in the emails, and was Ralsky's domain, according to the FBI and other

investigators.  (See www.spamhaus.org/rokso/evidence.lasso?rokso_id=ROK5053 and

www.spamhaus.org/rokso/evidence.lasso?rokso_id=ROK5119 ; last visited July 30,
2010.)

The Ralsky content, which is in the headers, is false and deceptive as alleged by

BSI, but none of the marks that may have been added by Hypertouch is alleged by World

Avenue or BSI to be false or deceptive.  None of the markers or minor header

information added by Hypertouch alter or obscure the false content transmitted by

Ralsky. e.g.: To be clear, the false HELO recorded in the header by Hypertouch's mail

server through automated processing as required by the RFCs is content created by World

Avenue's spammers, and not by Hypertouch.

A sample Ralsky spam message is marked as Exhibit H-2 at DE 263-3. This email

was sent to an email account hosted by XO Networks for a dial-up account that

Hypertouch has maintained with XO for over a decade. By mutual agreement, XO

networks routes all email sent to that email account to Hypertouch's server.  XO's mail

server added content to the email, a Received: line in the header reflecting the false

domain jriad.info that the Ralsky gang used to transmit the message:

```
Received: from mailpool.jriad.info (unknown [204.13.23.20])
by irresistable.cnc.net (ConcentricHost(2.54) MX) with ESMTP id
5B8D159DAF
```

Thus like the Ralsky spam in the TPC, this spam has a header which reflects the false

domain of "jriad.info" that Ralsky used to transmit the spam to XO's mail server

(irresistable.cnc.net). Hypertouch could sue World Avenue for this Ralsky spam. One of

Hypertouch's causes of action for this email would be based upon of the use of the falsely registered jriad.info in the transmission of the email as reflected in the header that XO's mail server automatically generated and pre-pended to the email message as it was received before it was transmitted to Hypertouch's mail server. The CDA would not allow WA assert an indemnification claim against XO, as it is attempting to do against Joe Wagner and Hypertouch.  XO does not lose its CDA, Maryland and Florida law immunities even, though as is the case, it "generally knew the content of the e-mails, and specifically, that the emails Joseph Wagner/Hypertouch [*XO*] sent and/or caused to be sent to Paul Wagner/Beyond Systems in Washington, D.C. and/or Maryland [*Hypertouch in California*] consisted of at least 99% alleged 'spam'" per the TPC.

World Avenue argues at p. 18, "Thus, the CDA protects ISCs [sic] from liability based only on 'information provided by another information content provider' and does not immunize a party that adds original content. 47 U.S.C. § 230(c)(1)."  World Avenue argues as if the mere addition of Bates numbers or dividers between emails, both of which were added by BSI's programs, not Hypertouch, would count as "addition of content" and would spoil CDA immunity.  The content added must be actionable. World Avenue strains too hard to torture the statute into an easily broken immunity, when the law is clearly otherwise.

Still on p. 18, World Avenue argues, ". . . Wagner/Hypertouch admitted that Hypertouch computers added (as opposed to altered) content at least to the headers in Emails at Issue. . . ."  The minimal header information that was automatically added by

26

Hypertouch's email client is easily distinguished, like Bates numbers or dividers between emails, and is not at issue in the underlying claims.  Neither BSI nor World Avenue has alleged that any markers or header material inserted by Hypertouch was false or misleading.  Hypertouch never "created tortious content" or "actionable content." [quoting from p. 19]

At p. 18, World Avenue relies on the following quote from <u>Anthony</u>, *supra*: "The critical issue is whether [the party] acted as an information content provider with respect to the information that appellants claim is false or misleading."  We agree.  And there is no allegation of any insertion of false or misleading content by Wagner/Hypertouch in the instant case.

In an important concession, World Avenue argues at p. 19, "Whether the information Wagner/Hypertouch added is false or misleading remains to be seen, and in all events raises fact issues as described more fully below."  Unfortunately, the pending motion is a motion to <u>dismiss</u>.  World Avenue must allege facts with specificity that state grounds for indemnification, and overcome CDA immunity.  It has failed to do so, and admits as much by making a mere hint of an argument against summary judgment.  Further, the vague reference to "fact issues" (which are not really described any "more fully" below) would be insufficient to overcome a motion for summary judgment if the motion were construed as such.

## IX.  PRIOR RULINGS

World Avenue argues on p. 19 that "the facts and arguments are identical to those in Kraft" and therefore the motion should be dismissed.  As noted above, in Kraft the TPC alleged creation of actionable content by Hypertouch, and the Court was left with an erroneous answer in response to its inquiry about prior adjudications of the ISP status of Hypertouch.   Clearly, Hypertouch has been adjudicated an ISP, and that ruling has been cited as authority in other cases.

Asis Internet Servs. v. Optin Global Inc., N.D. Cal., No. C-05-5124-CW, 9/27/06

ASIS v. ACTIVE RESPONSE GROUP

ASIS v. RICHARD RAUSCH

Melaleuca, Inc. v. Hansen, Case No. CV 07-212-E-EJL-MHW.  Plaintiff requests leave to furnish full citations via supplement to this memorandum.

In <u>BSI v. Keynetics</u>, 422 F. Supp. 2d 523 (D. Md. 2006), this court dismissed certain ISP's (Rackspace, Ltd.) based on CDA immunity. Plaintiff alleged that these parties provided web hosting services to the other defendants, and continued to do so despite notice of abuse, and that it was the central point from which thousands of the emails at issue originated.  There was evidence of active and knowing participation by the ISP.  Nevertheless, CDA immunity prevailed and the ISP's were dismissed.

## X.  WORLD AVENUE MISCONTRUES THE LAW ON INDEMNIFICATION

World Avenue admits and confirms that its claims are under the tort theory of indemnification rather than the "special relationship" theory, but then proceeds to ignore

the established body of law on point, and to ignore the facts as pled and as supported by the record.

The motion to dismiss, at pp. 20-22 addresses Maryland law on indemnification, which imposes requirements that are simply lacking here, leaving World Avenue's claims baseless.  The right to indemnity can only apply where "[a] person who, <u>without personal fault</u>, has become subject to <u>tort liability for the unauthorized and wrongful conduct of another</u>, [and] is entitled to indemnity from the other for expenditures properly made in the discharge of such liability."  [Emphasis added.]  <u>Pulte Home Corp.</u>, 942 A.2d at 731 (quoting Restatement of Restitution, § 96).  World Avenue would have to argue that its liability stems from the conduct of Wagner/Hypertouch.  No facts are alleged that would create such a line of liability. The Maryland and Florida spam deny explicitly the creation of such a line of liability. The emails promote World Avenue's business, and are sent by World Avenue's marketers, not by anyone promoting Joe Wagner or Hypertouch.  The sending of the emails is controlled by those on the sending end, not by the recipients. The emails were sent to email addresses at domains selected by the senders, not by the recipients.  And the emails were actually received at those domains, some of which happened to belong to BSI.  World Avenue simply wants to point a finger at Wagner/Hypertouch for the automated routing process that sent the emails to the Plaintiff, who has in turn exposed World Avenue's wrongdoing.  But for the routing by Wagner/Hypertouch, World Avenue reasons, it would not have been "caught."  In that sense, Wagner/Hypertouch were part of the digital "highway,"  (like Verizon, Google or

other MTA's), that ultimately delivered the emails to BSI.   There is no actual

participation by Wagner/Hypertouch in the creation or initiation of the emails; they are

just a part of the highway.

  World Avenue misconstrues Maryland's "active-passive analysis" articulated in

RTKL Assocs., Inc., 559 A.2d at 811, under which "a party is only entitled to

indemnification when the party's actions, although negligent, are considered to be

passive or secondary to those of the primary tort-feasor."  Id. (citation omitted); see also

Franklin, 711 A.2d at 187 ("It is well established under Maryland law that one who is

guilty of active negligence cannot obtain tort indemnification.").  Further,

"indemnification is not available to intentional or grossly negligent tortfeasors."  Pyramid

Condo. Ass'n v. Morgan,  606 F. Supp. 592, 597 (D. Md. 1985).

        World Avenue argues that its role is merely "passive," and that it is a victim of

the conduct of third parties.  World Avenue ignores the allegations in the Amended

Complaint, and the compelling evidence in the Florida and Texas AG investigations, all

of which demonstrate that the emails are part of a promotional scheme for and by World

Avenue and its affiliated entities, not for Wagner or Hypertouch.   World Avenue (not

one of its alter-ego entities) signed the settlements in Florida and Texas, and issued the

checks.  A key factor is the nature of the allegations in the Amended Complaint, which

clearly assert in paragraphs 21 – 90 that World Avenue was actively involved in the

entire email-based marketing scheme that gives rise to the claims in this case.  Further,

World Avenue would need to show that Wagner/Hypertouch initiated the emails, and that

World Avenue was unfairly dragged into the liability picture for some common activity

with Hypertouch, to even begin to tap the tort theory of indemnification.  There needs to

be "common liability in tort."  <u>Parler & Wobber v. Miles & Stockbridge, P.C.</u>, 756 A.2d

526, 534 (Md. 2000).  World Avenue has made no such allegations and no such showing.

## XI. CONCLUSION

Movants did not "send" the emails; CDA immunity applies; content was not added;

World Avenue has not alleged insertion of actionable content by Joe Wagner or

Hypertouch; World Avenue's participation was active; Hypertouch is a service provider;

and applicable law requires dismissal of the Third-party Complaint.   BSI requests leave

to complete the marking and submission for ECF filing of the exhibits referenced in this

memorandum within two hours after the filing of the memorandum.

Respectfully Submitted,

_____/s/_____

Stephen H. Ring
STEPHEN H. RING, P.C.
506 Main Street, Suite 215
Gaithersburg, Maryland 20878
MD Bar Id. No. 04731764; USDC, MD: #00405
Telephone: 301-563-9249
Facsimile: 301-563-9639

_____/s/_____

Michael S. Rothman
E. Jefferson Street, Suite 201
Rockville, MD 20850
Phone: (301) 251-9660
Fax: (301) 251-9610
Attorneys for Plaintiff

*Counsel for Third-Party Defendants James Joseph Wagner and Hypertouch, Inc*

Certificate of Service

I certify that a copy of the foregoing documents was served on the date of

ECF filing, via the ECF system, on all counsel of record.

_____/s/_____
Stephen H. Ring

**Exhibits to Plaintiff's Reply Memorandum**

H-8 Declaration of Paul A. Wagner

H-9 Declaration of James Joseph Wagner

H-10  Declarations of Correa, Vargas in Stamps.com

H-11  Declaration of Correa, customer of Hypertouch

H-12 Declaration of Vargas, customer of Hypertouch

H-13 Declaration of Haller, customer of Hypertouch

H-14 Declaration of Smaby

H-15 Declaration of Bihn

H-16  Ralsky "Starbucks" incentive awards spam sent to Hypertouch's XO Networks email account

H-17  DNS lookups, Postini

H-18  hosting history of World Avenue's domain SuperbRewards.com, showing DNS services

H-19  ISP's offering Catch-All Addresses

H-20  August 19, 2009 letter to World Avenue from the Vietnam Forum Foundation

H-21 UPS store address