# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ———————————————— * | |
| BEYOND SYSTEMS, INC. * | |
| * | |
| Plaintiff * | |
| * | |
| v. * | Case No. 8:08-cv-00921 (PJM) |
| * | |
| World Avenue USA, LLC, *et al*. * | |
| * | |
| Defendants. * | |
| ———————————————— * | |
| * | |
| World Avenue USA, LLC, * | |
| * | |
| Third-Party Plaintiff * | |
| * | |
| v. * | |
| * | |
| JAMES JOSEPH WAGNER, *et al*. * | |
| * | |
| Third-Party Defendants * | |
| ———————————————— * | |

## APPENDIX PURSUANT TO LOCAL RULE 105.5.

The Third-party Defendants, James Joseph Wagner and Hypertouch, Inc., through

counsel, file this appendix of cases not generally available pursuant to Local Rule 105.5,

listed on p. 28 of the Reply Memorandum at DE 376.  Copies of the relevant rulings in

these cases are attached.

Asis Internet Services v. Optin Global, Inc., No. 2006 U.S. Dist. LEXIS 46309, 2006 WL

1820902 (N.D. CA June 30, 2006), dismissed in part, 2006 U.S. Dist. LEXIS 73669,

2006 WL 2792436 (Sept. 27, 2006);

Asis v. Active Response Group - No. C07 6211 THE (N.D. CA);

<u>Asis v. Richard Rausch</u>, No. 08-03186 EDL, (N.D. CA. 2010, order May 3, 2010);

<u>Melaleuca, Inc. v. Hansen</u>, No. CV 07-212-E-EJL-MHW (D.Id; June 29, 2010).


Respectfully Submitted,




_____/s/_____
Stephen H. Ring
STEPHEN H. RING, P.C.
506 Main Street, Suite 215
Gaithersburg, Maryland 20878
MD Bar Id. No. 04731764; USDC, MD: #00405
Telephone: 301-563-9249
Facsimile: 301-563-9639



_____/s/_____
Michael S. Rothman
E. Jefferson Street, Suite 201
Rockville, MD 20850
Phone: (301) 251-9660
Fax: (301) 251-9610
Attorneys for Plaintiff
*Counsel for Third-Party Defendants James Joseph Wagner and Hypertouch, Inc*


<u>Certificate of Service</u>


I certify that a copy of the foregoing documents was served on the date of

ECF filing, via the ECF system, on all counsel of record.


_____/s/_____
Stephen H. Ring

2

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ASIS INTERNET SERVICES,

     Plaintiff,

  v.

OPTIN GLOBAL, INC., et al.,

     Defendants.

_____/

No. C 05-5124 CW

ORDER GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS AND DENYING THEM IN PART

    Defendants Michael Cuervo and John Terrence Dorland, Quicken Loans (Quicken), and Aegis Lending Corporation (Aegis) each move separately and join each other's motions to dismiss Plaintiff Asis Internet Service's First Amended Complaint (FAC) pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants Bruce Lerner, Chris Valley, National Fidelity Funding, Inc., Stateside Mortgage, Inc., American Home Equity Corp., and Michael Garcia (Mortgage

**United States District Court**
For the Northern District of California

1  Defendants) join in the motions to dismiss.[1]  Plaintiff opposes

2  these motions.  These matters have been submitted on the papers.

3  Having considered all of the papers filed by the parties, the Court

4  grants in part and denies in part Defendants' motions to dismiss

5  and grants Plaintiff leave to file an amended complaint.

6                              BACKGROUND

7      Plaintiff Asis Internet Services is a California corporation

8  that provides internet access services.  On December 12, 2005,

9  Plaintiff filed a complaint alleging that the Spammer Defendants

10  directed, controlled and participated in "spamming," causing more

11  than 10,000 deceptive and unsolicited commercial electronic

12  messages to be sent to Plaintiff's computer server between October

13  25, 2005 and November 14, 2005.  The header information for those

14  emails was falsified, misrepresented or forged in a way that would

15  mislead a reasonable recipient as to the contents and subject

16  matter of the message.  The complaint further alleged that several

17  mortgage brokers (the Mortgage Defendants) "conspired with and at

18  all times supported," and benefitted from, the Spammer Defendants'

19  actions.  Complaint § 10, 12.

20      The complaint brought claims under the Controlling the Assault

21  of Non-Solicited Pornography and Marketing Act of 2003 (CAN-SPAM

22  Act), 15 U.S.C. § 7701 _et seq._ and California's Business and

23  Professions Code § 17529 _et seq._, both of which restrict the use of

24  _____

25      [1]Optin Global, Inc., Vision Media Ltd., Rich Yang and Peonie
Pui Tang Chan (collectively, the Spammer Defendants), Leads Limited
26  and Azoogle.com (collectively, the Lead Generator Defendants), and
Francis Prasad and Emerald Home Loan, Inc. (members of the Mortgage
27  Defendants) do not join in the motions to dismiss.  Prasad has not
filed an answer to the First Amended Complaint.

28                                   2

1  unsolicited commercial email.  Plaintiff also brought a civil

2  conspiracy claim against all Defendants.

3       Aegis moved pursuant to Federal Rules of Civil Procedure 9(b)

4  and 12(b)(6) to dismiss the complaint against it.  Aegis argued (1)

5  that Plaintiff's federal and State anti-spam claims sounded in

6  fraud and that Rule 9(b) therefore required Plaintiff to plead the

7  claims with particularity; (2) that Plaintiff failed to demonstrate

8  that Defendants "initiated" the spam as required by the CAN-SPAM

9  Act; (3) that Plaintiff failed to allege the required elements of

10  the State anti-spam claim; and (4) that Plaintiff failed to allege

11  that Mortgage Defendants intended to aid in the commission of the

12  conspiracy as required by California law.  The other Mortgage

13  Defendants named in the original complaint joined the motion to

14  dismiss.

15       The Court granted the motion to dismiss in part and denied it

16  in part, finding that Federal Rule of Civil Procedure 9(b) applied

17  to averments of fraud in Plaintiff's claims under the CAN-SPAM

18  Act, 15 U.S.C. § 7701 <u>et seq.</u> and California Business and

19  Professions Code § 17529 <u>et seq.</u>, and that California Business and

20  Professions Code § 17529.5(a) extends liability to anyone who

21  "advertises" in a commercial email containing a misleading header

22  or subject line.  The Court further found that the allegations in

23  Plaintiff's complaint were sufficient to allege the civil

24  conspiracy element of entering into an agreement with the intent to

25  commit the underlying violation.

26       Therefore, the Court granted the motion to dismiss in part and

27  granted Plaintiff leave to file an amended complaint.  The Court

28                                    3

United States District Court

For the Northern District of California

advised Plaintiff that in its amended complaint it (1) "must state
with particularity the nature of the allegedly fraudulent subject
lines and the identity of the sender or senders of the alleged
spam" to go forward with its claims under either federal or State
anti-spam laws and (2) must demonstrate "that Defendants advertised
their services in the allegedly fraudulent emails" to go forward
with the § 17529.5 claim.  June 30, 2006 Order at 19.  Further the
Court instructed Plaintiff that it "may include . . . its civil
conspiracy claim, provided it is able successfully to state an
underlying claim under either the federal or State anti-spam laws."
Id.

     Plaintiff filed its First Amended Complaint on July 14, 2006,
removing some defendants and adding others.  Of particular
significance to the instant motions, Plaintiff included two new
defendants, Leads Limited, Inc. and Azoogle.com, Inc. (together the
Lead Generators).  The Lead Generators are described as "Internet
marketing companies in the business of generating sales leads by
hiring and managing individuals and groups to send emails to
perspective [sic] purchasers doing business in the United States."
FAC ¶ 9.

     As in the original complaint, Plaintiff alleges that the
Spammer Defendants directed, controlled and participated in
"spamming," causing more than 10,000 deceptive and unsolicited
commercial electronic messages to be sent to Plaintiff's computer
server between October 25, 2005 and November 14, 2005.  Plaintiff
also alleges that the header information for those emails was
falsified, misrepresented or forged in a way that would mislead a

4

**United States District Court**
For the Northern District of California

1  reasonable recipient as to the contents and subject matter of the

2  message.

3       In the FAC, Plaintiff alleges that Spammer Defendants sent

4  these emails while working as employees or agents of the Lead

5  Generator Defendants, who had pre-existing contracts to advertise

6  the Mortgage Defendants' financial services and to deliver sales

7  leads to them.  Therefore, Plaintiff alleges that the Mortgage

8  Defendants "conspired with and at all times supported the Lead

9  Generators and Spammers" and "benefitted financially and will

10 continue to benefit from their conspiratorial relationship with

11 Lead Generators and Spammers."  FAC ¶ 13, 16.  Plaintiff alleges

12 that Mortgage Defendants "knew or consciously avoided knowing" that

13 the Lead Generators' and Spammers' actions were injuring Plaintiff.

14                        LEGAL STANDARD

15      As stated in the Court's order regarding the first motion to

16 dismiss, a motion to dismiss for failure to state a claim will be

17 denied unless it is "clear that no relief could be granted under

18 any set of facts that could be proved consistent with the

19 allegations."  Falkowski v. Imation Corp., 309 F.3d 1123, 1132 (9th

20 Cir. 2002), citing Swierkiewicz v. Sorema N.A., 534 U.S. 506

21 (2002).  Although the court is generally confined to consideration

22 of the allegations in the pleadings, when the complaint is

23 accompanied by attached documents, such documents are deemed part

24 of the complaint and may be considered in evaluating the merits of

25 a Rule 12(b)(6) motion.  Durning v. First Boston Corp., 815 F.2d

26 1265, 1267 (9th Cir. 1987).

27

28                                    5

DISCUSSION

I.    Response to the Court's Order

Defendants argue that Plaintiff has failed to comply with the Court's order dismissing the original complaint and granting leave to amend to plead averments of fraud with particularity as required by Federal Rule of Civil Procedure 9(b).

A.    Nature of the Allegedly Fraudulent Subject Lines

In granting leave to amend the complaint, the Court advised Plaintiff that it "must state with particularity the nature of the allegedly fraudulent subject lines."  June 30, 2006 Order at 19. In its FAC, Plaintiff includes examples and states that the subject lines "were clearly intended to get someone to open the email by telling them that their loan was pre-approved ('Pre-approved rate #uzthxvmll') or that a loan was approved ('Notice: Loww Mortgage Ratee Approved')."[2]  FAC ¶¶ 33, 51.

This statement is similar to Plaintiff's statements regarding the non-existent domain names that this Court already deemed sufficiently particular when considering the original complaint. There the Court found that the complaint "state[d] with particularity how the allegedly fraudulent header information purporting to identify the sender of the email was false, [] explaining that the emails included domain names [] that were registered to unknown and false identities."  June 30, 2006 Order at 9.  Plaintiff has similarly alleged that the subject lines led

_____

[2]Plaintiff alleges that the misspellings in the headers are intentionally included to deceive Plaintiff's spam-blocking software.  FAC ¶ 33.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

the recipients to believe that a loan was approved or pre-approved, when in fact the email was sent for the purpose of collecting information for mortgage companies to use in seeking customers.

Defendants point to the fact that Plaintiff has only provided two examples of headers, while they seek relief for over 10,000 separate emails. However, the examples provided, together with the explanation of the ways in which they were likely to mislead readers, are sufficient to satisfy the pleading requirements of Rule 9(b).

Therefore, the Court denies Defendants' motions to dismiss the FAC on the grounds that Plaintiff failed to state with particularity the nature of the allegedly fraudulent subject lines.

B.    Identity of the Sender(s) of the Spam

The Court also advised Plaintiff that it must allege with particularity the sender or senders of the allegedly fraudulent spam.  June 30, 2006 Order at 19.  However, the Court specifically found that "Plaintiff's averments of fraud do not extend to the initiation of the allegedly fraudulent commercial emails, but only to their content."  Id. at 10.  The Court therefore found that Plaintiff need not plead with particularity facts surrounding the initiation of the emails.

In its FAC, Plaintiff identifies the Spammer Defendants as the individuals who sent the emails, alleging that "Defendants SPAMMERS transmitted, for and in the hire of Defendants LEAD GENERATORS and MORTGAGE BROKERS, in excess of 10,000 deceptive and unsolicited commercial electronic mail advertisements."  FAC ¶ 48.  Further, Plaintiff indicates, "The sending of these illegal advertisements

7

United States District Court

For the Northern District of California

was procured, from the SPAMMERS, working as employees or agents of
LEAD GENERATORS, under contract for delivery to the MORTGAGE
BROKERS." Id.

Narrowing the allegations of fraud to those emails that were
sent by three identified Spammer Defendants acting as the employees
or agents of two identified Lead Generator Defendants together with
the existing particularized statements regarding the content of the
emails is sufficient to "give defendants notice of the particular
misconduct which is alleged to constitute the fraud charged so that
they can defend against the charge" as required by Rule 9(b).
Semegen, 780 F.2d at 731.  Therefore, the Court finds that
Plaintiff has identified with sufficient particularity the senders
of the allegedly fraudulent spam.

However, as Defendants note, Plaintiff only makes the
particularized statement with respect to its State anti-spam claim,
and continues to allege only that "Defendants sent in excess of
10,000 separate items of electronic mail" with respect to its
federal anti-spam claim.  FAC ¶¶ 31, 48.  Therefore, the Court
denies Defendants' motion to dismiss Plaintiff's State anti-spam
claim but grants the motion to dismiss Plaintiff's federal anti-
spam claim.  Because both claims are based on the same factual
basis, the Court grants Plaintiff leave to amend to include the
particularized statement from the State cause of action in the
federal cause of action.  If Plaintiff does so, the Court will not
entertain an additional motion to dismiss.

II.  The CAN-SPAM Act Claim

In deciding the first motion to dismiss, the Court rejected

8

United States District Court

For the Northern District of California

1  Defendants' claim that Plaintiff's original complaint failed to

2  state a claim under the CAN-SPAM Act because it failed to allege

3  that Mortgage Defendants initiated the spam in question.

4  Defendants now argue that Plaintiff's FAC fails to allege that

5  Mortgage Defendants initiated the emails because of the addition of

6  the third category of defendants, the Lead Generator Defendants.

7  As this Court previously found, to state a claim against the

8  Mortgage Defendants under the CAN-SPAM Act, Plaintiff must "prove

9  that they paid or induced the Spammer Defendants to initiate

10 commercial email messages and that the Mortgage Defendants acted

11 either with actual knowledge, or by consciously avoiding knowing,

12 that the Spammer Defendants' acts were illegal."  June 30, 2006

13 Order at 11.

14      Defendants argue that the inclusion of the Lead Generators

15 removes the potential for liability for the Mortgage Defendants

16 because the FAC alleges that the Lead Generators hired the Spammers

17 and therefore provided the consideration required by the statute.

18 Aegis Motion to Dismiss at 5.  Plaintiff counters by arguing that

19 the statute does not require it to plead intent at all.  Opposition

20 at  3-4.  The Court finds neither position convincing.  While the

21 statute clearly requires that the plaintiff demonstrate intent on

22 the part of the defendant, it requires a demonstration of intent

23 "to pay or provide other consideration, or induce, another person

24 to initiate such a message on one's behalf."  15 U.S.C. § 7702(12)

25 (emphasis added).  Here, Plaintiff could prove consistent with the

26 allegations in the FAC that, through their contracts with Lead

27 Generator Defendants, Mortgage Defendants knowingly induced Spammer

28                               9

1    Defendants to send the illegal email messages.

2        Just as Plaintiff previously alleged that the Mortgage

3    Defendants "approved or ratified" the conduct of the other

4    defendants, Plaintiff now alleges that there existed business

5    relationships between the Mortgage Defendants, the Lead Generator

6    Defendants and the Spammer Defendants.  Plaintiff also alleges that

7    those business relationships included contracts between the Lead

8    Generator Defendants and the Mortgage Defendants to "advertise

9    MORTGAGE BROKERS financial services and deliver sales leads" and

10   that "MORTGAGE BROKERS knew, or consciously avoided knowing, at all

11   times that LEAD GENERATORS and SPAMMERS were violating the CAN-SPAM

12   ACT, and California Business and Professions Code § 117529.5

13   resulting in injury to Plaintiff."  FAC ¶ 14-15.

14       Because Plaintiff did not allege fraud with respect to the

15   initiation of the emails, the Court found that "Plaintiff need not

16   plead with particularity the circumstances surrounding the

17   initiation of the alleged email" and in particular that "Plaintiff

18   need not plead particular facts showing a business relationship

19   between the Mortgage Defendants and the Spammer Defendants."  June

20   30, 2006 Order at 10.  Plaintiff could prove consistent with the

21   allegations in the FAC that Mortgage Defendants knowingly induced

22   Spammer Defendants to send the illegal spam through Lead Generator

23   Defendants.

24       Therefore, the Court denies Defendants' motion to dismiss

25   Plaintiff's CAN-SPAM claim for failure to state a claim.

26   III. § 17529.5 Claim

27       The Court advised that, in order to include a § 17529.5 claim

28                                    10

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

in the FAC, Plaintiff must be able to allege "that Defendants advertised their services in the allegedly fraudulent emails." June 30, 2006 Order at 14.  In paragraph 49 of the FAC, Plaintiff quotes a typical email that can be construed as advertising the Mortgage Defendants' services.  While it does not name any of the defendants by name, the email does offer "up to 5 quotes from interested lenders."  FAC ¶ 49.  This clearly demonstrates that the Mortgage Defendant's services are being offered through the allegedly fraudulent emails.

Defendants attempt to argue that the FAC identifies only "USA Lenders Network" as advertising its services through the email. However, the email offers quotes from unidentified "interested lenders."  FAC ¶ 49.  Further, completing the form at the associated website leads to responses from each of the Mortgage Defendants.  Although the Mortgage Defendants are not individually named in the email cited in the FAC, their services are clearly referenced.  The Court finds that this is sufficient to state a claim under § 17529.5(b).  Therefore, the Court denies Defendants' motion to dismiss for failure to state a claim.

V.    Plaintiff's Civil Conspiracy Claim

In its June 30, 2006 Order, the Court denied Defendants' motion to dismiss Plaintiff's claim for civil conspiracy against Mortgage Defendants, subject to Plaintiff's successful statement of at least one underlying claim.  Defendants argue that Plaintiff has not successfully stated a claim and that the civil conspiracy claim should therefore be dismissed.  However, as discussed above, the Court finds that Plaintiff has stated a claim under both the CAN-

11

1  SPAM Act and § 17529.5(b).  Therefore, the Court denies Defendants'

2  motion to dismiss Plaintiff's civil conspiracy claim.

3  V.   Quicken Loans' Motion Based on Attachment of the Bishop
         Declaration

4

5      Defendant Quicken argues that Plaintiff has "pled itself out"

6  of its claim against Quicken because it attached to the FAC the

7  declaration of Amy Bishop, Quicken's Associate Corporate Counsel.

   Under Federal Rule of Civil Procedure 10(c), "A copy of any written
8
   instrument which is an exhibit to a pleading is a part thereof for
9
   all purposes."  The Ninth Circuit has held that, in considering a
10
   motion to dismiss for failure to state a claim, courts "are not
11
   required to accept as true conclusory allegations which are
12
   contradicted by documents referred to in the complaint." Steckman
13
   v. Hart Brewing, Inc., 143 F.3d 1293, 1295 (9th Cir. 1998).
14

15      Bishop's declaration states that Quicken requires the

16 companies it works with to agree to Quicken's policies and

17 contractual provisions requiring compliance with the CAN-SPAM Act

   and related laws.  Bishop Decl. at ¶ 3.  In particular, the
18
   declaration addresses the contract between Quicken and Azoogle.com,
19
   a Lead Generator Defendant, stating, "In its contract with Quicken
20
   Loans, Azoogle agrees to abide by Quicken Loans' privacy policy for
21
   companies with whom Quicken Loans does business and that policy
22
   requires compliance with junk email and other applicable laws.
23
   Moreover, in its contract with Quicken Loans, Azoogle 'represents
24
   and warrants that it has obtained any and all requisiste consent
25
   from consumers to pass their information to [Quicken.]'"  Id. at
26
   ¶ 6.
27

28                                    12

United States District Court

For the Northern District of California

1    Quicken argues that this clearly establishes a lack of

2    knowledge and intent on its part, which "completely contradicts and

3    rebuts Plaintiff's allegations in the [FAC]."  Quicken Motion to

4    Dismiss at 6.  Citing Northern Indiana Gun & Outdoor Shows, Inc. v.

5    City of South Bend, 163 F.3d 449 (7th Cir. 1998), Plaintiff

6    responds that it attached the declaration to its FAC for the

7    limited purpose of establishing the existence and role of the Lead

8    Generators and that it is not bound by other self-serving

9    statements in the declaration.  Opposition to Motion to Dismiss at

10   10-11.  Quicken counters by citing Thompson v. Illinois Dept. of

11   Prof. Req., 300 F.3d 750 (7th Cir. 2002).  In Thompson, the Seventh

12   Circuit noted that Northern Indiana Gun "reaffirmed the

13   well-settled rule that when a written instrument contradicts

14   allegations in a complaint to which it is attached, the exhibit

15   trumps the allegations."  300 F.3d at 754.  However, the Thompson

16   court characterized Northern Indiana Gun as appropriately

17   "appl[ying] a more flexible approach because the attached exhibit

18   was not at issue in the litigation."  Here, the declaration is not

19   at issue in the litigation.

20   Because the declaration is not a written instrument at issue

21   in this litigation, the self-serving statements included therein do

22   not bind Plaintiff.  Therefore, the Court finds that the attachment

23   of the Bishop declaration to the FAC does not negate Plaintiff's

24   claims against Quicken.

CONCLUSION

26   For the foregoing reasons, the Court grants Defendants'

27   motions to dismiss the FAC (Docket Nos. 87, 91, 99) in part and

28                                13

1  denies them in part and grants Plaintiff leave to amend to plead

2  with particularity the identity of the senders of the spam with

3  respect to its federal cause of action.[3]  The amended complaint

4  must be filed within a week of the date of this order.  The case

5  management conference is rescheduled for October 27, 2006 at 1:30

6  in order to allow Defendants Azoogle.com, Inc. and Leads Limited,

7  Inc. to answer the FAC.

8

9      IT IS SO ORDERED.

10

11 Dated:  9/27/06

       _____
12     CLAUDIA WILKEN
       United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24 [3]The Court grants Defendant Aegis' and Defendants Dorland and
   Cuervo's Requests for Judicial Notice (Docket Nos. 90, 96).
25     The Court also strikes from the record exhibits A and B to
   exhibit 1 of the FAC and orders Plaintiff to file redacted versions
26 of the exhibits omitting identifying information including the
   names of individuals seeking mortgages, home telephone numbers,
27 personal email addresses and home addresses.  Plaintiff need not
   file unredacted versions under seal.

28                              14

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ASIS INTERNET SERVICES, et al.

                Plaintiffs,

     v.

ACTIVE RESPONSE GROUP et al.,

              Defendants.

NO. C07 6211 TEH

ORDER DENYING MOTION TO
DISMISS

This matter came before the Court on July 21, 2008 on Defendant Active Response Group's Motion to Dismiss.  After considering the briefs and argument of the parties, the Court DENIES the motion.

**INTRODUCTION AND BACKGROUND**

Plaintiffs ASIS Internet Services and Foggy provide internet access services to individual customers.   Defendant Active Response Group is an internet marketer that hires subcontractors to send bulk commercial emails and thereby generate visitors for its customers' websites.  Plaintiffs allege that Defendant and related entities (collectively "ARG") sent thousands of unsolicited and misleading spam email messages to Plaintiffs' servers, in violation of the Controlling the Assault of Non-Solicited Pornography and Marketing ("CAN-SPAM") Act of 2003, 15 U.S.C. § 7704, and California Bus. & Prof. Code § 17529.5 (unlawful activities relating to commercial email advertisements). First Amended Complaint ("FAC").[1]   Each of the emails allegedly had false or misleading header information that concealed the true identity of the sender, in violation of 15 U.S.C.

_____

[1]   In response to Defendant's motion, Plaintiffs sought leave to file a proposed First Amended Complaint ("FAC").  Defendant addressed the FAC in Reply, contending the amendment would be futile because it suffers from the same legal defects. This Order therefore analyzes the sufficiency of the FAC rather than the original Complaint.

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

§ 7704(a)(1). FAC ¶ 28. Many also allegedly had subject lines that "would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents and subject matter of the message," in violation of 15 U.S.C. § 7704(a)(2). FAC ¶ 29. Moreover, the FAC alleges that the emails were sent to addresses acquired as the result of a directory harvest and by the use of automated tools or scripts, in violation of 15 U.S.C. § 7704(b)(1) and (2). FAC ¶ 32-33.

Plaintiffs bring this suit under 15 U.S.C. § 7706(g)(1), which provides a private right of action to any "provider of Internet access service adversely affected by a violation" of sections 7704(a)(1), (b), or (d) of the CAN-SPAM Act. With the FAC, they allege that they suffered various adverse effects from the sending and receipt of the subject emails, including having to process the emails over their servers, having to investigate the emails, and incurring expenses related to management of spam in general. FAC ¶¶ 25-27.

Defendant moves to dismiss on the grounds that these allegations are insufficient to establish standing because Plaintiffs failed to allege some "significant effect, monetary or technological" that was *caused by* the emails at issue. Defendant urges the Court to follow several recent decisions construing § 7706(g)(1), and hold that an IAP must allege it suffered discrete economic loss directly attributable to the deceptive emails alleged in the complaint in order to be "adversely affected by a violation" of the Act. The Court declines to do so. In an effort to place practical limits on the private right of action, those courts imposed additional standing requirements that are neither grounded in the language of the statute itself nor warranted by the legislative history. Their progressively more restrictive interpretations of the Act create a virtually insurmountable barrier to standing that is inconsistent with the statutory structure and purpose. Instead, this Court finds that a provider of Internet access services[2] has standing if it can show that it suffered spam-related harm or costs of the type typically experienced by ISPs rather than consumers, and carried the allegedly unlawful deceptive email over its facilities.

---

[2] This Order uses the terms "provider of internet access services," "IAP," and Internet service provider or "ISP" interchangeably.

1

2   **LEGAL STANDARD**

3       Although Defendant moves to dismiss both under Fed. R. Civ. Pro. 12(b)(1) and

4   12(b)(6), this Court resolves such questions of statutory standing under Rule 12(b)(6).

5   *Canyon County v. Syngenta Seeds, Inc.,* 519 F.3d 969, 975 n. 7 (9th Cir. 2008), *citing*

6   *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1175 (9th Cir. 2004) ("If a plaintiff has suffered

7   sufficient injury to satisfy the jurisdictional requirement of Article III but Congress has not

8   granted statutory standing, that plaintiff cannot state a claim upon which relief can be

9   granted").  Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(6) when a

10  plaintiff's allegations fail "to state a claim upon which relief can be granted." In evaluating

11  the sufficiency of a complaint's allegations, a court must assume the facts alleged in the

12  complaint to be true unless the allegations are controverted by exhibits attached to the

13  complaint, matters subject to judicial notice, or documents necessarily relied on by the

14  complaint and whose authenticity no party questions.  *Lee v. City of Los Angeles*, 250 F.3d

15  668, 688-89 (9th Cir. 2001).  In addition, a court need not "accept as true allegations that are

16  merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sprewell v.*

17  *Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on other grounds by* 275

18  F.3d 1187 (9th Cir. 2001).  A court should not grant dismissal unless the plaintiff has failed

19  to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*

20  *Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).  Moreover, dismissal should be with leave

21  to amend unless it is clear that amendment could not possibly cure the complaint's

22  deficiencies.  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).

23

24  **DISCUSSION**

25      The CAN-SPAM Act makes it unlawful to "initiate the transmission" of a commercial

26  email message that has false or misleading header information, or a deceptive subject line. 15

27  U.S.C. § 7704.  The Act is enforced by the Federal Trade Commission, other federal

28  agencies, and state attorneys general.  15 U.S.C. § 7706(a), (b), (f).  It also creates a limited

**United States District Court**
For the Northern District of California

3

right of action for injunctive relief or damages by any "provider of Internet access service adversely affected by a violation" of sections 7704(a)(1), 7704(b), or 7704(d) of the Act. 15 U.S.C. § 7706(g)(1).

Defendant argues this Court should follow the few others that have construed the standing provision. The first court to do so found, without much exegesis or ado, that the plaintiff had raised a triable issue of fact about whether it was "adversely affected" with a declaration that "high spam loads have caused decreased server response and crashes, led to higher bandwidth utilization, and forced expensive hardware and software upgrades" and a showing that it received "thousands of spam messages" on its servers. *Hypertouch Inc. v. Kennedy-Western University*, 2006 WL 648688, *4 (N.D. Cal. March 8, 2006).

Analysis in the second case to construe § 7706(g)(1), *Gordon v. Virtumundo, Inc.* 2007 WL 1459395 (W.D. Wash. May 15, 2007), was largely driven by the question of whether the plaintiff was even a *bona fide* internet service provider. The *Gordon* plaintiff asserted he had standing as an IAP even though it provided email service to only six customers, most of whom were family members, and none of whom paid for the service. *Id.* at *3, *9. Although plaintiff alleged that "the sheer volume of spam sent by Defendants" had cost him substantial time and resources to manage, plaintiff had "not hired any staff" to deal with spam, and had not specified what "resources" he had spent. *Id.* at *4. No customer had actually received spam messages because plaintiff used effective spam filters. *Id.* Plaintiff had not "come close" to using the bandwidth he leased from his server host, nor had his server costs gone up due to spam. *Id.*

Considering both the definition of an internet service provider and the requisite adverse effect, the *Gordon* court looked to the legislative history of the CAN-SPAM Act. It noted that Congress focused on harm specific to ISPs, going beyond the "burden of sorting through an inbox of spam" borne by the ordinary consumer. *Id.* at *7. The Report of the Senate Committee on Commerce, Science and Transportation found that spam "imposes significant economic burdens on ISPs" by clogging computer networks, slowing service, and forcing ISPs to invest in new equipment to increase capacity and hire customer service

United States District Court
For the Northern District of California

1   personnel to deal with subscriber complaints. *Id.* at *6, *quoting* S. REP. NO. 108-102, at 6

2   (2003)(Comm. Rep. on CAN-SPAM Act of 2003 (S. 877)) (hereafter "Senate Report").   The

3   court therefore concluded that the "adverse effect" to the plaintiff must be "real" and the type

4   uniquely experienced by ISPs, rather than consumers, *id.* at *7, and must rise beyond the

5   mere "annoyance of spam." *Id.* at *8.   Moreover, the court concluded that the required harm

6   must be "significant" "[i]f Congress's 'limited' right of action is to have any traction at all"

7   because without such a requirement, the right of action would be available to almost anyone.

8   *Id.* at *8.

9           Applying those standards, the *Gordon* court found that the plaintiff did not have

10  standing.   Plaintiff undisputably suffered "no harm related to bandwidth, hardware, Internet

11  connectivity, network integrity, overhead costs, fees, staffing, or equipment costs," and

12  alleged "no financial hardship or expense due to emails they received from Defendants," *id.*

13  at *8, and in fact had admitted to *benefitting* from spam by way of his "research" on spam

14  and "prolific litigation and settlements." *Id.* at *9.   Plaintiff was "not the type of entity that

15  Congress intended to possess the limited private right of action it conferred on adversely

16  affected bona fide Internet access service providers," and so lacked standing to sue under §

17  7706(g)(1). *Id.*

18          The *Gordon* decision, then, added two conditions for standing: the adverse effect must

19  be of a type unique to ISPs, rather than consumers, and it must be "significant."   Although

20  the court argued that plaintiff had shown no expense "*due to emails* they received from

21  Defendants," *id.* at *8, it did not explicitly require a causal relationship between the various

22  harms it listed and the subject emails.

23          The third decision to interpret the standing provision held that, even at the pleading

24  stage, a plaintiff must allege "the adverse effects that the ISP suffered from Defendant's

25  alleged spam." *Brosnan v. Alki Mortgage, L.L.C.*, 2008 WL 413732, *2 (Feb. 13, 2008).

26  The court intoned that the adverse effects must be "more than the time and money spent

27  dealing with spam," and

28

5

*United States District Court*
For the Northern District of California

1
2
3

must rise to a significant level of harm unique to an IAS.  These harms include a substantial decreased bandwidth, expenditures of resources to manage the spam (hired staff, purchased equipment, increased server costs) and compromised network integrity.

*Id.* at *3.  (citation omitted).  The *Brosnan* court relied solely on *Gordon* and *Hypertouch*, stating that "[a]ccording to the Act and *Gordon*, the plaintiff must have suffered actual adverse effects *as a result of Defendant's actions*, not merely pray for monetary damages to be established at some later point."  *Id.* at *2 (emphasis added).  Like the *Gordon* court, it gave no explanation of how or why an ISP was required to show a causal connection between the "significant" harms (such as decreased bandwidth, expenditures of resources or compromised network integrity) and the subject emails.

The most recent case to interpret the standing provision, *ASIS Internet Services v. Optin Global, Inc.*, 2008 WL 1902217 (N.D. Cal. April 29, 2008), was brought by Plaintiff in this action ASIS Internet Services, and was nearly identical to this one.  After reviewing the holdings and reasoning of *Hypertouch* and *Gordon*, the court observed that it found "the reasoning of *Gordon* to be sound."  *Id.* at *17.  The court's analysis was as follows:

> Further, having carefully reviewed the evidence, the Court concludes that no reasonable jury could find, based on the undisputed evidence, that the Emails that are the subject of this action caused any significant adverse effect to ASIS. While there is some evidence that spam generally has imposed costs on ASIS over the years, there is no evidence that the Emails at issue in this action resulted in adverse effects to ASIS: there is no evidence in the record that any of the Emails either reached any active ASIS users (rather than being filtered by Postini) or were the subject of complaints to ASIS; there is no evidence in the record that ASIS had to increase its server capacity or experienced crashes as a result of the Emails; and there is no evidence in the record that ASIS experienced higher costs for filtering by Postini as a result of the Emails. Indeed, the monthly charge for filtering that Postini charged ASIS was somewhat lower in the second half of 2005. when the Emails were sent, than in the first half of 2005. In short, ASIS suffered no meaningful adverse effect as a result of the Emails of any kind. As a result, it does not have standing to assert its claims under the CAN-SPAM Act.

*Id.* at *17.  Building upon the analysis of *Gordon*, the *Optin Global* court extended the *Gordon* court's finding that a plaintiff who had not shown harm "due to emails" received from the defendant had not shown standing, 2007 WL 1459395 at *8, to an affirmative requirement that plaintiff show the allegedly deceptive email caused the adverse effects listed.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

1    This requirement appears to have evolved as an artifact of courts' paraphrasing each

2  other, without an explicit analysis of what, in reality, would be required to show causation.

3  All courts that have construed the statute agree that the "adverse effects" on which standing

4  can be predicated include network crashes, higher bandwidth utilization, and increased costs

5  for hardware and software upgrades, network expansion and additional personnel. *See, e.g.,*

6  *Hypertouch* at \*4, *Gordon* at \*6, \*8, *Brosnan* at \*3, and *Optin Global* at \*17; *see also* 15

7  U.S.C. § 7701(6)(pointing to the "significant monetary costs on providers of Internet access

8  services ... that carry and receive such mail" as one of the harms the Act is intended to

9  redress).   Yet, as Plaintiff argued and Defendant conceded at the hearing in this matter, *none*

10  of these adverse effects can, as a practical matter, be traced or causally linked to a particular

11  email or batch of emails.  At the hearing, Defendant was unable to identify *any kind* of

12  adverse effect or economic loss that an ISP could show was the "result of" an allegedly

13  deceptive email.

14    Imposing a requirement that the plaintiff show a particular email caused the "adverse

15  effects," therefore, makes a standard for ISP standing that no ISP can realistically meet.  It

16  defines the private right of action set out in § 7706(g)(1) out of existence.  However, the

17  Court must choose a construction that gives meaning to each provision of the statute, *United*

18  *States v. Trident Seafoods Corp.*, 92 F.3d 855, 860 (9th Cir.1996)*, Beisler v. Commissioner*,

19  814 F.2d 1304, 1307 (9th Cir. 1987), including the private right of action.

20    Moreover, the legislative history of the CAN-SPAM Act appears to contradict *Optin*

21  *Global*'s restrictive interpretation of the standing requirement.  *See Tahara v. Matson*

22  *Terminals, Inc.,*  511 F.3d 950, 953 (9th Cir. 2007)(court may look to legislative history for

23  guidance where statute is ambiguous).  The Senate Report on the CAN-SPAM act provides,

24  *in the section on enforcement*, that:

25    Section 7(f) would allow a provider of Internet access service adversely affected by a
       violation of section 5 to bring a civil action in Federal district court or other court of
26    competent jurisdiction. *This could include a service provider who carried unlawful*
       *spam over its facilities*, or who operated a website or online service from which
27    recipient email addresses were harvested in connection with a violation of section
       5(b)(1)(A)(I).

28

7

1   S. REP. NO. 108-102 at 21 (2003)(Comm. Rep. on CAN-SPAM Act of 2003 (S.

2   877))(emphasis added).  This language equates "carrying unlawful spam" with adverse

3   effects caused by the violation, and makes no mention of an additional requirement that the

4   plaintiff link the cost of carrying spam to specific emails.  Moreover, the portion of the Act

5   governing statutory damages for the private right of action makes them dependent on the

6   number of unlawful email messages "transmitted or attempted to be transmitted over the

7   facilities of the provider of Internet access service." 15 U.S.C. § 7706(g)(3)(A).  While this

8   language does not define adverse effect for the purposes of standing, it further suggests that

9   an ISP is wronged when it is forced to carry, filter, or investigate deceptive email.

10       The Court therefore holds that a provider of internet access services is "adversely

11  affected by a violation" of the CAN-SPAM Act within the meaning of § 7706(g)(1) if it has

12  suffered ISP-specific harms, such as the network problems or increased costs discussed

13  above, and has carried the unlawful spam over its facilities.  As Judge Samuel Conti

14  observed in a case analyzing the damages provisions of the Act, the structure and legislative

15  history of the CAN-SPAM Act show that its primary purpose is to punish spammers, not to

16  compensate its victims.  *Phillips v. Netblue, Inc.*, 2006 WL 3647116, *3-*4 and n.3 (N.D.

17  Cal. December 12, 2006), citing the "Purpose of the Bill" portion of the Senate Report,

18  *supra*.  Providers of internet access service can seek an injunction and collect damages of up

19  to a hundred dollars per email for each violation or actual damages, together with attorney's

20  fees. § 7706(g)(1), (3) and (4).  States enforcing the Act can obtain injunctive relief, fees, and

21  damages of up to $250.00 per email.  § 7706(f)(1), (3) and (4).  The Act even orders the

22  Federal Trade Commission to create a bounty payable to those who track down spammers

23  and provide information leading to the FTC's collection of a civil penalty, *id.* at *5, *citing* 15

24  U.S.C. § 7710 – further proof that punishment and deterrence, rather than compensating

25  harm, are the Act's primary goals.  A broad interpretation of the standing provision which

26  allows ISPs to join in enforcing the Act is consonant with this statutory purpose, and more

27  fully effectuates the purpose of the private right of action than the restrictive *Optin Global*

28  construction. *See Resident Councils of Washington v. Leavitt,* 500 F.3d 1025, 1032 (9th Cir.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   2007), *quoting Tcherepnin v. Knight,* 389 U.S. 332, 336 (1967)(court should construe

2   remedial legislation broadly to effectuate its purposes).

3        Defendant intimates a broad interpretation of the standing requirement will make

4   damages untethered to any real harm suffered by the ISP,[3] and will create a flood of suits by

5   "spam litigation mills" – ISPs who have suffered no discrete harm and who, with modern

6   technology, can successfully filter spam before it reaches their customers.  But again, the

7   focus of the Act is not to compensate ISPs for the burdens of filtering spam, but to penalize

8   and deter those who would send false, deceptive, and misleading email.  There is no reason

9   to hold that ISPs that block deceptive email (and incur costs doing so) cannot enforce the

10  CAN-SPAM Act's prohibitions.  On the contrary, a holding that an ISP which successfully

11  protects its consumers with filters and other spam management has no standing to bring suit

12  would emasculate the private right of action, undercut the deterrent purposes of the Act, and

13  inappropriately "shift[] to the victim the responsibility to avoid spam." *See Netblue,* 2006

14  WL 3647116, *4.

15       Plaintiffs have alleged facts sufficient to show they were "adversely affected by a

16  violation" of the Act.  The FAC alleges Plaintiff ASIS was adversely affected because it

17  received, processed, and stored the spam emails at issue in this suit; because it spends

18  significant employee time dealing with spam, including approximately $3,000 per month in

19  spam filtering costs and employee time;  has been forced to expand its server and network

20  capacity because of spam; and has experienced network slow downs because of spam.  FAC

21  ¶ 26.  The FAC alleges Plaintiff Foggy was forced to purchase a new filtering system

22  because of spam, in part because of the emails at issue in this case, and that Plaintiff Joel

23  Housholter and his system administrator collectively spend about nine hours a week working

24  on problems caused by spam.  FAC ¶ 27.  Plaintiffs therefore adequately allege that they

25  suffered ISP-specific harm because they incurred spam-related expenses for filtering

26  _____

27       [3]  This argument echoes *Gordon* court's reasoning that if the plaintiff ISP were not required
to show "substantial actual harm," the per-email statutory damages under § 7706(g)(3) would
28  effectively impose strict liability on spammers for any email any ISP received.  2007 WL 1459395
at *8.

United States District Court

For the Northern District of California

1  systems, expanded server and network capacity, and personnel time.  Plaintiffs also allege

2  that they carried the allegedly unlawful emails over their facilities.  FAC ¶¶ ¶¶ 13-16, 23-24.

3  These allegations, taken as true, are sufficient to allege standing under 15 U.S.C.

4  § 7706(g)(1).[4]

5

6  **CONCLUSION**

7          Defendant's Motion to Dismiss is DENIED, and Plaintiff's request for leave to file the

8  First Amended Complaint is GRANTED.  The stay of discovery the Court ordered at the

9  hearing on this matter is vacated, and the parties are to proceed with limited discovery as

10  discussed at the hearing.   A Case Management Conference is hereby set for 1:30 p.m. on

11  October 20, 2008.  The parties are to submit a Joint Case Management Conference Statement

12  no later than October 13, 2008.

13

14

15  **IT IS SO ORDERED.**

16  Dated:   July 30, 2008
                                        _____
                                        THELTON E. HENDERSON, JUDGE
                                        UNITED STATES DISTRICT COURT

17

18          [4]      Because the FAC alleges solely that unassigned and inactive email accounts received

19  the spam emails, FAC ¶ 17, Defendant also contends Plaintiffs were not acting as "providers of
    internet access services" within the meaning of § 7706(g)(1) when they administered these

20  unassigned an inactive email accounts.  The argument has no merit.  For the purposes of the Act,
    "internet access service" is

21

22          a service that enables users to access content, information, electronic mail, or other services
            offered over the internet, and may also include access to proprietary content, information,
            and other services as part of a package of services offered to consumers.

23

24  47 U.S.C. § 231(e)(4);  15 U.S.C. § 7702(11) ("internet access service" has meaning given in 47
    U.S.C. § 231(e)(4)).   Providing that service to consumers entails more than simply administering

25  the email accounts of those active consumers; other components of the business, from administering
    payroll to filtering spam to managing closed accounts, are part of the integral process of running a
    business.   Administrative accounts "are used by internet access providers for testing, configuring,

26  and maintenance of email computer servers."  Plaintiffs' Memorandum of Points and Authorities in
    Support of Imposition of a Protective Order, filed April 21, 2008.  Emails sent to inactive and closed

27  accounts consume server and filtering resources.  Both mechanically and conceptually,
    administering closed and inactive accounts is part of providing internet access service.   Defendant

28  offers no principled reason or precedent to suggest that the Court should treat an entity differently
    depending upon which of the components of running such a business is at issue.

United States District Court
For the Northern District of California

1

2

3

4

5

6           IN THE UNITED STATES DISTRICT COURT

7        FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

ASIS INTERNET SERVICES, et al.,

10

            Plaintiffs,                    No. 08-03186  EDL

11

   v.                                      **ORDER GRANTING PLAINTIFFS'**
12                                         **MOTION FOR SUMMARY JUDGMENT,**
                                           **GRANTING PLAINTIFFS' MOTION TO**
13  RICHARD RAUSCH, et al.,                **SEVER, DENYING AS MOOT**
                                           **PLAINTIFFS' MOTION TO DISMISS**
14          Defendants.                    **AND GRANTING LEAVE TO FILE**
                                           **AMENDED COMPLAINT**
15  _____/

16

17        Plaintiffs Asis Internet Services and Joel Householter, dba Kneeland Engineering, dba

18  Foggy.net allege that they have received 24,724 unsolicited commercial email advertisements from

    Defendants[1] Richard Rausch, Kirk Whiting, and Edward Heckerson, who are individuals doing
19
    business as Find a Quote.  Plaintiffs allege that Defendants have violated the Controlling the Assault
20
    of Non-Solicited Pornography and Marketing Act of 2003 (CAN-SPAM Act), 15 U.S.C. § 7701 et
21
    seq., which restricts the transmission of unsolicited commercial email.
22
          On October 16, 2008, the clerk of the court entered default against Rausch and Whiting.  On
23
    March 19, 2009, the clerk entered default against Heckerson.  On July 7, 2009, the parties stipulated
24
    to set aside default against Heckerson.  Also on July 7, 2009, Plaintiffs withdrew their motion for
25
    default judgment against Rausch, Whiting and Heckerson.  On September 3, 2009, the parties
26
    stipulated to set aside the default against Whiting.  Rausch remains in default.
27
          On September 8, 2009, Heckerson and Whiting answered the amended complaint.  On October
28

_____

            [1]        Plaintiff dismissed Defendant Mark Theis on March 2, 2009.

30, 2009, Plaintiffs filed a motion for summary judgment against Heckerson, and later filed a proof of service dated October 30, 2009. The motion was set for hearing on December 22, 2009. When Heckerson did not file an opposition, the Court continued the hearing and provided another opportunity for him to oppose. Despite the continuance, Heckerson did not file an opposition to the Motion for Summary Judgment by the December 29, 2009 deadline. Accordingly, the Court held a hearing on Plaintiff's motion for summary judgment on January 19, 2010. At that hearing, the Court permitted Plaintiffs to file additional briefing on the question of whether Plaintiffs had standing.

On February 9, 2010, Plaintiffs filed a supplemental declaration of the president of Asis Internet Services in support of Plaintiff's standing. Later, on February 18, 2010, Plaintiffs filed a Motion to Dismiss Defendant Whiting and a Motion to Sever Defendant Rausch. No Defendant opposed the motions. On March 30, 2010, the Court held a hearing on the Motion to Dismiss and the Motion to Sever, and a further hearing on the Motion for Summary Judgment. The Court provided Plaintiffs another opportunity to file additional briefing on the issue of damages under the CAN-SPAM Act, which Plaintiffs filed on April 2, 2010.

For the reasons stated at the January 19, 2010 and March 30, 2010 hearings and in this Order, Plaintiffs' Motion for Summary Judgment is granted, Plaintiffs' Motion to Sever is granted, and Plaintiffs' Motion to Dismiss is denied as moot because the Court granted Plaintiffs leave to file an amended complaint.

**Motion for Summary Judgment against Defendant Heckerson[2]**

**Facts**

Plaintiff Asis Internet Services is an internet access service, in operation since 1995, in Garberville, California. See White Decl. ¶ 2. Asis owns various domain names used to provide internet and email services. See id. ¶ 9. Asis provides dial-up and broadband internet and email service to much of the population of Garberville. See id. ¶ 2. Asis has just under 1,000 internet access and email customers. See id. Asis provides its services through its own equipment, service agreements with Postini, Falcon Knight, AT&T and other vendors, and its team of four employees.

---

[2]     Plaintiffs and Heckerson have consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c).

1    See id. ¶ 7.

2        Asis receives approximately 200,000 spam emails per day to all of its and its customers; email

3    accounts, both active and inactive. See White Decl. ¶ 5. It costs approximately $3,000 per month to

4    process spam emails in both processing and employee costs. See id. Some emails have a higher

5    cost if they contain viruses or hacker software, or if they result in customer complaints. See id. Asis

6    occasionally suffers network and server slow downs based on daily receipt of spam emails. See id.

7        Between November 16, 2006 and May 5, 2008, Asis received 24,724 emails from Defendants

8    that are the subject of this case. See White Decl. ¶ 6. Asis received the emails first on its filtering

9    service operated by Postini, then transferred, processed and stored the emails on its email server, and

10   then transferred the emails to its attorney where they were stored on a special spam storage and

11   investigation server. See id.; Ex. C.

12   **Legal Standard**

13       Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on

14   file, and any affidavits show that there is no genuine issue as to any material fact and that the movant

15   is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Material facts are those which

16   may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

17   A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return

18   a verdict for the nonmoving party. Id. The court must view the facts in the light most favorable to

19   the non-moving party and give it the benefit of all reasonable inferences to be drawn from those

20   facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must

21   not weigh the evidence or determine the truth of the matter, but only determine whether there is a

22   genuine issue for trial. Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

23       A party seeking summary judgment bears the initial burden of informing the court of the basis

24   for its motion, and of identifying those portions of the pleadings and discovery responses that

25   demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317,

26   323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively

27   demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue

28   where the nonmoving party will bear the burden of proof at trial, the moving party can prevail

**United States District Court**
For the Northern District of California

3

merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Id. If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial." See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250. If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323.

**Discussion**

Plaintiffs move for summary judgment based on 15 U.S.C. §§ 7704(a)(1) and (a)(2) of the CAN-SPAM Act. The CAN-SPAM Act prohibits such practices as transmitting messages with "header information that is materially false or materially misleading." See 15 U.S.C. § 7704(a)(1).[3] Further, the CAN-SPAM Act prohibits transmission of a commercial electronic message by a person with actual or fairly implied knowledge that the subject heading would be likely to mislead a

---

[3]     15 U.S.C. § 7704(a)(1) states:

(a) Requirements for transmission of messages

(1) Prohibition of false or misleading transmission information

It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a transactional or relationship message, that contains, or is accompanied by, header information that is materially false or materially misleading. For purposes of this paragraph--

(A) header information that is technically accurate but includes an originating electronic mail address, domain name, or Internet Protocol address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations shall be considered materially misleading;

(B) a "from" line (the line identifying or purporting to identify a person initiating the message) that accurately identifies any person who initiated the message shall not be considered materially false or materially misleading; and

(C) header information shall be considered materially misleading if it fails to identify accurately a protected computer used to initiate the message because the person initiating the message knowingly uses another protected computer to relay or retransmit the message for purposes of disguising its origin.

**United States District Court**
For the Northern District of California

1   recipient about a material fact regarding the contents of the message. See 15 U.S.C. § 7704(a)(2).[4]

2            **Standing**

3      "[T]he CAN-SPAM standing inquiry involves two general components: (1) whether the

4   plaintiff is an 'Internet access service' provider ('IAS provider'), and (2) whether the plaintiff was

5   'adversely affected by' statutory violations." Gordon v. Virtumundo, Inc., 575 F.3d 1040, 1049 (9th

6   Cir. 2009). As to the first element, the Ninth Circuit noted that the CAN-SPAM Act defines

7   "Internet access service" by reference to the Communications Act, see 15 U.S.C. § 7702(11), which

8   provides:

9            The term "Internet access service" means a service that enables users to access
             content, information, electronic mail, or other services offered over the Internet, and
10           may also include access to proprietary content, information, and other services as part
             of a package of services offered to consumers. Such term does not include
11           telecommunications services.

12   47 U.S.C. § 231(e)(4). The Ninth Circuit declined to set forth a general test or to define the outer

13   bounds of what an IAS provider is, but stated generally that: (1) providing email accounts alone is

14   not sufficient to be an IAS provider; (2) IAS providers are generally distinct from entities that

15   merely carry or receive such email; and (3) there may be a technical or hardware component implicit

16   in the definition. Gordon, 575 F.3d at 1051-52. The plaintiff in Gordon was not an IAS provider

17   because he did not have physical control over or access to the hardware, his service appeared to be

18   limited to using a control panel via an ordinary Internet connection through an ISP to set up email

19   accounts and other administrative tasks, he had a nominal role in providing internet services, and he

20   did not take any precautions to avoid receiving spam. See Gordon, 575 F.3d at 1052.

21      Here, by contrast, Plaintiff is a corporation licensed to do business in California that provides

22

23      [4]    15 U.S.C. § 7704(a)(2) states:

24           (2) Prohibition of deceptive subject headings

25           It is unlawful for any person to initiate the transmission to a protected computer
             of a commercial electronic mail message if such person has actual knowledge,
26           or knowledge fairly implied on the basis of objective circumstances, that a
             subject heading of the message would be likely to mislead a recipient, acting
27           reasonably under the circumstances, about a material fact regarding the contents
             or subject matter of the message (consistent with the criteria used in enforcement
28           of section 45 of this title).

1   dial-up, broadband internet and email service to almost 1,000 customers. See White Decl. ¶ 2. It

2   has been in business since 1995, provides services using its own equipment, has service contracts

3   with outside vendors, and has four employees. See id. ¶ 7. There is no triable issue of fact as to

4   whether Plaintiff is an ISP.

5         As to the second element, the Gordon court did not provide an outer limit of the meaning of

6   "adversely affected" in this context, but did define some of its contours. First, the "type of harm

7   envisioned by Congress did not encompass the ordinary inconveniences experienced by consumers

8   and end users." Gordon, 575 F.3d at 1053. Instead, the "harms redressable under the CAN-SPAM

9   Act must parallel the limited private right of action and therefore should reflect those types of harms

10   uniquely encountered by IAS providers." Id. The sorts of harms that may be within the statute

11   include: (1) "the cost of investing in new equipment to increase capacity and customer service

12   personnel to deal with increased subscriber complaints;" (2) "maintaining email filtering systems

13   and other anti-spam technology on their networks to reduce the deluge of spam;" and (3) "network

14   crashes, higher bandwidth utilization, and increased costs for hardware and software upgrades,

15   network expansion, and additional personnel." Id. However, ordinary filtering costs do not

16   constitute a harm. Id. at 1054 ("We expect a legitimate service provider to secure adequate

17   bandwidth and storage capacity and take reasonable precautions, such as implementing spam filters,

18   as part of its normal operations."). The Gordon court declined to enumerate each and every harm

19   that might satisfy the adverse affect element, but stated that "at a minimum . . . the harm must be

20   both real and of the type experienced by ISPs . . . . the harm must be of significance to a bona fide

21   IAS provider - something beyond the mere annoyance of span and greater than the negligible

22   burdens typically borne by an IAS provider in the ordinary course of business." Id. at 1053-54

23   (citing Hypertouch v. Kennedy-Western Univ., 2006 WL 648688, at *4 (N.D. Cal. Mar. 8, 2006)

24   (finding evidence of "decreased server response and crashes," "higher bandwidth utilization," and

25   "expensive hardware and software upgrades" sufficient harm for statutory standing)).

26         The Gordon court did not decide whether there must be a direct causal link between the

27   particular emails at issue in litigation and the ISP-type harms, but stated that:

28               To give the statutory text meaning there must be, at bare minimum, a demonstrated
                relationship between purported harms and the type of e-mail practices regulated by

the Act-i.e., a showing that the identified concerns are linked in some meaningful way to unwanted spam and, in turn, represent actual harm. The e-mails at issue in a particular case must, at the very least, contribute to a larger, collective spam problem that caused ISP-type harms.

Gordon, 575 F.3d at 1054.  The Gordon court rejected the argument that the harm for standing purposes is merely "the cost of carrying SPAM emails over the [Internet access provider's] facilities."  Id. at 1053, n.11.  The plaintiff in Gordon had not demonstrated that he was "adversely affected" because: (1) he had not hired additional personnel; (2) he had not experienced technical concerns or incurred costs that can be necessarily attributed to commercial email; and (3) he purposefully refused to implement spam filters or to make any other attempt to block spam.  See Gordon, 575 F.3d at 1055.

Here, unlike the plaintiff in Gordon, Plaintiffs have made a sufficient showing of adverse affect.  Specifically, Plaintiffs initially stated that they receive 200,000 spam emails per day, that processing the emails costs approximately $3,000 per month, that some emails have a higher processing cost, that Asis occasionally experiences network slow downs due to spam, and that Asis' contract with vendors provides for spikes in bandwidth without additional cost.  See White Decl. ¶ 5. Plaintiffs also state that the emails at issue in this case were received by Postini, a filtering service, and then processed and transferred to Asis's servers, and then transferred to counsel.  See White Decl. ¶ 6.  Plaintiffs have further stated that some its clients are local businesses that lack the resources to adequately screen for spam, and so hire Plaintiffs to do so.  See Supp. White Decl. ¶ 3. Three of Plaintiffs' clients complained about the specific spam at issue in this case, and resolution of those complaints consumed twenty-two hours of Plaintiffs' staff time.  See Supp. White Decl. ¶¶ 4-8.  Plaintiffs lose customers regularly as a result of spam, and would realize over one third more revenue per year if they did not have to spend money on addressing spam.  See id. ¶¶ 9-10. Plaintiffs' showing of standing is sufficient under Gordon, which requires "some combination of operational or technical impairments and related financial costs attributable to unwanted commercial email."  Gordon, 575 F.3d at 1053-54.

**Merits of Plaintiffs' claims**

Plaintiffs' motion is based on Heckerson's failure to answer Requests for Admissions. Plaintiffs served the Requests for Admission on September 9, 2009.  See Singleton Decl. Ex. A3.

7

1    Those Requests address the crux of the CAN-SPAM issues in this case.  For example, Request

2    Number 3 stated: "Admit that Defendant Edward Heckerson is, or was in the business of internet

3    marketing via sending, or having sent, bulk commercial email messages;" Request Number 5 stated:

4    "Admit that Defendant Edward Heckerson sent bulk commercial email messages for marketing

5    purposes;" Request Number 6 stated: "Admit that Defendant Edward Heckerson knew that the

6    Affiliates they were using to acquire leads were sending, or hiring others to send, unsolicited

7    commercial electronic emails in violation of the CAN-SPAM Act;" Request Number 7 states:

8    "Admit that Defendant Edward Heckerson knew that the Affiliates they were using to acquire leads

9    were sending, or hiring others to send, commercial electronic emails with false header information in

10   violation of the CAN-SPAM Act;" Request Number 9 stated: "Admit that Defendants Edward

11   Heckerson knew that the Affiliates they were using to acquire leads were sending, or hiring others to

12   send, commercial electronic email advertisements with misleading information on their behalf;"

13   Request Number 12 stated: "Admit that even though Defendants Edward Heckerson claims it does

14   not tolerate SPAM by its Affiliates, Defendant Edward Heckerson has taken no action sufficient to

15   stop or limit the use of SPAM by its Affiliates;" and Request Number 15 stated: "Admit that

16   Defendant Edward Heckerson sent or had sent by Affiliates, on Defendant's behalf, commercial

17   electronic mail messages advertising insurance that were sent to email addresses at the email server

18   with domain name of: asis.com, during the period of November 16, 2006 through May 5, 2008."

19   See id.  Heckerson did not respond to the Requests for Admission.  See Singleton Decl. ¶ 6.  On

20   October 13 and 15, 2009, Plaintiffs sent a letter and email advising Heckerson's counsel of the

21   overdue responses.  See id. ¶ 6; Ex. B.  Heckerson did not respond to the letter or email.  See id. ¶ 6.

22        If a party does not respond to Requests for Admission, they are deemed admitted.  See Fed. R.

23   Civ. P. 36(a)(3).  Rule 36 is self-executing; a matter that is admitted under this rule is conclusively

24   established unless the court permits the admission to be withdrawn or amended.  See Fed. R. Civ. P.

25   36(b).  Unanswered requests for admissions may be relied on as the basis for granting summary

26   judgment.  See Conlon v. U.S., 474 F.3d 616, 621 (9th Cir. 2007), citing O'Campo v. Hardisty, 262

27   F.2d 621, 624 (9th Cir. 1958); United States v. Kasuboski, 834 F.2d 1345, 1350 (7th Cir.1987)

28   ("Admissions made under Rule 36, even default admissions, can serve as the factual predicate for

8

summary judgment."); Cereghino v. Boeing Co., 873 F.Supp. 398, 403 (D. Or. 1994) (resulting admissions not improper merely because they relate to ultimate fact or prove dispositive of entire case).

By failing to respond to Plaintiffs' Requests for Admission, Heckerson has admitted liability under the CAN-SPAM Act. Specifically, with respect to the violation of § 7704(a)(1), Heckerson admits that he was in the business of internet marketing via sending or having sent bulk commercial email messages, that he contracted with one or more affiliates to send bulk commercial email messages and that he sent or had his affiliates send commercial electronic email messages containing false header information (Request Numbers 3, 4, 7). In addition, with respect to § 7704(a)(2), Heckerson admits that he knew that his affiliates were sending or hiring others to send commercial electronic mail advertisements with misleading information (Request Number 9).

Further, Heckerson's admissions satisfy the additional knowledge requirement when an action is brought by an ISP. Specifically, § 7704(a) prohibits the "initiation" of certain types of misleading email messages. Initiate is defined by the CAN-SPAM Act as: ". . . to originate or transmit such message or to procure the origination or transmission of such message, but shall not include actions that constitute routine conveyance of such message." 15 U.S.C. § 7702(9). "Procure," in turn, is defined to mean: ". . . intentionally to pay or provide other consideration to, or induce, another person to initiate such a message on one's behalf." 15 U.S.C. § 7702(12). Further, when an ISP brings an action under the CAN-SPAM Act, a special definition of "procure" applies:

> In any action brought under paragraph (1), this chapter shall be applied as if the definition of the term "procure" in section 7702(12) of this title contained, after "behalf" the words "with actual knowledge, or by consciously avoiding knowing, whether such person is engaging, or will engage, in a pattern or practice that violates this chapter".

15 U.S.C. § 7706(g)(2). Pursuant to the Requests for Admission, Heckerson admitted that he knew that his affiliates were sending or hiring others to send unsolicited commercial electronic emails in violation of the CAN-SPAM Act, that he knew that the affiliates were sending emails with false header information, misleading subject lines, and misleading information, and that he has established a pattern and practice of using spammers to acquire sales leads (Request Numbers 6, 7, 8, 9, 14).

**United States District Court**
For the Northern District of California

1    Accordingly, there is no triable issue of fact as to whether Heckerson violated the CAN-SPAM

2    Act, and Plaintiffs' Motion for Summary Judgment is granted.

3          **Damages**

4    In an action brought by an Internet service provider, statutory damages are available:

5          For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is
           the amount calculated by multiplying the number of violations (with each separately
6          addressed unlawful message that is transmitted or attempted to be transmitted over
           the facilities of the provider of Internet access service, or that is transmitted or
7          attempted to be transmitted to an electronic mail address obtained from the provider
           of Internet access service in violation of section 7704(b)(1)(A)(i) of this title, treated
8          as a separate violation) by--

9          (i) up to $100, in the case of a violation of section 7704(a)(1) of this title; or

10         (ii) up to $25, in the case of any other violation of section 7704 of this title.

11

12   15 U.S.C. § 7706(g)(3)(A).  Courts have discretion to award treble damages if the court finds that

13   the defendant acted willfully and knowingly or the unlawful activity included one or more of the

14   aggravated violations in § 7704(b).  See 15 U.S.C. § 7706(g)(3)(C).  Aggravated violations

15   contained in § 7706(b) include directory harvesting and automated creation of multiple email

16   accounts, both of which Plaintiffs argue occurred here.  In assessing damages, courts may consider

17   whether the defendant has established and implemented commercially reasonable practices and

18   procedures to prevent CAN-SPAM Act violations or the violation occurred despite commercially

19   reasonable efforts to maintain compliance with the CAN-SPAM Act.  See 15 U.S.C. §

20   7704(g)(3)(D).  Courts may also award attorneys' fees and costs.  See 15 U.S.C. § 7706(g)(4).

21         Plaintiffs seek statutory damages in the maximum amount of $100 per email for each violation

22   of § 7704(a)(1), and in the maximum amount of $25 per email for each violation of § 7704(a)(2), for

23   a total of $3,090,500.00.  Because there is no evidence that Heckerson has a practice or procedure in

24   place to prevent CAN-SPAM Act violations, and he has admitted that he has taken no action

25   sufficient to stop or limit the use of spam by his affiliates, the statutory bases for reducing damages

26   under § 7704(g)(3)(D) have not been met here.

27         At the hearing on March 30, 2010, the Court expressed doubt that Plaintiffs would be entitled

28   to the maximum amount of statutory damages on the facts of this case, and provided Plaintiffs leave

     to file supplemental briefing on the issue of damages, and in particular, to address the approach

United States District Court
For the Northern District of California

1   taken by <u>Facebook, Inc. v. Wallace</u>, 2009 WL 3617789 (N.D. Cal. Oct. 29, 2009).  In <u>Facebook</u>, the

2   plaintiff sought a default judgment of over $7 billion in statutory damages under the CAN-SPAM

3   Act and California Business and Professions Code section 22948.3 against an individual who

4   engaged in a phishing and spamming scheme that compromised the accounts of a substantial number

5   of Facebook users.  The court found that statutory damages were justified because the defendant

6   "willfully violated the statutes in question with blatant disregard for the rights of Facebook and the

7   thousands of Facebook users whose accounts were compromised by his conduct," and willfully

8   violated the TRO and preliminary injunction issued in that case.  <u>Facebook</u>, 2009 WL 3617789, at

9   *2.  Even so, and not ruling on the question of whether the award would violate due process, the

10  <u>Facebook</u> court was not persuaded that an award of over $7 billion was proportionate to the

11  defendant's offenses.  <u>Id.</u> at *2.  The court exercised its discretion to decline to award all of the

12  damages requested by the plaintiff, and instead awarded $50 for each of the 14,214,753 violations of

13  the CAN-SPAM Act, and a set amount for one violation of the state law, for a total award of

14  $711,237,650.00.  <u>Id.</u>  Given the magnitude of the award, the <u>Facebook</u> court declined to award

15  treble damages.  <u>Id.</u>

16      Statutory damages are warranted in this case given Heckerson's violations of the CAN-SPAM

17  Act.  However, as in <u>Facebook</u>, the Court is not persuaded that an award of $3 million is

18  proportionate to Heckerson's offenses, even without reaching the issue of whether the award would

19  violate due process.  This case involves far fewer emails than in <u>Facebook</u>, so the misconduct was

20  less pervasive and widespread.  Further, Heckerson did not willfully violate an injunction in this

21  case.  Heckerson simply did not engage in the same level of misconduct as the <u>Facebook</u> defendant,

22  so an award of the maximum statutory damages is not warranted.

23      Instead, this case is more similar to <u>Tagged, Inc. v. Does 1 through 10</u>, 2010 WL 370331 (N.D.

24  Cal. Jan. 25, 2010).  There, the defendant initiated a total of 6,079 spam emails to users of a social

25  networking site seeking to fraudulently entice users of that website to click on hyperlinks in those

26  spam messages that would take the user to an adult dating website.  <u>Tagged</u>, 2010 WL 370331, at *

27  1.  The court entered default judgment in favor of the plaintiff for, among other things, violations of

28  several provisions of the CAN-SPAM Act.  <u>Id.</u> at * 6.  With respect to damages, however, the court

United States District Court
For the Northern District of California

1 concluded:

2     It is true that defendant's violations, from what plaintiff has alleged, were intentional and willful, and statutory damage awards are justified to punish defendant and to

3 deter future violations. That does not justify an award of nearly two million dollars under the CANSPAM Act to plaintiff. A court has wide discretion to determine the

4 amount of statutory damages between the statutory maxima and minima. In calculating statutory damage, some courts have looked to estimates of actual

5 damages. Here, plaintiff gives no estimates of actual damages to itself nor how much defendant profited from his actions. Plaintiff cites to three other default judgment

6 orders to supports its position that it is entitled to nearly two million dollars in this instant action. In <u>Facebook v. Guerbuez</u>, No. C08-03889 (N.D.Cal. decided Nov. 21,

7 2008), Facebook was awarded $873 million against a defendant who had sent four million spam emails to other Facebook users. In <u>Myspace v. Wallace</u>, 2008 U.S. Dist.

8 LEXIS 75752 (C.D.Cal. May 28, 2008), Myspace was awarded $223 million against a defendant who had sent nearly 400,000 messages and posted 890,000 comments

9 from 320,000 "hijacked" Myspace.com user accounts.

10     In contrast, in this instant action, defendant Vogeler sent 6,079 individual emails to 6,079 Tagged users. Accordingly, this order concludes that it is just to award

11 statutory damages of $25 per violation, amounting to a total of $151,975. These damages along with permanent injunction will adequately serve the purpose of

12 punishment and deterrence.

13 <u>Id.</u> at *11-12 (internal citations omitted). Accordingly, the Court awards statutory damages of $25

14 per violation of § 7704(a)(1), and $10 per violation of § 7704(a)(2), for a total statutory damages

15 award of $865,340.00.

16     Plaintiffs argue that they are entitled to treble damages. Although Plaintiffs did not seek treble

17 damages in the original summary judgment motion, Plaintiffs raised the treble damages issue at the

18 hearing and in the supplemental briefing. Plaintiffs have provided persuasive evidence that

19 Heckerson engaged in conduct that warrants aggravated damages, and the total amount of trebled

20 damages is less than the award sought in Plaintiffs' motion.

21     The CAN-SPAM Act provides that:

22     (C) Aggravated damages

23     The court may increase a damage award to an amount equal to not more than three times the amount otherwise available under this paragraph if--

24
25     (i) the court determines that the defendant committed the violation willfully and knowingly; or

26     (ii) the defendant's unlawful activity included one or more of the aggravated violations set forth in section 7704(b) of this title.

27
28 15 U.S.C. § 7706(g)(3)(C). Plaintiffs argue that Heckerson engaged in aggravated violations by

conducting a directory harvest, which is prohibited under § 7704(b)(1)(A), and using automated

**United States District Court**
For the Northern District of California

1   scripts to acquire email accounts, which is prohibited under § 7704(b)(2).

2                              **Directory harvest**

3        The CAN-SPAM Act states that a directory harvest is an aggravated violation of the Act:

4        (1) Address harvesting and dictionary attacks--

5        It is unlawful for any person to initiate the transmission, to a protected computer, of a
         commercial electronic mail message that is unlawful under subsection (a) of this
6        section, or to assist in the origination of such message through the provision or
         selection of addresses to which the message will be transmitted, if such person had
7        actual knowledge, or knowledge fairly implied on the basis of objective
         circumstances, that--
8
9        (i) the electronic mail address of the recipient was obtained using an automated
         means from an Internet website or proprietary online service operated by another
         person, and such website or online service included, at the time the address was
10       obtained, a notice stating that the operator of such website or online service will not
         give, sell, or otherwise transfer addresses maintained by such website or online
11       service to any other party for the purposes of initiating, or enabling others to initiate,
         electronic mail messages; or
12
13       (ii) the electronic mail address of the recipient was obtained using an automated
         means that generates possible electronic mail addresses by combining names, letters,
         or numbers into numerous permutations.
14

15   15 U.S.C. § 7704(b)(1)(A).  According to Plaintiffs' president, Nella White, a directory harvest can

16   be demonstrated by looking at the actual emails which all contain both the "sent to" email account

17   and the actual name of the customer owning the account in the header information in the email.

18   White Decl. in Support of Brief re: Aggravated Damages ¶ 4; Ex. A.  Ms. White testified that many

19   of the email accounts that received the spam emails at issue in this case are closed and have been

20   closed for some time.  Id. ¶ 5; Ex. B.  However, the emails identify the actual consumer who owned

21   the email accounts.  Id.  According to Ms. White, the only way someone could have obtained the

22   customer information is through a directory harvest because the information does not exist anywhere

23   else and the owners of the accounts no longer have access to the email accounts to solicit emails.  Id.

24   ¶ 6.  Further, Ms. White states that Plaintiffs provide an Acceptable Use Policy on its servers, which

25   has been in place for a number of years.  Id. ¶ 7; Ex. C.  Ms. White's declaration is persuasive and

26   undisputed evidence that Heckerson conducted a directory harvest that justifies treble damages

27   under § 7706(g)(C).

28                              **Automated scripts**

                                        13

1   The CAN-SPAM Act states that use of automated scripts is an aggravated violation of the Act:

2       (2) Automated creation of multiple electronic mail accounts
3       It is unlawful for any person to use scripts or other automated means to register for
        multiple electronic mail accounts or online user accounts from which to transmit to a
        protected computer, or enable another person to transmit to a protected computer, a
4       commercial electronic mail message that is unlawful under subsection (a) of this
        section.

5

6   15 U.S.C. § 7704(b)(2).  According to Josh Mohland, a programmer/analyst for Plaintiffs' counsel's

7   firm, the emails in this case demonstrate use of an automated script.  Mr. Mohland stated that there

8   were 4,408 unique email addresses in the "From" headers of the 24,724 emails at issue in this case.

9   Mohland Decl. ¶ 3.  The majority of the emails followed the pattern:

10  name@subdomain.domain.com.  Mohland Decl. in Support of Brief re: Aggravated Damages ¶ 3;

11  Ex. A.  The "name" portion was either related to the product being advertised (e.g., lower

12  mortgage@), or a common name (e.g., joe@).  Id. ¶ 4.  The subdomains used in the emails usually

13  contained a word and a number (e.g., mail1).  Id. ¶ 5.  The pattern of emails also involved sending

14  emails from multiple subdomains and domains using the same "name," such as

15  jesse@mx7.greenthe.com, jesse@mx11.greenthe.com, jesse@m15.oilca.com and

16  jesse@vmx15.penintatt.com.  Id. ¶ 6.  Mr. Mohland opined that it is common practice for spammers

17  to acquire thousands of email accounts and domain names through automated scripts because the

18  current technology identifies the spammer fairly quickly and puts the sending email account, domain

19  name and IP address on blacklists and reputation-based lists used by spam filtering services used by

20  the sending and receiving ISPs to block additional further spam from those addresses.  Id. ¶ 8; Ex. B.

21  Mr. Mohland provides persuasive and undisputed evidence that Heckerson used automated scripts,

22  which constitutes an aggravated violation under the statute and justifies treble damages.

23      Accordingly, the Court exercises its discretion to treble the statutory damages award of

24  $865,340.00, for a total award of $2,596,020.00.

25  **Motion to Sever Defendant Rausch**

26      Provided no substantial right will be prejudiced, particular parties may be severed on the

27  grounds that joinder is improper under Federal Rule of Civil Procedure 20.  See William Schwarzer,

28  et al., Federal Civil Procedure Before Trial, § 16:161 (Rutter Group 2009) (citing Coughlin v.

**United States District Court**
For the Northern District of California

14

1   Rogers, 130 F.3d 1348 (9th Cir. 1997)).  Rule 20 provides for joinder of defendants if the right to

2   relief is asserted against them jointly, severally, or alternatively with respect to or arising out of the

3   same transaction or occurrence, and there is a common question of law or fact among defendants.

4   See Fed. R. Civ. P. 20.  Here, joinder of Rausch was not improper because Plaintiffs allege that he

5   was involved, along with the other Defendants, in the business that caused the spam at issue in this

6   case.

7       However, even where joinder is proper, a court may order severance under Federal Rule of

8   Civil Procedure 21 to prevent delay or prejudice.  See Schwarzer, Federal Civil Procedure Before

9   Trial, § 16:162 (citing Coleman v. Quaker Oats Co., 232 F.3d 1271, 1296 (2000)).  Here, Rausch is

10  in default and has filed for bankruptcy.  He has not consented to this Court's jurisdiction under 28

11  U.S.C. § 636(c).  His presence in this lawsuit prejudices Plaintiffs because the Court is prevented

12  from ruling on the summary judgment motion as to Heckerson, who has appeared, answered and

13  consented.  Accordingly, there is good cause to sever Rausch, and Plaintiffs' motion to sever Rausch

14  is granted.

15  **Motion to Dismiss Defendant Whiting**

16      The Court lacks authority to rule on Plaintiffs' motion to dismiss because Defendant Whiting

17  has not consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c).  See Nasca v.

18  Peoplesoft, 160 F.3d 578, 578-79 (9th Cir. 1998).  As stated at the hearing, however, the Court

19  granted Plaintiffs leave to file an amended complaint pursuant to Federal Rule of Civil Procedure 15

20  to remove Whiting as a Defendant.  Plaintiffs filed their amended complaint on April 2, 2010.

21  Accordingly, Plaintiffs' Motion to Dismiss Defendant Whiting is denied as moot.

22  **IT IS SO ORDERED.**

23  Dated: May 3, 2010

24  *Elijah D. Laporte*
    _____
    ELIZABETH D. LAPORTE
    United States Magistrate Judge

25

26

27

28

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MELALEUCA, INC., | |
| Plaintiff, | Case No. CV 07-212-E-EJL-MHW |
| v. | **REPORT AND RECOMMENDATION** |
| DARYL HANSEN, | |
| Defendant. | |

## INTRODUCTION

Pending before the Court is Defendant Daryl Hansen's Motion to Dismiss (Docket No. 38).[1] This action was filed on May 8, 2007 and the pending Motion was filed on October 24, 2008. The action has been stayed since February 13, 2009 upon the parties' representations that they were involved in settlement negotiations. On June 3, 2010, the parties informed the Court that no settlement had been reached and the case would be proceeding forward. Accordingly, the Court will now render its decision on the pending Motion.

---

[1] This motion was previously dismissed without prejudice while the parties were engaging in settlement discussions. At the status conference held on June 3, 2010, the parties indicated that settlement negotiations had broken down and that the motion was being renewed.

**REPORT & RECOMMENDATION - 1**

# REPORT

## BACKGROUND

Defendant Hansen resides in California and at the time of these alleged events,

worked as an independent marketing executive for a multi-level marketing company called

ITV. In connection with the work he performed for ITV, Hansen would attempt to get ITV

customers to join ITV, performing the same type of work.  Melaleuca, an Idaho

corporation, is engaged in a similar type of business model. Melaleuca encourages its

customers to become marketing executives by referring family and friends to Melaleuca to

purchase its products and allowing them to earn commission on any orders made by the

referred individuals.

Additionally, Melaleuca is the owner of the domain name iglide.net. Through

iglide.net, Melaleuca gives their marketing executives the option of purchasing Internet

services, including e-mail. Melaleuca provides e-mail accounts through the iglide.net

domain name and provides Internet access through a third-party Internet Service Provider

("ISP"), IP Applications. (Nye Aff., Docket No. 43-3, ¶¶ 4-5.)

After Hansen began working at ITV, he contacted individuals via e-mail, some of

whom worked at Melaleuca, and inquired whether they would be interested in hearing

about a new business opportunity. The e-mails gave a brief description of how ITV works,

exulted the benefits of working for ITV and asked the individuals to call him. It has been

represented at an earlier hearing that Hansen was aware that several of these individuals

**REPORT & RECOMMENDATION - 2**

worked at Melaleuca. Some of the Melaleuca marketing executives he contacted were users of the iglide.net e-mail service.

Melaleuca has brought four causes of action against Hansen, including violation of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM" Act), 15 U.S.C. § 7701, *et seq.*, violation of the Idaho Consumer Protection Act ("ICPA"), misappropriation of trade secrets and tortious interference with contract.

## DISCUSSION

### 1.      Standard of Review

A motion to dismiss under Rule 12(b)(6) will be granted when the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Generally, the Court may not consider any material beyond the pleadings in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Branch v. Tunnel*, 14 F.3d 449, 453 (9th Cir. 1993). Furthermore, if a Rule 12(b)(6) motion raises "matters outside the pleading" and these matters are "presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *Id.* at 453. When reviewing a motion for summary judgment, the proper inquiry is whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of

**REPORT & RECOMMENDATION - 3**

some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those which may affect the outcome of the case. *See id.* at 248.

## 2. Defendant's Motion

Hansen has moved to dismiss Melaleuca's CAN-SPAM claim on the grounds that Melaleuca does not have standing to bring such a claim. He also seeks to have count two, violation of the Idaho Consumer Protection Act, dismissed because it is preempted by federal law.

### A. *Standing under the CAN-SPAM Act*

There are two elements for standing under the CAN-SPAM Act: (1) Plaintiff must be a provider of "Internet access service" and (2) Plaintiff must be "adversely affected" by a violation of the Act. 15 U.S.C. § 7706(g)(1). Hansen argues that Melaleuca fails on both elements.

#### (1) *Internet Access Service*

The CAN-SPAM Act defines the term "Internet access service" by reference to the Communications Act, *see* 15 U.S.C. § 7702(11), which, in turn, defines Internet access service ("IAS") as a service that "enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to

**REPORT & RECOMMENDATION - 4**

consumers." 47 U.S.C. § 231(e)(4).

Prior to 2009, districts courts in the Ninth Circuit broadly interpreted the term

"Internet access service." *See Hypertouch, Inc. v. Kennedy-Western Univ.*, 2006 WL

648688 (N.D. Cal. March 8, 2006); *MySpace, Inc. v. The Globe.com, Inc.*, 2007 WL

1686966 (C.D. Cal. Feb. 27, 2007). In 2009, the Ninth Circuit weighed in on the matter

and expressly rejected an overly broad interpretation of "Internet access service" that

would ignore congressional intent. *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1051 (9th

Cir. 2009). The court recognized that Congress intended to "exclude plaintiffs who,

despite certain identifying characteristics, did not provide the actual, *bona fide* service of a

legitimate operation." *Id*. at 1050 (emphasis in original). While recognizing that standing

would not be limited to traditional Internet service providers ("ISPs"), the service that

connects customers to the Internet itself, the Ninth Circuit held that providing e-mail

accounts alone would not be sufficient. *Id*. Without setting forth a general test or defining

the outer bounds of what it means to be an "Internet access service" provider, the court

noted that there "may be a technical or hardware component implicit in the definition." *Id*.

at 1052. In *Gordon*, the court held that the plaintiff was not a provider of "Internet access

service" because it hosted its registered domain name on leased server space, did not have

access or physical control over the hardware, and a third party enabled his online access.

*Id*.

Like the plaintiff in *Gordon v. Virtumundo*, Melaleuca provides e-mail accounts to

**REPORT & RECOMMENDATION - 5**

its customers through the iglide.net domain name which it owns. Melaleuca also, like the

plaintiff in *Gordon*, provides Internet access through a third party ISP called IP

Applications. Melaleuca does not have access or control over the hardware that enables

Internet access. Because Melaleuca does not have more than a "nominal role in providing

Internet-related services," it does not fall within the definition of an "Internet access

service" provider. *See Gordon v. Virtumundo*, 575 F.3d at 1052. Accordingly, Melaleuca

lacks standing to bring a claim under the CAN-SPAM Act.

      (1) *Adversely Affected*

      Even if Melaleuca was found to be an IAS provider, it would also have to satisfy

the "adversely affected" element in order to have standing under the CAN-SPAM Act. In

*Gordon*, the Ninth Circuit addressed what type of harm would satisfy the "adversely

affected" element in order to confer standing. The court found that the "harms redressable

under the CAN-SPAM Act must parallel the limited private right of action and therefore

should reflect those types of harms uniquely encountered by IAS providers," not merely

consumers and end users. 575 F.2d at 1053. Examples of the type of harm Congress

wanted to protect against, that were identified in the Committee Report, included

investment in new equipment for increased capacity, customer service personnel to deal

with increased complaints, and other anti-spam technology to reduce deluge of spam. *Id.*

(citing S. Rep. No. 108-102, at 6). Courts have similarly found the harms such as "network

crashes, higher bandwidth utilization, and increased costs for hardware and software

**REPORT & RECOMMENDATION - 6**

upgrades, network expansion, and additional personnel" were among the types of harms

envisioned by Congress. *Id.* (citing *ASIS Internet Services v. Active Response Group*, 2008

WL 2952809, *5 (N.D. Cal. July 30, 2008)). While the Ninth Circuit would not enumerate

each and every harm that might satisfy this element, it did note that the harm must be real

and the kind "experienced by ISPs." *Id.* That is, it must be of "significance to a *bona fide*

IAS provider, . . . greater than the negligible burdens typically borne by an IAS provider in

the ordinary course of business." *Id.* at 1054. Further, the court dictated that an especially

hard look should be taken if a court suspects that the plaintiff is not a *bona fide* Internet

access provider. *Id.*

As for the harm it experienced, Melaleuca argues as spam increases, it loses

customers, customer complaints increase and that it received at least six complaints

directly related to the e-mails sent by Hansen. Melaleuca also contends that spam increases

its cost of providing e-mail services due to increased personnel costs and increased costs

for storage. Melaleuca's ISP, IP Applications, bills Melaleuca for storage and support calls

in excess of prescribed amounts and accordingly Melaleuca pays a higher price for IP

Application's Internet services.  (Nye Aff. ¶¶ 9-12; Carter Aff., Docket No. 43-5, ¶ 10.)

The harm described by Melaleuca is not the type that Congress envisioned when it

enacted the CAN-SPAM Act. Melaleuca does not complain of requiring hardware

upgrades or higher bandwidth due to spam. The types of harms described by Melaleuca,

namely increased cost of IP Applications' Internet services, fall into the category of

**REPORT & RECOMMENDATION - 7**

"consumer and end user" harms described by the Ninth Circuit in *Gordon v. Virtumundo*.

*See* 575 F.3d at 1053. These harms were not envisioned by Congress when it limited the

private right of action to adversely affect IAS providers. They are not the type experienced

by ISPs or of significance to a *bona fide* IAS provider. Melaleuca fails to satisfy both

elements for standing set forth in the CAN-SPAM Act.[2]

### B. State Law Claims

Based on the Court's finding that Plaintiff's federal CAN-SPAM Act claim should

be dismissed, it is prudent to consider whether the Court should continue to exercise

jurisdiction over the remaining state law claims. *Acri v. Varian Associates*, 114 F.3d 999,

1001 (9th Cir. 1997) (en banc). Where, as here, the Court has determined prior to trial that

all federal claims shall be dismissed, "the balance of factors . . . will point toward

declining to exercise jurisdiction over the remaining state-law claims." *Id.* (quoting

*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350  n. 7 (1988)). Thus, in accordance

with the direction provided by the case law, and consistent with the factors set forth in 28

---

[2]  In an apparent effort to bolster its standing argument, on November 26, 2008, five days before
filing its response brief, Melaleuca received an assignment of claims from IP Applications for all CAN-
SPAM and other claims related to unsolicited commercial e-mail sent to e-mail accounts sold by
Melaleuca. Pl's Mem., Ex. A, Docket No. 43-2. Without deciding whether IP Applications would have
standing under the CAN-SPAM Act, the Court finds this assignment does not establish Melaleuca's
standing to bring a CAN-SPAM action against Hansen. Standing is determined at the time an action is
commenced. *See Minneapolis & St. L. R.R. Co. v. Peoria & Pekin Union Ry. Co.*, 270 U.S. 580, 586
(1926); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n. 4 (1992). Because this assignment occurred
more than a year after this action was filed, it does not cure the defects the Court has found with
Melaleuca's standing to bring a claim under the CAN-SPAM Act. *See also Blair-Naughton, LLC v. Diner
Concepts, Inc.*, 2007 WL 4463584, *2 (D. Kan. Dec. 17, 2007) (finding that party had no standing
because the purported assignment occurred after the case had been filed and two days prior to the party
filing their response to a motion to dismiss).

U.S.C. § 1367(c), the Court declines to exercise its discretion to hear the state law claims

and will dismiss the claims without prejudice to the Plaintiffs' right to refile them in state

court. For these reasons, the Court will not address the CAN-SPAM preemption argument

which can be raised in state court.

## **RECOMMENDATION**

IT IS RECOMMENDED that Plaintiff's Motion to Dismiss (Docket No. 38) **be**

**GRANTED**.

Written objections to this Report and Recommendation must be filed within fourteen (14)

days pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1, or as a result of failing to do

so, that party may waive the right to raise factual and/or legal objections to the United

States Court of Appeals for the Ninth Circuit.



DATED: June 29, 2010

_____
Honorable Mikel H. Williams
United States Magistrate Judge

**REPORT & RECOMMENDATION - 9**