IN THE U.S. DISTRICT COURT FOR MARYLAND,
SOUTHERN DIVISION

| | | |
|---|---|---|
| **BEYOND SYSTEMS, INC.** | * | |
| | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | **Case No.** 8:08-cv-00921 |
| | * | |
| **WORLD AVENUE USA, LLC, ET AL.** | * | |
| | * | |
| Defendants | * | |

**DECLARATION OF PAUL A. WAGNER
IN SUPPORT OF SUR-REPLY TO WAUSA'S REPLY
MEMORANDUM REGARDING MOTION FOR PARTIAL SUMMARY JUDGMENT
ON MARYLAND RESIDENCY**

I, Paul A. Wagner, state the following under oath:

1. I am over 18 years of age, have personal knowledge of the matters stated below unless otherwise indicated, and am competent to testify to the facts set forth in this Declaration.

2. I am the president of Beyond Systems, Inc. ("BSI"), plaintiff in this case.

3. I have reviewed the Reply Memorandum of Defendant World Avenue USA, LLC filed at Docket Entry 397 and its supporting exhibits and have identified facts that are misstated in those filings. I make the statements below based on my personal knowledge unless otherwise indicated.

The Reply states, at p. 19: "BSI has failed to present competent evidence -- or any evidence -- that the E-Mails At Issue sent to the electronic mail addresses containing the @hasit.com and @has-it.com domains were 'held' by BSI at the relevant time. Paul Wagner's Declaration states only that the addresses are held 'at this time.' " I respond that in my referenced Declaration, I was speaking in the context of the "658 emails giving rise to this suit

were sent to an email address ending in @hasit.com or @has-it.com," and clearly meant "[A]t this time" as in during a finite period of time -- i.e., during the relevant period.

The Reply states, at [pp. 19-20] "This conclusion is further buttressed by Wagner's reference to the Yahoo! agreement, which Wagner refers to as "[s]imilar."  Id. at  25. ... the e-mail address belongs to Yahoo! and not to BSI. Since Wagner refers to the Yahoo! address as "similar" to the @hasit.com and @has-it.com addresses, and the Yahoo! Address is not by its terms owned by Wagner, then same result should apply with @hasit.com and @has-it.com recipient e-mail addresses, i.e., Wagner does not own them."   I respond that In paragraph 25 of my referenced  declaration, I clearly indicated that Hypertouch, Inc. owned the hasit.com and has-it.com domain names, but that certain email addresses on those domains were assigned to and held by BSI.  I distinguished between "own" and "belong," and between domain names and email addresses on the domain names:

> "Hypertouch owns and controls those two domain names; BSI owns and
> controls all the other recipient domain names in this suit. By
> agreement between BSI and Hypertouch, BSI is the designated
> recipient for certain email addresses at the hasit.com or
> has-it.com domains. Those addresses belong to BSI at this
> time. Similarly, by agreement between BSI and Yahoo!,
> paulawagner2002@yahoo.com belongs to BSI at this time."

The Reply states, at p. 20, "WAUSA's Motion pointed to discovery responses in which BSI failed to identify any real person who received the E-Mails At Issue or objected to and refused to identify any such person. See Memorandum, pp. 14-15."

I respond that I see that WAUSA's memorandum now cites two sets of statements from BSI as proof that what it calls "fictitious email addresses are not  held by a Maryland resident," without defining "fictitious."  I refer to the following:

[Memorandum, p. 14]
   Rather than disclosing the identity of any real person who

> was a recipient, BSI raised a laundry list of inapplicable
> objections, including that "'recipient email address' is
> undefined."  See BSI's Response to Interrogatory 14 of the
> First Set of Interrogatories and Document Requests 1, 10 and
> 11 of the First Set of Document Requests, attached as
> Exhibit 11 to the Saunders Declaration.

[Memorandum, p. 15:]

> BSI admitted on the record that there is no real person
> behind those email addresses, there is no client, and that
> BSI is the recipient of the emails. See Paul Wagner
> Deposition, pp. 131: 22; 132: 1-8.

I respond that regarding p. 14, WAUSA's Interrogatory no. 14 is vague, and does not seek the identity of the person to whom the email address is held.  It asks: "Identify each of the EMAILS AT ISSUE wherein the recipient e-mail address was contained in the source code for the Selected  Domains."  Similarly, WAUSA's Requests for Production nos. 1 and 11 do not address this question.  BSI responded in part as follows to Request no. 10, and produced supporting documents:

> Each email address, and its underlying account on CommuniGate or
> SIMS, was assigned to BSI.  Server configuration files have been
> produced.

Regarding p. 15, I  testified that BSI was the person behind certain email addresses @hypertouch.com, and that they are not assigned to a client of BSI's but rather to BSI itself.  The context of the inquiry was explaining how a catch-all (wildcard) account worked.  BSI uses some wildcard email addresses frequently. [Paragraph 26 of the Wagner Declaration.]

I refer to my deposition at pp. 130-132:

> Q. Explain to me what that means for somebody
> sends an e-mail to the domain name of Hypertouch.com
> that's all going to be to the right of the at sign,
> correct?
> ...
> Q. So these clients that are going to use the

> domain name, how is that -- how does that work? Can you walk me through that?
> THE WITNESS: Which aspect -- we receive e-mail addressed to that domain name.
> ...
> Q. How does that - tell me how that e-mail gets to @Hypertouch.com?
> A. So all the e-mails at issue, I believe, have come to BSI. BSI is a recipient. Those e-mail addresses were not assigned to some other user at the time the e-mail was received. So BSI is the recipient of all those e-mails as well as an ISP for them. So there are other accounts to which Hypertouch routes e-mails, but none of those are at issue in this suit.

The Reply states, at pp. 22-23, "Wagner attempts to introduce evidence about BSI providing Internet and technology services to IBM, NASD, Motorola, Salsaweb/WEPA, Boxorox, NEIT Solutions, SELCO, St. Lukes House. This is the very same evidence that BSI withheld in response to the Fourth Request for Production.  I respond that all of the entities named above, except NEIT Solutions, were BSI clients before 2004.  St. Luke's is still a customer of BSI.

    4.     I have read Dr. Krawetz's Rebuttal Declaration at p. 2, stating, "... all 67,739 emails were delivered from the sender to mail servers in California."  The emails were sent to a recipient in Maryland (i.e., BSI). The emails were delivered to the recipient's mailbox located on one of multiple servers in Maryland, passing multiple other mail servers including the spammer's server(s) and Hypertouch's mail server in California.

    5.     In the same Rebuttal Declaration Dr. Krawetz states, at p. 2: "A secret agreement between BSI and Hypertouch, unknown to the sender, resent these emails from the successful delivery in California to BSI servers that may be located in Maryland."  I am aware that the domain name, hypertouch.com, is registered to BSI in Maryland (See for example Plaintiff's Exhibit G-7 at DE 344-7) and that the servers of both Hypertouch and BSI present an SMTP

banner to every connecting machine variously giving notice that the email will go to machines in Maryland and, for Hypertouch's servers, also in California. (See Exhibit J-1)

      6.     Dr. Krawetz states, at [p. 3]

> 7. Even though Paul Wagner knew the address was no longer accurate, BSI continued to use the incorrect address for years.
> 8. According to the company history of the UPS Store (see Exhibit 20100724-01), Mail Boxes Etc. was rebranded as The UPS Store in 2003. It is my understanding that the rebranding coincided with the change of address.

I respond that the renumbering of the street addresses in part of Wheaton Plaza did not coincide with the acquisition of Mailboxes, Etc. by the UPS Store in 2003. The address renumbering happened years later. Dr. Krawetz's understanding is incorrect. Dr. Krawetz gives no proof of the date of the renumbering or that any of World Avenue's bulk emailers had difficulty mailing a document to BSI. A functional phone number and email address likewise appears in the Whois registration of BSI's domain names. BSI transferred its principal address to 9501 Anchorage Place, Bethesda, MD 20817 on 2/13/2008. (See Exhibit 1 attached to World Avenue's MSJ, pp. 3-4 to Burton Deposition (containing Informal Action of the Sole Shareholder, Director, and President of BSI changing the Principal Office of BSI to 9501 Anchorage Place).)

    Dr. Krawetz states, at p. 3: "BSI uses it [Hypertouch's server at 75.16.30.107] for receiving mail to BSI domains including castalia.net and beyondsys.net." I respond that BSI uses that server only on an infrequent basis as a secondary mail server for castalia.net and beyondsys.net.

    Dr. Krawetz states further: "From the sender's viewpoint, this server functions as a BSI server because BSI configured its DNS to have email delivered to this server. There is no technical difference between BSI and Hypertouch."

I respond that end recipients Steptoe & Johnson, Perkins Coie and Gibson Dunn, for example, similarly route their email through an intermediary -- i.e. Postini. (See Exhibits J-2 and J-3.) There is a technical difference between the end recipients and the intermediary.

Dr. Krawetz states, at p. 4: "In paragraph 14, Wagner states that these applications are used for managing servers from within BSI. However, he contradicts himself in paragraph 17 by stating that he uses remote access software to control BSI's Maryland servers from remote locations, "including Colorado, California, Florida, and overseas, across the Internet."

I respond that I said BSI uses remote access software to connect to a second machine in the same building or across the Internet, and that certain BSI clients use remote access software to connect to certain BSI machines. These include Hypertouch, Inc.; Keivan Khalichi; and others.

Dr. Krawetz states, at p. 5: "Yahoo! does not run externally accessible remote access software on any of their public mail, web, or DNS servers."

I respond that WAUSA presents no proof, such as port scans of hundreds of Yahoo! server or a Yahoo! policy statement, in support of this new asserted fact. According to Dr. Krawetz, having a web-based administration capability is a remote access capability. (See Dr. Krawetz's citation of e.g. BSI's iTools Administration Server and BSI's CommuniGate Mail Servers [both in Krawetz Decl., p. 8]. Similarly, Yahoo allows customers to change their settings remotely via the web and will shortly be offering configurations via SSH. (See http://help.yahoo.com/l/us/yahoo/smallbusiness/webhosting/glossary/glossary-18.html)

Dr. Krawetz states, at p. 7: "However in paragraph 27, he claims that all emails sent to "@hypertouch.com" belong to BSI because BSI owns the domain. Either the emails belong to the designated recipient or they belong to the domain registrant, but not both."

I respond that I did not mention "email" in paragraph 27. Email, email address and domain name are distinct concepts, as are own and belong (belong being broader).

WAUSA makes additional statements and argument in its Reply that could have been raised in its Motion, which likewise merit rebuttal. The Reply states, at [p. 1], " ... its claim that a 4" x 1' UPS mail drop box smaller than a child's lunch box is really a "Virtual Office."

I respond that the record does not show what services the Mailboxes Etc ("MBE") in Wheaton, MD offered, or promised over the phone, when BSI signed up with it in 2003. The UPS Store's current web page is not very detailed, but does mention "Business Services," including "Fax Services, Send and Receive." Another web page for another UPS Store a few miles away (at http://www.theupsstoredc.com/tag/virtual-office-dc/) does mention being a "virtual office." I understand that the Mailboxes Etc services vary by location and owner.

The Reply states, at p. 1, footnote 1: "To date, Paul Wagner filed a total of 11 Declarations in this case and at least 46 more Declarations in the numerous other cases he has filed around the United States."

I respond that BSI has only filed suit only in Maryland (except a suit against Connexus Corp. and Hydra Media, Inc. in California), and that I have submitted most of the declarations as needed for specific topics during litigation involving heavy briefing by counsel, with hundreds of exhibits that require explanation or authentication. Defendants and their counsel have likewise filed numerous declarations in this action, addressing specific points as needed. I resided at the 1612 Sherwood Road, Silver Spring, MD address until 1995. BSI has had clients in Maryland since its inception, including the NASD, the Solar Electric Light Company and St. Luke's House who, during some intervals needing daily work on their premises.

The Reply states, at p. 8: "The "principal office" is the place where a corporation must have on file a "statement of affairs" and a list of stockholders on request, a copy of bylaws, minutes, and voting trust agreements." I respond that Alton Burton, JD MBA CPA, has kept digital copies of all of BSI's legal corporate filings since he assisted in forming BSI in 1996. I refer to the Deposition of Alton Burton pp. 26-27:

>     22 Q. I believe you said, earlier, that you
>     1 helped with the legal creation of BSI in 1996?
>     2 A. Yes, I did.
> [Id., p. 69]
>     5 Q. By the way, do you keep a copy of the BSI
>     6 change of principal office, this form, in your
>     7 office?
>     8 A. I keep copies of -- generally, I keep
>     9 copies of documents that I draft. That's my general
>     10 procedure.
> [Id., p. 71]
>     1 Q. So if I wanted to get the -- if I wanted
>     2 to, over the years, get copies of board resolutions
>     3 that BSI or directors resolutions that BSI has issued
>     4 since 1996, they wouldn't be on your premises?
>     5 A. I would probably have copies of them.

The Reply states, at p. 9:

"... The UPS Store itself refers to its mailboxes as a P.O. Box, [reference to Footnote 8] ...

Footnote 8: See http://www.theupsstorelocal.com/4356/ (In addition, we have private Florida Mailbox Rentals (PO Box) that have a real prestigious Las Olas street address)."

I respond that Footnote 8 cites a hyperlink to a web page for a local MBE in Florida that has never been used by BSI. I have viewed that web page and found that it links to a second page at http://www.theupsstore.com/about/pages/abotheups.aspx, which mentions "(PO Box Rentals)" [without periods] which states that the store is independently owned:

>     "The UPS Store and Mail Boxes Etc. together comprise approximately
>     4,800 independently owned locations in the U.S., Puerto Rico and
>     Canada, providing convenient and value-added business services to

the small-office/home-office (SOHO) market, corporate "road warriors," and consumers."

I verified the above URL in WAUSA's footnote 8 on September 3, 2010.

The Reply states, at p. 10: " ... BSI manages remotely its alleged Maryland servers from "Colorado, California, Florida and overseas, across the Internet"   and this does not make BSI a Maryland resident. P. Wagner.   Decl. at. ¶17."

I respond that my complete sentence in the "Decl. at 17" was:  "Besides my physical visits to the Maryland locations, I use the remote access software to control BSI's Maryland servers via laptop from the same Local Area Network or from distant locations, including Colorado, California, Florida and overseas, across the Internet."

BSI has produced documents evidencing the configuration of its servers via a web interface, as is the normal way the configurations are set (i.e., remotely, versus at the console of the server itself).

The Reply states at p. 10: " Paul Wagner's statement that "[i]n practice, [he] often called MBE and asked them to hold the mail for me to pick up when I was in the area, typically working" is unsupported by any facts..."

I respond that the image of a mailbox, which World Avenue introduced in its Reply on p. 9, confirms the fact that BSI still receives mail to that mailbox and that it is being held there.

The Reply states at  p. 11: "It is undisputed that William Wagner was never told that his residence was being used for a business or that a commercial  business was being operated from his home; ... Id. at pp. 76:22; 77:1-22 . . ."

I respond that Dr. Wagner did not recall being told that computer "equipment" was to be used in connection with running a company, as opposed to his residence being used for BSI, and refer to the Deposition of Dr. William Wagner, pp. 76-77:

21 A No, I can't.
22 Q You don't recall him ever telling you that
1 that computer equipment was to be used in connection
2 with him running a commercial company?
3 A No, I didn't hear that.
4 Q You don't recall him telling you that that
5 computer equipment was to be used in connection with
6 running a company called BSI?
7 A That's correct. I did not hear that.

The Reply states at p. 12, " Paul Wagner introduced no evidence whatsoever about the period of time that he (or any purported BSI employee) spent at the Sherwood Road address from July 2004 to the last of the E-Mails At Issue on February 24, 2010."   I respond that I have seen no evidence from WAUSA about how much of BSI's staff time was spent working at Sherwood Road or anywhere else in Maryland, versus not in Maryland.

The Reply states at p. 12: "Paul Wagner attempts to create an issue of fact by averring that "I frequently visit" the Sherwood Road address. P. Wagner Decl., ¶ 7. Wagner's Declaration is written in present tense and does not address the time period of the E-Mails At Issue from July 2004 to February 24, 2010."

I respond that "[F]requently visit" means over a period of time.  In paragraph 7 of my Declaration,  I was addressing at least the period of time Dr. Krawetz covered on p. 3 of the Krawetz Declaration of June 10, 2010 when he asserted that "[Paul Wagner] appears to visit the property infrequently."

The Reply states at p. 12: "Although Paul Wagner asserts that his father does not see him "working" at this address when he comes to visit due to the fact that Paul Wagner has "different working hours" than his father  "for different reason[s]", William Wagner father physically lived in this house until November of 2007 and he could have seen Paul Wagner's late into the night [work]".  I respond that the relevant question to Dr. Wagner was about the time

period after he and his wife had moved to the condo in 2007, not before, and I refer to the following portion of the deposition of Dr. William Wagner, pp. 79-80]

```
20 Q You mentioned that you go back to the
21 Silver Spring house, I think you said, approximately
22 four times a week?
William John Wagner April 5, 2010
80
1 A Three, four I think I said.
2 Q When you go back to the Silver Spring
3 house, over the years, have you ever seen Paul there
4 when you were there?
5 A Occasionally run into each other.
```

The Reply states, at p. 13: "Most importantly, the record is undisputed that Paul Wagner comes by the Rockville location infrequently -- about once a month. W. Wagner Tr. at p. 140; DE 266/267-54."

I respond that I read Dr. Wagner's testimony stating that Paul Wagner visited "[o]nce a month" or "every couple of weeks," approximately, while Dr. Wagner was at the condo, and that Paul Wagner additionally comes to the condo when Dr. Wagner is not present as well, and I refer to the following excerpts from the Deposition of Dr. William Wagner, p. 140:

```
 4 Q Approximately how often does Paul come to
 5 the Rockville condo?
 6 A Oh, let's see. Once a month, every couple
 7 weeks; something like that.
 8 Q How often does he --
 9 A That's -- that's just a guess.
10 Q Are you -- are you or your wife always
11 present?
12 A Not always.
13 Q Do you know why Paul comes to the Rockville
14 condo when you're not present?
15 A I don't know that he comes when I'm not
16 present. I don't know. He could. But, no.
```

The Reply states, at p. 14: "BSI is not a resident of Maryland, particularly in light of its

admissions that it "communicates with those sites by electronic means many times daily" from some other place." I respond that I can also be at one of the sites when I or my computers communicate with them.

The Reply states, at p. 16, "Wagner's statement that "BSI's Vice-President owns a house in Alexandria, VA." does not create any positive inference in favor of BSI because real estate ownership is insufficient to demonstrate any control, direction of management of BSI's business." I respond that my understanding is that my mere ownership of a townhouse in Washington, DC is insufficient to demonstrate that I control or direct the management of BSI's business from that location versus in Maryland.

The Reply states, at p. 16, "Therefore, BSI is not a Maryland resident -- either through its direct contact with the State or through the contacts of its virtual "electronic agents." I respond that by "electronic agents" I meant programs running on BSI's computers located in Maryland, which have permanent contact with Maryland.

The Reply states, at p. 17, "The address is Joseph Wagner's address. S. Saunders Decl. Exhibit 14, p. 1, 5 (WAUSA-3rd- PARTY-02166, 02176) [DE 266/267-2]. I respond that it is not clear what address WAUSA discusses here -- the web address "the hypertouch.com website," a street address of the registrant, administrative, technical or billing contacts, or an email address. In any case, the documents referenced in Saunders Decl. Exhibit 14, p. 1, 5 are nearly 13 years old, created on "18-Oct-1997" on p. 1 and "Oct 17, 97" on p. 4. This long precedes the earlier claimed email. Beyond Systems was a "new company" at that time. Hypertouch, Inc. was not formed until 1999.

The Reply states, at p. 18, "Wagner's own writing states (unaddressed in his Declaration, but only his brother's Declaration who speculates about what Joseph Wagner meant): "This is the

Hypertouch owned record to which all other enclosed Internic network records relate." [S. Saunders Declaration Exhibit 15, p. 5.[DE 266/267-2]], p. 7;" I respond that WAUSA's Exhibit 15, p. 6 shows Joe Wagner's signature dated "August 17, 1998" on the Trademark/Service Mark Application, well before the date of the first claimed email.

I declare under penalties of perjury that the foregoing statements are true and correct.

Date:   September 6, 2010      _____

### Exhibits

J-1  SMTP banner of mail.reasonabledoubt.com

J-2  Postini for Steptoe and for Perkins, Coie

J-3  Whois for PSMTP.com (Google, Inc.)