## IN THE U.S. DISTRICT COURT FOR MARYLAND,
## SOUTHERN DIVISION

| | | |
|---|---|---|
| BEYOND SYSTEMS, INC. | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| | * | |
| | * | |
| v. | * | **Case No. PJM 08 cv 0921** |
| | * | |
| WORLD AVENUE USA, LLC | * | |
| successor by merger to NIUTECH, LLC., | * | |
| DBA THE USEFUL, ET AL. | * | |
| | * | |
| Defendants | * | |

<u>REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION TO COMPEL
DEFENDANT WAUSA TO PROVIDE COMPLETE ANSWERS TO
PLAINTIFF'S SECOND SET OF INTERROGATORIES</u>

Plaintiff submits this reply memorandum in support of its Motion to Compel Defendant

World Avenue USA, LLC ("WAUSA" or "World Avenue") to provide complete answers to

plaintiff's second set of interrogatories, responding to WAUSA's opposition memorandum.

### 1. WAUSA as Successor of Niutech; "You"

The "You" debate continues.  Plaintiff sued "World Avenue USA, LLC, successor by

merger to Niutech, LLC."   An answer was filed on behalf of that entity acknowledging its

successor status  (See answer at 76, amended answer  at DE 85, granted at DE 105.)  That same

entity responded to the Florida Attorney General action without debate over its successor status.

 The same federal taxpayer ID number has been used by Niutech, WAUSA, and TheUseful,

LLC.  "TheUseful, LLC," is simply a name change applied to WAUSA.  The Articles of Merger

clearly state that Niutech merged into WAUSA, which  assumed all assets and liabilities of

Niutech.  WAUSA clearly existed as a Delaware LLC as of the date of the merger.  (All of this is

supported by Plaintiff's Exhibits K-2 through K-5 attached to the Motion to Compel, and

Defendant's Exhibits 2-8 attached to the Opposition.) Yet WAUSA attempts to argue that all

filings in this suit on behalf of WAUSA were made on behalf of an entity that is not the

successor of Niutech.  This conclusion hangs on the creation of a second entity named World

Avenue USA, LLC in September, 2006, which is not the successor entity described in the

amended complaint.

Defendants' non-successor theory invites the entry of a default and/or sanctions against

the entity that is the successor of Niutech, for failure to file an answer (as it contends now that

the responding party is not the one identified in the complaint as successor to Niutech) and for

failure to provide discovery responses.  WAUSA is clearly identified in the complaint as the

successor entity identified in the public records, and has been placed on notice of the claims

asserted.  If there exists an entity that has held the name, "World Avenue USA, LLC" within the

"World Avenue" family of entities, that has not answered and participated in this suit, that entity

 (under whatever name it now operates) invites the entry of a default.  Plaintiff relies on the

detailed facts and exhibits in the Motion tracing the corporate history based on public records,

and disagrees with WAUSA's interpretation of those records.

As noted in the Motion, continuing after 2006, WAUSA has held itself out as the

successor of Niutech.  For example, in August, 2008 WAUSA filed an action to preclude later

disclosure of documents that had been produced during the Florida attorney general action in

2006-07.  FL AG 2179-87.  In the caption, WAUSA names itself, "World Avenue USA, LLC,

successor by merger to Niutech, LLC."

The Amended Complaint at DE 34 names as a defendant, "World Avenue U.S.A., LLC, successor by merger to Niutech, LLC, dba 'TheUseful'."  This same phrase was used to identify World Avenue in the Florida attorney general proceedings. See Exhibit K-11, FL AG 211-213. In the Texas attorney general investigation, the entity is referred to as "Niu Tech, LLC" See Exhibit K-13, attached, TX AG 1-9), and as simply "World Avenue." (Id. at TX AG 28-33).   In those actions, subpoenas and document requests were propounded and answered using those names, without any protest that the attorneys general had named the wrong entities. WAUSA was regarded as the central entity in these two attorney general actions, which were based on considerable research and investigation.  The settlement check for $1,000,000 in the Florida AG action was written by WUASA.  Document FL AG 0046

WAUSA should not be permitted to dodge discovery in this case on the pretense that it lacks knowledge or information as to others in the "World Avenue group," having demonstrated so clearly in the AG actions that it does in fact have the information and records, and can produce them.

**2.  "You' as including "TheUseful."**

The trade name, "TheUseful" has been used continuously in an email-based lead-generation  business since the year 2000, as shown by World Avenue websites.  See Exhibit K-5. It has also been registered as a trade name of Niutech, LLC.  Exhibit K-2   Discovery on topics related to the continuation this business, associated with the name, "TheUseful," should be permitted through the era of Niutech's operations to the present.

In its responses to the interrogatories WAUSA says, "WAUSA understands the terms "YOU" and "YOUR" to mean Defendant World Avenue USA, LLC, the named Defendant in

3

this case formed on September 22, 2006, its officers, directors, employees, agents, <u>representatives and attorneys</u>. *See* DE 257 at p. 2." WAUSA Answers to Plaintiff's Second Set of interrogatories, at 5.   WAUSA's attorneys are the same attorneys who have handled all the transactions that created the World Avenue family of companies, and who have represented Niutech, TheUseful, LLC, and the "Sister Companies."   Those attorneys clearly have access to a broad array of information about the lead generation business at issue, including all incarnations of WAUSA  and its affiliated entities.

The collaboration between WAUSA and its "sister companies" or affiliated entities effectively creates a partnership or joint venture between and among them.  A partnership is "the unincorporated association of two or more persons to carry on as co-owners a business for profit . . . whether or not the persons intend to form a partnership and whether or not the association is called 'partnership,' 'joint venture,' or any other name."  Corps. & Assn's Code Ann. § 9A-202(a).  *See also Seaboard Surety Co. v. Richard F. Kline, Inc.*, 91 Md. App. 236 (1992); *Herring v. Offutt,* 266 Md. 593 (1972).  Each partner is an agent of the partnership, and each partner has the authority to bind the principal as to matters within the scope of the partnership.  Corps. & Assn's Code Ann. § 9A-301(1); RESTATEMENT (THIRD) OF AGENCY § 2.02 (2006); *Lister v. Allen*, 31 Md. 543 (1869); *Garfinkel v. Schwartzman*, 253 Md. 710 (1969).   Under these  principles, TheUseful, LLC is properly included within the definition of YOU.

### 2. Privilege Log.

In the Opposition on page 6 WAUSA attempts to dodge its obligation to produce a privilege log by suggesting that the parties agree to a mutual exchange of privilege logs. (Plaintiff produced an initial privilege log on which the Court commented during the hearing on

September 23, stating no expansion of that log would be ordered.)  Plaintiff's privilege log is not

at issue in the Motion to Compel.  Defendant should be ordered to produce its privilege log

immediately, and sanctions should be imposed for its delay.

One significant factor here, regarding matters over which Defendants might claim

privilege, is that the involvement of counsel in the daily activities of WAUSA and its "Sister

Companies" is exposed in the documents that have been produced in discovery, including those

from the Florida Attorney General.  The Defendants' lead generation operation entails skirting

the law, and essentially invites a stream of lawsuits under anti-spam statutes.  In-house attorneys

have fulfilled ordinary business functions such as registering trade names, helping with the

selection of domain and trade names, and handling non-litigation complaints. (Supported by

Levine suit documents and multiple documents generated by, or referring to, house counsel

Homer Appleby in routine business operations.)    Furthermore, the confusing welter of

corporate entities created by Defendants, using the same law firm for both corporate formation

and litigation services, arguably renders counsel witnesses on issues of fact that pertain to the

merits.

### 3.  Attorney General documents.

On pages 7 and 13 of the Opposition WAUSA argues there has been no showing of

improper withholding of documents related to the Florida Attorney General proceeding.  This is

simply not accurate, nor is Plaintiff required know exactly what documents WAUSA has

withheld.  Clearly, the Bates numbering in the Florida Attorney General action, as shown at FL

AG 2179-87,  goes far beyond the Bates numbering of WAUSA's documents produced in the

instant case, and the subject matter in both cases involves allegations of deceptive advertising via

email.  WAUSA petitioned to seal documents in the Florida AG action it identified as "Niutech 00014 - 42, 0044-10571, 10744-15745, 0016209-220, 0016510-16642 and WA001369-3651, WA003659 – 4025," (Exhibit K-9, document FL AG 2174 attached to Motion to Compel), clearly showing documents ranging into the 16,000's.  WAUSA has produced a total of some 7,000 pages in this case, including many that originate from Plaintiff or its customers, or other sources unrelated to Defendants.  The burden should be on WAUSA to explain why the full assortment of documents from the FL AG action should not be produced.

### 4.  Spoliation.

On page 10 of its Opposition World Avenue argues burden based on its notion that BSI has "spoliated" emails for not retrieving and saving the images stored on the very servers controlled, owned and used by WAUSA and its associated entities.   Those are the Defendants' own creatives.   Production of creatives by Plaintiff is not a precondition to production of creatives by WAUSA.   The emails at issue were generated by a relatively small number of campaigns, each carrying an identifier.  The creative for each campaign can be determined from Defendants' records, as shown by the testimony quoted below.

Amazingly, WAUSA states that its creatives in native format "cannot be located."  This sounds like an admission of spoliation, as the creatives were clearly in existence during the campaigns, and WAUSA has been in litigation over its email marketing continuously since that time.  WAUSA has obviously been under an obligation to preserve its documents during past litigation and during this suit.   Mr. Peterson testified that the employees were advised by management on several occasions to preserve records:

> Q    Do you know if Niutech was ever
> 18    asked to preserve any of the reports you've

6

19    just described, or any of the records,
20    tracking emails, for purposes of litigation?
21    A        I believe a few times, we were
22    told not to destroy anything, yes.

      Q        And when did that occur? When did
2     those requests occur?
3     A        Whenever we got sued. I think it
4     happened once or twice. I mean, it wasn't a
5     regular basis, that we would get, you know,
6     somebody suing us. But when it happened, we
7     were told not to touch your email, not to
8     touch anything that you legally can't throw
9     anything away now, and --
10    I mean, I remember one meeting,
11    where it was the whole keeping records kind of
12    thing, after one of the law suits.

Peterson deposition at 88-89.  Thus, WAUSA (successor of Niutech) had notice to

preserve its records, and the creatives would clearly be among the key documents as a

means to identify campaigns.  Their absence suggests spoliation by WAUSA.

      This objection is a repetition of the "burden" objection, also addressed on page 7 of BSI's

first motion to compel at DE 307 and in the Wagner report at 327-12.  There has been no

"spoliation."  Furthermore, there is ample information in the emails at issue, which have been

produced by BSI in discovery, from which WAUSA can respond to the discovery requests.  The

images referenced in image URLs appearing in the claimed emails were never transmitted to BSI

in the first place, unless BSI happened to open them before WAUSA's agents disabled the image

links.  However, World Avenue should have preserved them, at least for purposes of pending

litigation, lest it be guilty of "spoliation" itself.

### 5. Burden.

WAUSA argues on page 11 of the Opposition that the discovery sought would create an unreasonable burden on WAUSA.  The Order at DE 213 reads in relevant part, "Accordingly, the scope of Plaintiff's concerns for purposes of discovery are those emails sent by Defendant from July 20, 2004 to present . . ."   WAUSA's attachment of a declaration by Mr. Richard (Exhibit 12) addressing the determination of the origin of emails is helpful in that it admits that the origin can be determined, but its estimate of 30 minutes per email for those within the scope of the order is a gross exaggeration.  As shown by the testimony quoted below, each campaign can be tracked to the point of origination, and there are several features that allow an automated search for this purpose.

### 6. Creatives.

WAUSA's designee for its ESI deposition was Tadd Schlotter, who testified:

Q   Are you familiar with whether or not any ads
or creatives, within the meaning of the first paragraph
under "Definitions" on page 6515 of Exhibit 7, reside
or have resided on any servers owned or maintained by
World Avenue?
      MR. SAUNDERS:  I object to the form of the
question.
      Go ahead and answer if you can.
      THE WITNESS:  Maintained, yes.
BY MR. RING:
 Q   Okay.  Whose servers would contain those ads
or creatives that are maintained [by WAUSA]. . .

         [Lines 13-21 redacted as confidential.]

 Q   And at which location?
 A   FiberMedia.

Sclotter deposition at 166-67.  Thus, WAUSA clearly has access to the creatives.  WAUSA is

long overdue.  Production of creatives is also addressed in BSI's first motion to compel as to

answers to interrogatories, DE 307, at p. 7.   Plaintiff also addresses this omission in its

motion to compel production of documents at DE 327-3, quoting Request 13 and WAUSA's

response as follows:

REQUEST 13.
All DOCUMENTS RELATING to every offer of a PRODUCT or service by YOU
(including but not limited to, sponsors, contractors, sub-contractors, advertisers, ad networks,
affiliates, publishers, andlor vendors acting on YOUR behalf) by COMMERCIAL EMAIL
andlor INTERNET ADVERTISING since January I, 2004, which DOCUMENTS shall include
the following: (i) the date during which such an offer was made; (ii) the Campaign number or
code or other identifier; and (iii) every Subject line used in COMMERCIAL E-MAIL
referencing such an offer.

RESPONSE:

[Lengthy objections omitted.]

. . . Subject to and without waiving these objections and as explained in the Answers to
Interrogatories and objections thereto, WAUSA and its Sister Companies did not transmit the
Emails At Issue. Moreover, Plaintiff has provided no evidence that links WAUSA to the
transmission of the E-Mails At Issue, and therefore, WAUSA has no responsive documents.
However, WAUSA is producing documents related to certain products offered by a Sister
Company to WAUSA.

DE 327-3 At 26. [Emphasis added.] The documents produced do not provide the information

sought.   Even if restricted to campaigns containing the emails at issue, the production is

inadequate, failing to identify the campaign number or other identifier, and failing to identify the

campaigns for all  of the emails at issue.

World Avenue disseminated the images along with email templates to its email marketers

prior to the ad campaigns.

Eric Santelices, a Senior Systems Administrator for "World Avenue,"  testitfied on

September 29, 2010 concerning the images provided for affiliates to use in their emails, as

follows:

```
        Q       And where were these images
11    stored, or housed?
12    A       Images, as far as I know, came
13    from our image servers.
14    Q       And where were they located?
15    A       Where were what located?
16    Q       The image servers?
17    A       We had image servers in fiber
18    media data center, which is located in Miami,
19    Florida.
```

Santelices deposition at 10.  And further:

```
        Q       Okay, what did you work have to
19    do, specifically with image servers?
20    A       Making sure that they were
21    available.
22    Q       Making sure that what was available?
2     A       The image servers, themselves,
3     that they were serving traffic, and traffic
4     means that a web page being requested or an
5     image being requested and that image, being
6     ultimately returned to the requester.
7     Q       And how were images requested?
8     A       HTTP.
9     Q       And were you able to determine
10    whether or not images were, in fact, served,
11    as requested?
12    A       Yes.
13    Q       How could you tell?
14    A       The access logs.
15    Q       What is an access log?
16    A       It is a record of where the
17    request came from, and the result of that
18    request.
```

Id. at 18.  Thus, not only were the images (part of the creatives) accessible, but the details

of when they were accessed, and by whom, were also accessible.

Mr. Peterson, who directed the email marketing department among other things, testified:

      Q     What about -- what does the word
16  creative mean?
17  A     Creative is the actual ad, whether
18  that's an email or web placement, that's the
19  actual ad that people see.

      Q     Did Niutech provide creatives for
2  use by affiliates?
3  A     Yes.

Peterson deposition at 59-60. (Niutech merged into WAUSA.)  And further, at 62:

      Q     When you talk about the creatives
3  being provided by Niutech to the affiliates,
4  what records would show who uploaded what
5  content or what creatives?
6  A     That would be coming out of the
7  trafficking department, of Niutech. The
8  trafficking was the people that took the ad
9  from the creative group and uploaded it into
10  the system.

And at 64:

      Q     Okay. When the affiliate sends an
6  email that's part of one of these promotions
7  for Niutech, what is the time line from when
8  the creative is accessed, to the time the
9  email actually goes out into the world?
10  A     Depends how good that deployer
11  was. I mean, it could take them hours to set
12  up an offer in a system, depending upon what
13  he was using to deploy. There were guys that
14  could get it out within an hour.
15  Q     And when you say, get it out, what

16      are you talking about?
17      A      Meaning, they could go in and pull
18      that creative, put it in their system and
19      deploy it within an hour.
20      Q      What do they have to do with the
21      creative, once they have accessed it?
22      A      Well, they have to attach it to

65

      a list. They own a data base themselves,
2      these deployers, and so, they would go and
3      they would pull an ad, and they would stick in
4      their -- whatever software they were using,
5      and then they'd attach a list to it, and then
6      their system would, you know, rotate through
7      that list of people's names, or email
8      addresses, and then, you know, constantly be
9      pulling that ad and sending it out.

Dale Harrod, who was vice president of  Niutech, LLC in charge of email marketing,

testified on September 30,2010 as follows:

      Q      Okay. And can you answer my
2      question about identifying each campaign. Was
3      there a method to identify it?
4      A      Well, in being able to track the
5      campaign, you could identify the campaign.
6      Q      And what means was used to
7      identify it?
8      A      All campaigns have specific links
9      within them, and that is the mechanism that is
10      used to identify.

Harrod deposition at 38.   Thus, WAUSA, as successor of Niutech, should be able to identify the

campaigns that included the emails at issue, and to identify the creatives for each campaign.

**7. The "Native Format" Objection**

12

WAUSA fails to explain away its obligations to produce documents in native format.  Its obligations under the ESI Agreement at DE 113 as quoted in the Motion to Compel have not been impaired. Access is demonstrated by the testimony quoted above.

**8.  Relevance**

WAUSA argues that the discovery sought is not relevant, or not likely to lead to the discovery of admissible evidence.  On the contrary, the discovery is highly relevant and is within the bounds permitted by the orders that allow discovery of facts relevant to agency, assistance and conspiracy.

**9.  Internet "not relevant."**

On page 8 of the Opposition WAUSA argues that inquiry about advertising via the Internet is not relevant because the suit arises from the transmission of emails.  WAUSA is being disingenuous, in that it knows full well that the emails are lined to landing pages maintained by the World Avenue Companies, and that one way track those behind the email campaigns is to examine the domain names and IP addresses associated with those pages.

**10.  Identify**

On page 9 of the Opposition WAUSA objects to the definition of the word "identify" as too broad, denying that WAUSA participates in the sending of email, or that it enlists agents. This is not what the FL AG documents show.  Rather, WAUSA was actively involved in the campaigns, and its pretense of uninvolvement is only consistent with its intent to deny and conceal the truth.

World Avenue's refusal to provide "affiliate identifiers," "referrer identifiers" or

"principals in control" is completely unjustified.  The testimony is clear that the affiliates have

ID's by which their traffic and commissions are tracked:

Q Let's go back to the hypothetical,
18 where I'm the potential customer, I've got the
19 email in front of me, offering a free iPod,
20 and I click on a link, and I go to a landing
21 page.
22 So far, is my activity attributed to or tied to any particular --

2 A Absolutely.
3 Q -- publisher or affiliate?
4 A Sure.
5 Q How?
6 A Whoever deployed that email to
7 you, that's tracked immediately. They know,
8 for that matter, the deployer knows who they
9 sent it to. They know when you open that
10 email. They know when you clicked on anything
11 in that email, and that's tracked from the
12 moment that that deployment happens.
13 Q So, does Niutech know that?
14 A Absolutely.
15 Q How do they know?
16 A You place a sub-ID on their links.
17 Q What is a sub-ID?
18 A It's basically, a number or
19 letters, or whatever, that designates where
20 that traffic is coming from.
21 So, every affiliate had a sub-ID.
22 That's how you determined who was driving –

Peterson deposition at 36-37  Thus, it is essential to have the affiliate ID's matched to

their owners as another means of tracking the emails to BSI.  WAUSA has refused to

provide this information.

### 11.  WAUSA's "Other objections."

On page 12 of the Opposition WAUSA addresses its "other objections," and in doing so admits that "WAUSA and no Sister Company . . . transmitted the emails at issue," although probably unintentional.   The various denials and objections by WAUSA in this section are belied by the documents from the FL AG and the deposition testimony quoted above on the existence of records and WAUSA's access to them.  WAUSA continuously attempts to re-write the discovery requests to focus on WAUSA's <u>conduct.</u>   Most of the requests actually ask for information, regardless of WAUSA's conduct.  The deposition testimony puts WAUSA in a position to have knowledge, or to have access information, that is responsive to the interrogatories.

### 12.  Levine documents.

On page 13 WAUSA argues that documents concerning the Levine suit by Steven Levine (Niutech's former counsel) against Niutech are confidential.  This is not so – the documents are out in the open, having been made public first in the Levine suit, and then in the FL AG action, and Niutech apparently took no steps to protect at least those materials that are now public.

Interestingly, on page 13 WAUSA admits that the "smoking gun" documents (including emails regarding questionable conduct) "relate to offers contained on the internet registration path of Niutech."   Well, that makes them very relevant.  The offers by Niutech were in the campaigns that generated the emails at issue.  WAUSA is the successor of Niutech.  The information should be provided.

### 14.  Emails to and from Mr. Ji.

On page 14 WAUSA distorts the interrogatory seeking information about emails to and from Mr. Ji as if the inquiry were seeking the emails at issue.  Clearly, the emails at issue were not sent to or from Mr. Ji during their broadcasting.  The interrogatory goes to communications to and from Mr. Ji that may pertain to the email-based lead generation business.

### 15.  Compliance Guidelines, Interrogatory 6.

On page 14 the Opposition notes that WAUSA in fact had produced some Compliance Guidelines for a "sister company," but that WAUSA does not want this to be taken as proof that it has access to information about the "sister companies."   WAUSA goes on to confuse information held by WUASA about affiliated entities ("sister companies"), with information about WAUSA.   Most of the information sought in the interrogatories is not restricted by WAUSA's own conduct, rather going to information in its possession or control.

### 16.  Naming of Affiliates.

On page 15 of the Opposition WAUSA argues that it cannot identify the affiliates in the lead generation campaigns because it is not the successor of Niutech and because WAUSA contends it did not participate in the campaigns.  This is a non-sequitur.  If WAUSA or its "attorneys or representatives" have the information, it should be produced, regardless of WAUSA's contentions about its participation.  The testimony quoted above demonstrates that WAUSA has this information, including affiliate ID's.

### H..  Use of Domain Names, Fictitious Names; Interrogatory 9.

On page 15 of the Opposition WAUSA argues that discovery is confined to a list of some 41 domain names, and again denies its involvement.  WAUSA ignores the Court's directives that

Plaintiff is entitled to discovery of facts pertaining to agency, and pertaining to <u>assistance</u> in the transmission of the emails, and pertaining to <u>representatives</u> of WAUSA.  The amended complaint alleges that all the defendants conspired and acted as agents of each other, and assisted the transmissions.   Even within the limited set of 41 domain names in the first set of emails at issue, the campaigns in which they were sent must be examined to confirm the nexus to World Avenue, and the particular World Avenue entities involved.  Discovery as to those campaigns is within the scope permitted.  And again, the Court invited Plaintiff to establish a good faith basis to go beyond the 41 domain names.  Plaintiff attempted to make that showing at the hearing on September 23, 2010 in connection with the motion at DE 223 (WAUSA's motion to quash the Enom subpoena), but was not permitted to do so due to the constraint of time.

### I.   Use of 9/22/06 as a time bar; Interrogatory 10.

On page 16 of the Opposition, addressing Interrogatory 10, WAUSA argues that it cannot provide information prior to September 22, 2006, which it contends is its date of creation, because it has no information prior to that date.  It again denies that it is the successor of Niutech. Plaintiff again objects to the preposterous denial, as the WAUSA named in this suit is the one that is clearly identified in public records as the successor of Niutech.  Even if WAUSA II were considered, it is part of the same "family" of World Avenue companies, has the same attorneys and representatives, and has access to the same information.

### J.  Cross-employees; Interrogatory 11.

On page 17 of the Opposition, addressing Interrogatory 11, WAUSA states, ". . . WAUSA will provide a supplemental listing on sister companies," promising to identify employees who have worked for more than one of the sister companies.  The requested

information is long overdue and is relevant for the reasons stated in the memorandum in support of the motion to compel.  See Plaintiff's memorandum at 30-31.

**K.  Interrogatory 12.**

**L.  Interrogatories 13** (identify senders), **14** (identify creators), **15** (identify documents regarding senders).  WAUSA argues "burden" as to providing the information sought, despite the testimony from Messrs. Schlotter and Pearson as to the availability of the information.  The premise behind the "burden" argument must be that the information exists.

**M.  Former employees; Interrogatory 15.**

WAUSA argues its non-existence prior to September 22, 2006.  Plaintiff again points to the definition of "YOU" to include affiliated entities, and seeks a complete answer.

N.  Evidence of any claimed "consent;"  Interrogatory 16.

WAUSA should be ordered to provide this long-overdue information immediately.

O.  Original content allegedly inserted by BSI; Interrogatories 17, 18.

Plaintiff denies that it inserted any original content into the emails at issue, and that the transmittal information added to headers by MTA's is not original content.  Plaintiff is entitled to any evidence WAUSA relies upon in support of any contention that BSI added original content.  If there is none, WAUSA should say so.  There is no reason for further delay in providing a full response.

**P.  Identification of emails sent to a "spam trap;" Interrogatory 20.**

WAUSA's response refers to its lengthy expert reports, without specificity.  This is not a reference to "business records" under the Rule 33 option, and is not a proper response.  WAUSA should be ordered to provide this information, if it has any, immediately.

18

**Q.  Facts supporting contention of non-violation of statutes; Interrogatory 21.**

WAUSA attempts to throw the burden of providing facts back on Plaintiff.  This is unwarranted.  If WAUSA has no facts supporting its position, it should say so.  Otherwise, it should provide a full response.

**R.  Creatives; Interrogatory 22.**

WAUSA contends it does not provide creatives.  The inquiry goes beyond what WAUSA might "provide."  A full response should be required, as the full collection of creatives related to the emails at issue has not been provided.

**S.  Evidence of alleged consent; Interrogatories 23, 24.**

WAUSA says it will supplement.  This response is long overdue.  WAUSA should be required to provide a full response immediately, or suffer the conclusion that it has no such evidence of alleged consent to the initiation (as distinct from the transfer by an MTA) of the emails.

**T.  Terminations and suspensions; Interrogatory 25.**

Again WAUSA hides behind the statement that it "does not engage" in this activity.  The inquiry goes beyond what WAUSA might contend it does or does not do, and covers information that WAUSA might have by virtue of its association with others, and its participation in the business venture of the World Avenue companies.  A full response should be required immediately.

**U.  Fraud; legitimate business practices; Interrogatories 26 – 30.**

WAUSA produced the Compliance Policy of TheUseful, LLC, demonstrating its access to records of the "sister companies" when convenient.  WAUSA should thus be required to make full responses to this and all the other discovery requests.

### V.  Contracts; Interrogatories 32, 33.

The deposition testimony of Mr. Peterson shows that Niutech routinely required signed copies of the insertion orders.  Identification of the persons with whom these contracts were entered, at least for the email campaigns that resulted in emails to Plaintiff, should be required.

### W.  Participants; Interrogatory 34.

WAUSA should know the participants by virtue of its own position among the family of World Avenue companies.  Further, knowledge of "attorneys" is included under "YOU" and as confirmed by the introduction to WAUSA's responses.  The same law firm has represented all of the "family" in most of its transactional and litigation activities.  Thus, the information sought should be provided immediately.

### X.  Contractors; Interrogatory 35.

WAUSA responds as if the contracting is limited to contracts with WAUSA.  The inquiry is not so limited.  A full response should be required.

### Y.  Payments to WAUSA; Interrogatory 36.

WAUSA contends it did not send  the transmissions. This is beside the point.  WAUSA further denies that it made payments.  This is also beside the point, as the inquiry is not limited to payments made by WAUSA.  WAUSA goes on to say that its "Legacy System" is shared by TheUseful, and this system "ties any payment to a unique customer."  This is news from WAUSA; this information belongs in a response under oath, and needs to be stated fully.  It

confirms that payments are another method of tracking emails to and through WAUSA's "customers."

### Z.  "Five categories of information;" Interrogatory 37.

WAUSA denies that it sent the emails, again, and refers to the Declaration at Exhibit 12. The inquiry is not limited to anything that WAUSA might admit that it sent.  A full response is required.

### AA.  Suits by the government; Interrogatory 38.

Plaintiff relies on WAUSA's certification that its listing is complete, and asks for supplementation as required under the Rules.

### BB.  Suits regarding false and deceptive information.

Plaintiff asks for complete and updated information.

### CC.  Overseas entities.

Plaintiff asks for complete and updated information.

Plaintiff requests an order compelling Defendant World Avenue USA, LLC to provide complete and responsive answers to the interrogatories, under oath, and further seeks an order imposing costs and sanctions on Defendant for unreasonably withholding information and failing to meet its discovery obligations in providing full responses in the first place.

_____/s/_____                    October 23, 2010
Stephen H. Ring
STEPHEN H. RING, P.C.
506 Main Street, Suite 215
Gaithersburg, Maryland 20878
USDC, MD: #00405
Telephone: 301-563-9249
Facsimile: 301-563-9639




_____/s/_____
Michael S. Rothman
401 E. Jefferson Street Suite 201
Rockville, MD 20850
Telephone: (301) 251-9660 Fax: (301) 251-9610

*Attorneys for Plaintiff*

## Exhibits

22