# EXHIBIT 34

IN THE U.S. DISTRICT COURT FOR MARYLAND,
SOUTHERN DIVISION

+ + + + +

IN THE MATTER OF:

BEYOND SYSTEMS, INC.

      Plaintiff,

v.

WORLD AVENUE USA, LLC

      Defendants.

Case No.
PJM 08 cv 0921

Thursday,
September 30, 2010
Pompano Beach, Florida

DEPOSITION OF:

DALE S. HARROD

called for examination by Counsel for the Plaintiff, pursuant to Notice of Subpoena, in the Mumbai Conference Room of the Forum Hotel, located at 600 SW Third Street, Pompano Beach, Florida, when were present on behalf of the respective parties:

Page 2

APPEARANCES:
    On Behalf of the Plaintiff, Beyond
    Systems, Inc.:

        STEPHEN H. RING, ESQ.
    of: Stephen H. Ring, PC
        506 Main Street
        Suite 215
        Gaithersburg, MD 20878
        Tel: (301) 563-9249
        Fax: (301) 563-9639
        Email: shr@ringlaw.us
        MICHAEL S. ROTHMAN, ESQ.
    of: Law Office of Michael Rothman
        401 East Jefferson Street
        Suite 201
        Rockville, MD 20850
        Tel: (301) 251-9660
        Fax: (301) 251-9610
        Email: mike@mikerothman.com
    On Behalf of the Defendant, World Avenue
    USA:

        SANFORD M. SAUNDERS, JR., ESQ.
    of: Greenberg Traurig, LLP
        2101 L Street, NW
        Suite 1000
        Washington, DC 20037
        Tel: (202) 331-3130
        Fax: (202) 261-0150
        Email: saunderss@gtlaw.com

        JOHN L. MCMANUS, ESQ.
    of: Greenberg Taurig, LLP
        401 East Las Olas Boulevard
        Suite 2000
        Fort Lauderdale, FL 33301
        Tel: (954) 765-0500
        Fax: (954) 765-1477
        Email: mcmanusj@gtlaw.com

Page 4

TABLE OF CONTENTS

WITNESS        DIRECT  CROSS  REDIRECT  RECROSS

DALE HARROD

    By Mr. Ring        5

    By Mr. Saunders           65

Page 3

On Behalf of the Deponent, Dale Harrod:

    MARK E. STEIN, ESQ.
Of: Higer, Lichter & Givner LLP
    18305 Biscayne Boulevard

    Suite 402
    Aventura, FL 33160
    Tel: (305) 356-7550
    Fax: (305) 933-9970
    Email: mstein@hlglawyers.com

ALSO PRESENT:

    CHADD SCHLOTTER
    PAUL WAGNER

Page 5

1    P-R-O-C-E-E-D-I-N-G-S
2    5:05 p.m.
3    WHEREUPON,
4    DALE STEPHEN HARROD
5    having been called as a witness by Counsel for
6    the Plaintiff, and having been duly sworn, was
7    examined and testified as follows:
8    DIRECT EXAMINATION
9        BY MR. RING:
10   Q   Please state your full name.
11   A   Dale Stephen Harrod.
12   Q   Steven with a "V"?
13   A   P-H.
14   Q   The right way.
15       And where do you work?
16   A   I'm currently consulting.
17   Q   For?  Do you have more than one
18   client?
19   A   Yes.
20   Q   Do you do any work at the present
21   time for a company The Useful, LLC?
22   A   No.

Page 6

```
 1    Q    For a company called World Avenue
 2  USA?
 3    A    No.
 4    Q    Or a company called Niutech, LLC?
 5    A    No.
 6    Q    Have you in the past consulted or
 7  worked for any of those three?
 8    A    I worked for Niutech.
 9    Q    When did you start and finish?
10    A    August 2005 to August 2006.
11    Q    In this deposition, you are
12  represented by counsel, correct?
13    A    I am
14    Q    And that's Mr. Klein, seated next
15  to you?
16         MR. STEIN:  Stein.
17         MR. RING:  I'm sorry.  Stein.
18  It's Mark Stein?
19         THE WITNESS:  Yes.
20         BY MR. RING:
21    Q    And are you represented by any
22  attorneys other than Mr. Stein?
```

Page 7

```
 1         MR. STEIN:  You can answer the
 2  question.
 3         THE WITNESS:  Yes.
 4         BY MR. RING:
 5    Q    Who else?
 6    A    Greenberg Taurig.
 7    Q    When you left Niutech in August of
 8  '06, what position did you hold?
 9    A    Vice President of Email Marketing.
10    Q    Did you hold any other positions
11  while at Niutech?
12    A    No.
13    Q    What were your duties as Vice
14  President of Email Marketing?
15    A    To run the email channeling.
16    Q    Was that email sent between and
17  among people within the company or from some
18  spot in the company to somebody outside?
19    A    People external to the
20  organization.
21    Q    Okay.  So what does the email
22  channel mean?
```

Page 8

```
 1    A    We would -- people opted in on the
 2  co-registration path -- we would send them
 3  additional offers.
 4    Q    What does "opted in" mean?
 5    A    They provided consent on the co-
 6  registration path to be contacted.
 7    Q    Was any record kept of the fact of
 8  opting in?
 9    A    I was not in charge of the co-
10  registration path.
11    Q    Okay.  Do you know if there was a
12  means by which that opt-in was recorded?
13    A    I was not in charge of the co-
14  registration path.
15    Q    Okay.  I understand you weren't in
16  charge, but you might know over the lunch
17  counter or the water cooler or you might learn
18  some way.  I just want to know if you have
19  knowledge --
20    A    I do not know.
21    Q    Okay.  What do you mean by the
22  registration or co-registration path?
```

Page 9

```
 1    A    It's a series of landing pages
 2  that have offers.
 3    Q    What's a landing page?
 4    A    The web page that someone sees
 5  when they click on a link.
 6    Q    Were those landing pages -- who
 7  created those landing pages?
 8    A    I do not know.
 9    Q    Do you know whether or not Niutech
10  created those landing pages?
11    A    I do not know.
12    Q    What are the offers you referred
13  to a minute ago?
14    A    Can you be more specific?
15    Q    Yes.  You said that the co-
16  registration path was a series of landing
17  pages with offers.
18    A    Uh-hum.
19    Q    I just want to know what those
20  offers are.
21    A    I wasn't in charge of the co-
22  registration path, so I don't know what offers
```

Page 22

1  where did you work? Was that iLeap?
2      A    Correct.
3      Q    In your work at Niutech, did you
4  have occasion to communicate with Niuniu Ji?
5      A    Yes.
6      Q    How frequently?
7      A    We would meet, a minimum, once a
8  month, maybe once every other week.
9      Q    And why would you meet?
10     A    To discuss the financials of the
11 division.
12     Q    Do you know who your replacement
13 was when you left?
14     A    I do not.
15     Q    Have you stayed in touch with
16 anyone at Niutech since you left?
17     A    One or two.
18     Q    Who would that be?
19     A    Steve Saccone.
20     Q    And who else?
21     A    Eric Guimond.
22     Q    How do you spell his last name?

Page 23

1      A    G-U-I-M-O-N-D.
2      Q    Do you recognize any of the
3  following company names? World Avenue USA,
4  LLC?
5      A    Yes.
6      Q    And how do you recognize that?
7      A    I believe it was a services
8  company established by the same proprietors of
9  Niutech.
10     Q    And how do you know that?
11     A    That was the common understanding
12 within the organization.
13     Q    And did you understand that entity
14 to exist before you left Niutech?
15     A    I believe it was just being
16 established when I left.
17     Q    Do you know of an entity called
18 The Useful, LLC?
19     A    Yes.
20     Q    What do you understand it to be?
21     A    As I worked for Niutech, I don't
22 know what The Useful's role was.

Page 24

1      Q    Did you have any dealings with
2  anyone who worked for The Useful while you
3  were working for Niutech?
4      A    I don't know who was paid under a
5  given company. We were pretty much
6  encapsulated.
7      Q    Niutech was?
8      A    No, the email marketing department
9  was.
10     Q    You have indicated you worked for
11 Niutech the entire time you were there. Just
12 so I'm clear, did it ever occur that you
13 received a paycheck from any entity other than
14 Niutech?
15     A    Never.
16     Q    And that would apply to the entire
17 time you were employed at -- well, let's get
18 an address. What physical address was the
19 location of your employer when you worked for
20 Niutech?
21     A    I don't recall the address. It
22 was in Boca Raton.

Page 25

1      Q    Was it on Broken Sound?
2      A    I believe so.
3      Q    And that address did not change
4  for the entire time you worked for Niutech?
5      A    It did not.
6      Q    Who was in charge of the IT
7  department while you were at Niutech?
8      A    I believe it was Marty Torcy.
9      Q    T-O-R?
10     A    I don't know the spelling.
11     Q    Did anyone else besides Mr. Torcy
12 wear the hat of IT Chief or Chief Information
13 Technology Officer? First of all, what was
14 his title?
15     A    I do not know.
16     Q    Okay. Did anybody else serve as
17 head of the IT department besides Marty Torcy
18 during the time you worked for Niutech?
19     A    Not to my recollection.
20     Q    Was it your understanding that
21 Marty Torcy was the Chief of the IT department
22 for Niutech?

Page 26

1  A  Marty and I would meet to discuss
2  my particular needs. Past that, I don't know
3  what Marty's responsibilities were or who else
4  was responsible for technology.
5  Q  Do you know which corporation he
6  worked for?
7  A  I do not.
8  Q  Do you recall the names of any
9  people who worked in your email department
10 besides Mr. Saccone and Mr. Harrod?
11      MR. STEIN: He's Mr. Harrod.
12      (Laughter.)
13      BY MR. RING:
14 Q  I'm sorry. Mr. Saccone and Mr.
15 Cardona?
16      MR. STEIN: And I'm sorry, what I
17 heard him testify to is he's kept in touch
18 with Mr. Saccone, not that Mr. Saccone worked
19 in his email department. I don't know if he
20 did or didn't.
21      MR. RING: Let's find out.
22      BY MR. RING:

Page 27

1  Q  Okay. Did Mr. Saccone work in the
2  email department while you were there?
3  A  He did.
4  Q  For what period of time?
5  A  Approximately the first six
6  months.
7  Q  And was that under you?
8  A  It was.
9  Q  And you have already mentioned Mr.
10 Cardona. Who else worked in that department?
11 A  A gentleman by the name of Ben. I
12 do not recall his last name.
13 Q  What position did he hold?
14 A  He was a programmer.
15 Q  Do you recall any other names?
16 A  Evelyn. I do not know her last
17 name.
18 Q  And her position?
19 A  I don't recall her position.
20 Q  Any others you recall?
21 A  I've already -- Eric Guimond.
22 Q  That's right, you did give me him,

Page 28

1  I recall. Okay. Any others?
2  A  No. It's been a long time.
3  Q  From what location were the emails
4  sent that were sent by the email department?
5  And by that, I mean, what town and city? And
6  state?
7  A  Niutech, when I came onboard, did
8  not have an operational email system, and we
9  were working out the details. So we, instead
10 of acquiring servers directly, we leased them
11 to bring the system online. Also, there were
12 bandwidth considerations for the co-
13 registration path. So what city they resided
14 in, I could not tell you because we leased
15 them from any number of ISPs.
16 Q  Do you recall the names of those
17 ISPs?
18 A  Not offhand, no.
19 Q  Do you recall what period of time
20 the leasing took place?
21 A  I don't understand the question.
22 Q  You described a situation where

Page 29

1  Niutech did not have certain capacities, so
2  you leased servers.
3  A  Uh-hum.
4  Q  For what period of time were those
5  servers leased? Are they still being leased
6  today? At the time you left Niutech, were
7  they still being leased?
8  A  When I left, yes.
9  Q  Okay. Does Niutech or did
10 Niutech, when you were working there, maintain
11 some servers on its own premises that were
12 used for the sending of emails, as you've
13 described?
14 A  They did not have the server
15 capacity or bandwidth to do such.
16 Q  So they did not?
17 A  Correct.
18 Q  And that statement remained true
19 through the entire time you were working
20 there?
21 A  Yes.
22 Q  What records would identify the

Page 46

```
 1   website.  You would select -- you would look
 2   at Offer X.  If you wanted to engage that
 3   offer, all those assets would be present as
 4   links or you would copy/paste.  It would say,
 5   "Approved Subject lines", "Approved From
 6   lines", and they might give you two or three
 7   of them to select from.
 8        Q    Okay.  Now the word "approved" is
 9   a word that's applied by whom?
10        A    The advertiser.
11        Q    So the advertiser is, basically,
12   providing Niutech with pre-approved content
13   for the email?
14        A    Correct.
15        Q    Is that fair?  Okay.  And once
16   Niutech, while you were there, once Niutech
17   received this information from the advertiser,
18   then what was the next step in putting
19   together the promotion or the campaign?
20        A    We would ensure that the HTML was
21   proper and would render properly for users
22   receiving it, correct any minor structure
```

Page 47

```
 1   issues, while not changing the content.  We
 2   would, then, test it to a small group of
 3   individuals to see what those metrics were.
 4        Q    What do you mean by "render
 5   properly"?
 6        A    If you've ever received an email
 7   by which the pictures were broken or the text
 8   was all together, it's not rendering or being
 9   displayed to the end-user as it should.
10        Q    And what is the purpose of the
11   HTML code in the email?
12        A    To display pictures and text to
13   the end-user.
14        Q    How did -- strike that.
15             Who was the small group used for
16   the preliminary test you described?
17        A    Depending upon the offer, they may
18   be a random sample of data or a targeted
19   sample of data.  In the hypothetical AARP, you
20   would obviously want to engage people who were
21   older than 50 years old.
22        Q    And where did the data consisting
```

Page 48

```
 1   of email addresses for those people come from?
 2        A    The co-registration path.
 3        Q    That would be a co-registration
 4   path that had generated some lead information,
 5   is that correct?
 6        A    Yes.
 7        Q    And that was co-owned by whom?
 8        A    It was owned by the company.
 9        Q    Niutech?
10        A    Yes.
11        Q    So that list of people was part of
12   a larger list maintained by Niutech, is that
13   right?
14        A    Yes.
15        Q    Did Niutech maintain more than one
16   list?
17        A    It wasn't list-based.  The data
18   was stored in a database and accessed as
19   needed.
20        Q    And that database contained lead
21   information on prospective customers, is that
22   correct?
```

Page 49

```
 1        A    No.
 2        Q    What did it contain?
 3        A    That database contained
 4   information that customers had typed in
 5   themselves on the co-registration path.
 6        Q    And that database was used for
 7   what?
 8        A    Well, then, in our department,
 9   email marketing.
10        Q    How many emails were sent in each
11   campaign?
12        A    It varied.
13        Q    From what to what?
14        A    Ten thousand to 2 million.
15        Q    What was the size of the
16   database --
17        A    I do not know.
18        Q    -- in terms of number of records?
19        A    I do not know.
20        Q    What was the format?
21        A    I do not know.
22        Q    Do you know if it was an SQL, by
```

Page 62

1  campaigns.
2  Q   And those campaigns would consist
3  of anywhere from 10,000 to 2 million emails
4  each?
5  A   In the case of an email of 2
6  million, then we are probably looking at 1 or
7  2 million.
8  Q   Per day?
9  A   Per day.
10 Q   Could you get out two campaigns in
11 a day that consisted of 2 million emails
12 intentional or intended targets each?
13 A   The systems were capable of it.
14 Q   What systems were you talking
15 about?
16 A   IDEA.
17 Q   And that IDEA software was hooked
18 up to servers located offsite?
19 A   Correct.
20     MR. RING:  Take a short break.
21     (Whereupon, the foregoing matter
22 went off the record at 6:08 p.m. and went back

Page 63

1  on the record at 6:10 p.m.)
2      BY MR. RING:
3  Q   Mr. Harrod, do you know what part
4  of the building was occupied by the Publisher
5  Services department?
6  A   I don't know where they were
7  located.
8  Q   Do you know whether they were, in
9  fact, in the same building with your
10 department?
11 A   I don't; I don't know.
12 Q   Do you know if Niutech had any
13 other office space besides the Broken Sound
14 address where you worked at the time you
15 worked there?
16 A   They had a fulfillment warehouse
17 down the street.
18 Q   How far down the street?
19 A   Three blocks.
20 Q   How do you know that?
21 A   Because we had company functions
22 there.

Page 64

1  Q   Okay.  Do you know, in fact, that
2  there was a Publishers Services department at
3  the time you worked at Niutech?
4  A   Yes.
5  Q   How do you know that?
6  A   In meetings with various other
7  department heads it was brought up.
8  Q   And did someone from the
9  Publishers Services department attend those
10 meetings?
11 A   This would have been more along
12 the lines of Publishers Services did this type
13 of, these numbers, those types of things, but
14 I had no direct contact with them.
15 Q   And as a result of these meetings
16 where the word "Publishers Services" came up,
17 you did not happen to meet anyone from
18 Publishers Services?
19 A   I don't recall.  I don't; I just
20 don't recall.
21 Q   Okay.
22 A   I mean there was a lot of people

Page 65

1  that worked at that company.
2  Q   All right.
3      MR. RING:  Your witness.
4      MR. SAUNDERS:  Give us a second.
5      (Whereupon, the foregoing matter
6  went off the record at 6:11 p.m. and went back
7  on the record at 6:19 p.m.)
8  CROSS-EXAMINATION
9      BY MR. SAUNDERS:
10 Q   Mr. Harrod, you mentioned that you
11 worked for a company, iLeap?
12 A   Yes.
13 Q   At one point in time, I think you
14 said they franchised to ISPs?
15 A   Correct.
16 Q   Those ISPs, did they use spam
17 filters?
18 A   Yes.
19 Q   Common practice for ISPs to use
20 spam filters?
21 A   Yes.
22 Q   Good practice for ISPs to use spam