**IN THE U.S. DISTRICT COURT FOR MARYLAND,**
**SOUTHERN DIVISION**

BEYOND SYSTEMS, INC.     )
                                    )
    Plaintiff            )
    v.                      )       Case No. PJM 08 cv 0921
                                      )
WORLD AVENUE USA, LLC, et al. )
    Defendants     )
_____ )

**DEFENDANT WORLD AVENUE USA, LLC'S MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF ITS EXPEDITED MOTION FOR ORDER TO SHOW**
**CAUSE AS TO AUGUST TRIAL DISCOVERY**

Defendant, WORLD AVENUE USA, LLC ("**WAUSA**") hereby submits its

Memorandum of Points and Authorities in Support Of Its Expedited Motion for Order To Show

Cause As To August Trial Discovery regarding issues material to the three trial issues

established by the Court in DE 544.  WAUSA seeks expedited consideration on the grounds the

case goes to trial in less than four (4) months and it is being grossly prejudiced in all manner of

ways - from denial of discovery needed to depose BSI and Hypertouch's principals, to BSI's use

of materials in the Wagner expert report that the Court expressly declared inadmissible, to - last

but not least - being forced to expend vast amounts of time and money re-litigating matters

because BSI repeatedly refuses to obey Orders it dislikes.   Further WAUSA states as follows:[1]

          **I.**        **STATEMENT OF FACTS.**

          **A.**        **The Game Plan Document.**

    1.       On March 29, 2010, WAUSA served its Fourth Request for Production, and

---

[1] WAUSA has made a herculean effort for more than a year to resolve this Motion and avoid
having to file it, but BSI has still refused to comply.  *See* L.R. 104 Certificate, attached as
Exhibit 1.

requested, *inter alia*, a copy of the Game Plan Document, a document referenced in the *Kraft* litigation that described a 2008 plan of litigation against WAUSA and other targets by BSI.

2.      BSI did not produce the Game Plan Document.  Instead, it filed a false Response stating:  "Plaintiff has no responsive documents."  *See* excerpted Response, attached as Exhibit 2.

3.      On June 15, 2010, WAUSA filed its Motion to Compel Production of Documents Responsive to Fourth Request for Production seeking, *inter alia*, the Game Plan Document.  *See* DE 271-272.  In its Memorandum of Points and Authorities, WAUSA identified the Game Plan Document as one document identified in *Beyond Systems, Inc. v. Kraft Foods, Inc.*, Case No. 8:08-cv-00409-PJM, as "Prospective Spam Cases-BSI-2008-01222" and was an attachment to a February 12[2], 2008 e-mail to BSI's expert in that case, John Levine, and also known as KLENSIN00220.  *See* DE 272; *see* Ex. 3 (Klensin e-mail).  Clearly, WAUSA sought production of a 2008 Game Plan.

4.      BSI knew exactly what WAUSA was requesting.  On July 2, 2010, BSI opposed the Motion to Compel and changed its story that no responsive documents existed, instead stating:

> "Game Plan" document. The Court has ruled in Kraft that this document is covered by attorney-client privilege and is not subject to discovery.  See order in <u>Kraft</u> at DE 370.

*See* DE 322, filed July 2, 2010, p. 2, ¶ 1.

---

[2] The referenced Order at DE 370 in the Kraft Action, among other things, granted "BSI's Motions for Return of Inadvertently Produced Privileged Document [Paper Nos. 290 and 303]." An excerpted copy of DE 370 is attached as Exhibit 4.  BSI's Motion at DE 290 in the Kraft Action was a Motion for Return of Inadvertently Produced Privileged Document and Order Striking All Reference To Said Document.  *See* Exhibit 5 (Excerpted Motion and Memorandum of Points and Authorities, pp. 1-4).  The Motion for Return specifically identified the very 2008 Game Plan Document that WAUSA requested in the Fourth Request for Production. *See* Exhibit 5, p. 4.

5.      On October 7, 2010, the Court granted WAUSA's Motion to Compel Production of Documents Responsive To Fourth Request for Production and issued sanctions against BSI for opposing the Motion.  *See* DE 441; attached as Exhibit 6.  The Court's October 7th Order held that: "As the game plan document was not listed in a privilege log, it shall be produced."  *Id.*.

6.      BSI still did not produce the Game Plan Document.  Instead, on October 21, 2010, BSI moved for reconsideration.  *See* DE 455, pp. 1, 6 (excerpt attached as Ex. 7).  In the Motion, BSI again stated that the Game Plan Document was protected by the Order in the *Kraft* Action at DE 370, and therefore, a privilege log was not required.  *See* Ex. 7, DE 455, p. 6.

7.      At a hearing held on February 16, 2011, the Court denied BSI's Motion for Reconsideration, issued sanctions for its filing, and once again ordered BSI to produce the Game Plan Document.  *See* DE 606, attached as Exhibit 8.  The Court stated:

> But coming back to the overall theme of the motion for reconsideration, I again agree with the defense that it's not a real reconsideration. Number one, the game plan memo, at first the plaintiff indicated that it had no responsive documents. That was set forth in electronic case file No. 272-2. Then plaintiff had claimed privilege but never provided a privilege log. Therefore, it was waived.

*See* Exhibit 9, excerpted Transcript of February 16, 2011 hearing, p. 87, lines 6-12.

8.      It is now April 28, 2011 -- more than a year since it was first requested, the Court has issued two Orders compelling production have been disobeyed, and 71 days has passed since the Court most recently ordered its production.  It remains unproduced.

9.      In its latest effort to avoid obeying two clear Court Orders, instead of producing the 2008 Game Plan Document and the 2006 Game Plan Documents in unredacted format, on April 14, 2011, BSI produced a collection of heavily-redacted documents Bates Stamped BSI-JiCos-117527 to BSI-JiCos-117597. These consist of 71 pages of heavily-redacted documents

pertaining to communications between 2004 and January 2008, but the documents do not include the February 2008 Game Plan communication. *See* excerpts attached as Composite Exhibit 1-0. By BSI's own filings in the *Kraft* Action (*see* Exhibits 4-5, *supra*., this is *not* the 2008 Game Plan that WAUSA requested and the Court twice ordered to be produced.

10.     As previously explained by BSI *itself* to this Court in the *Kraft* Action, these documents were a 2006 version of the Game Plan, but were not the 2008 Game Plan:

> Additionally, Plaintiff previously asserted a claim of attorney-client work product and attorney-client communication privilege to a 2006 version of this document [2008 Game Plan Document] by including it in its privilege log. Ex. 12, June 22, 2009 BSI privilege log. Document No. 2 on that log is an earlier draft of the document currently in dispute.

*See* Exhibit 5, excerpt of DE 290 in *Kraft* Action-filed February 9, 2010, p. 8, ¶ 1.

11.     In turn, Exhibit 12 to the *Kraft* Action filing disclosed a September 11, 2006 "draft case summary prepared for Chadbourne & Parke." *See* Ex. 5, excerpt of DE 290 in *Kraft* Action, Exhibit 12, p. 1, Document 2.   BSI-JiCos-117527 to BSI-JiCos-117597 contain a heavily-redacted version of the September 11, 2006 Game Plan Document (*see* Ex. 10), but not the 2008 Game Plan Document.

12.     Thus, BSI *had actual knowledge*: (i) there was a 2006 Game Plan and a 2008 Game Plan; (ii) that it had claimed privilege for the 2006 Game Plan in the *Kraft* Action; (iii) that its Motion for Return in the *Kraft* Action related to the 2008 Game Plan; (iv) that the Motion for Return in the *Kraft* Action had been granted at DE 370; and (v) that it cited this  Court to that ruling in the *Kraft* Action at DE 370 when WAUSA asked for the Game Plan and again in its Motion for Reconsideration.  However, BSI only produced heavily-redacted copies of the 2006 Game Plan and entirely withheld the 2008 Game Plan to which the *Kraft* Action related.  BSI's ongoing failure to comply with the Court's Orders and to produce both the unredacted 2008

Game Plan Documents and the unredacted 2006 Game Plan Documents warrants a finding it is in contempt and the imposition of additional sanctions as described below.

## B. Paul Wagner's "Hybrid" Expert Report

13.     On February 16, 2011, this Court also addressed BSI's failure to timely disclose its expert witnesses and tender expert witness reports as required under the Scheduling Order in effect at the time of the required disclosure, *i.e.*, by March 1, 2010. *See* DE 58, p.2; DE 64-65; DE 127-128.

14.     In the intervening 11 months, and notwithstanding its subsequent receipt of WAUSA's expert report, BSI never troubled itself to make the required expert disclosures, including those experts' reports. Rather, BSI's sole acknowledgement of its failure to meet the deadline, and sole effort to remedy same, was to file on April 20, 2010 a sparsely-detailed motion seeking to be excused without explaining its neglect. *See* DE 214. Then, despite a full hearing on February 16, BSI again offered no explanation for disregarding  the Scheduling Order. *See* Composite Exhibit 9.

15.     After  BSI's presentation on the issue, this Court ruled that BSI was barred from using any experts at either the August, 2011 mini-trial or any other trial that may occur in this case. *Id*. As the sole exception, the Court allowed Paul Wagner to serve as a hybrid fact/expert witness, provided that Mr. Wagner's "expert" opinions were based solely on "those areas of his business operation that came to his attention as a result of his business operation, not the litigation materials." *See* Exhibit 9, p. 26, lines 3-6.

16.     With as much respect for the Court's February 16 ruling as had previously been shown to the Scheduling Order's deadlines, on March 10, 2011, Mr. Wagner proceeded to file a massive "expert" report that:  (i)  relied on and attached prior briefs and motions in this case,

reports and declarations in other litigation, exhibits in this litigation, affidavits in other litigation from witnesses, and depositions of Mr. Wagner in this and other cases; (ii) was comprised of a hodgepodge of different sources; (iii) relied on opinions of the experts specifically excluded by the Court, attached their reports, depositions, and multiple exhibits prepared by them; (iv) opined on matters excluded by Judge Messitte from the August Trial; and (v) relied on otherwise impermissible materials.  In short, Mr. Wagner's report relied upon and sought to introduce the expert reports and litigation materials the Court had prohibited BSI from using.[3]

17.     On Saturday, April 23, 2011 and Monday, April 25th, 2011, BSI continued to violate the Court's expert exclusion Order by serving copies of new Reports from the same excluded experts, as well as re-cycling some of the same reports rejected by the Court at the February 16, 2011 hearing.

### C.  BSI and Hypertouch's Server Shell Game

18.     On July 15, 2009, WAUSA served its First Set of Interrogatories on BSI. Question 13 of those Interrogatories asked BSI to identify the physical locations of all its servers and the servers involved in the transmission of the E-Mails At Issue.  *See* Exhibit 11 (Excerpt of Interrogatory 13).

19.     On January 8, 2010 BSI served deficient responses.  Therefore, on April 9, 2010,

---

[3] BSI has since filed a Motion for Reconsideration ("MFR") of the February 16 Order.  *See* DE 611.  Even more recently, BSI filed a Reply packed full of new arguments that could have been, but were not, presented to the Court at either the February 16 hearing or in its initial MFR.  *See* DE 641, filed April 8, 2011.  These new, albeit specious, arguments will necessitate a Sur-Reply, thereby elongating the briefing process.  Not content with one round of post-hearing briefings seeking to avoid obeying the Order, BSI also filed a separate Motion to Modify Scheduling Order for Advisory Jury Trial as to Expert Disclosures  [DE-638] ("MMSO"), which raises yet further "grounds" for circumventing the strictures of the February 16 Order.  Naturally, the MMSO has required a full round of briefing too.  *See* DE 650.  This desperation tactic contravenes the Court's clear instructions on November 29th to avoid burdening the Court with unnecessary filings and briefings

WAUSA filed a Motion to Compel.  *See* DE 209.

20.    On September 23, 2010, after a full hearing on the merits, this Court ordered BSI to provide a complete answer to Question 13.  *See* DE 428, attached as Exhibit 13; Exhibit 14 (excerpt of September 23, 2010 hearing).  Question 13 stated:

> "For each IP address, identify the servers and physical location of all servers associated (primary and secondary) with each IP address."

The question was phrased in the present tense.  *See* Exhibit 11.

21.    On September 27, 2010, BSI supplemented its answers and provided the city and state locations of what purported to be each server,  primary and secondary, associated with each IP address.  *See* Exhibit 15 (excerpt of Supplemental Answer to Interrogatory 13).    These included what were identified as six Hypertouch city and state addresses in California.  *Id*.  Two California cities were named, Modesto, California and Redwood City, California.  *Id*.  BSI made no mention of a third California city, Palo Alto.  *Id*.

22.     The significance of this question, and these answers, lies in BSI's earlier admission that nearly all the E-Mails at Issue in this case were initially sent from somewhere to Hypertouch in California, and only then relayed from Hypertouch in California to BSI in Maryland.  As part of the proof to be presented at the August mini-trial, WAUSA sought to inspect and videotape the purported Hypertouch  servers just as it had done with the purported BSI  servers in Maryland and Washington, D.C.  All of this relates to the third of the three mini-trial issues, namely the nature of the relationship between Hypertouch and BSI.  *See* DE 544, p. 2, ¶ 1.

23.    February 4, 2011 was the deadline for submitting premises inspection requests. *See* DE 571, DE 636.   Pursuant to the Scheduling Order, the Inspections were conducted in March, 2011.  *Id*.   The location formerly housing the Hypertouch servers -- a half height

unfinished storage room in the residence of one of Joseph Wagner's acquaintances, Jaime Vargas -- had no Hypertouch servers.

24.     The reason is apparent from Hypertouch's April 8, 2011 "Responses and Objections to WAUSA's Interrogatories Relating to the August Trial" ("Trial Interrogatories"). Hypertouch, which had earlier objected and refused to answer a document production request asking the location of its Servers,[4] and had engaged in an extended effort to avoid answering any discovery for an entire year  (all of which were rejected by the court), finally answered the same question when posed in the Trial Interrogatories **after** the inspection deadline had passed.

25.     Hypertouch's Answer to Question 1 of the Trial Interrogatories states that all of Hypertouch's servers were moved in June 2010, *three (3) months before* BSI's September 27, 2010 Court-Ordered Supplemental Answers, to a new and hitherto undisclosed address at █████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████     as of June 2010.  *See* Exhibit 16.

26.     The only reasonable inference is that BSI's Supplemental Answers, given under Court Order three months after the Servers were moved, were false.  *See* Exhibit 15.  For its part, Hypertouch was a full participant in the Server shell game.  Not only did it move the Servers

---

[4] *See* Motion to Compel Complete Production of Document from Hypertouch, Inc. Responsive to First Request for Production.

once it realized WAUSA had identified their original locations, but it refused on every manufactured pretext imaginable to answer discovery served long before the inspection deadline had passed and instead, only answered the question after the inspections had occurred.  *See* Exhibit 16.

27.     This behavior has cost the Defendants significant attorneys' fees and costs for multiple inspections of premises where no servers were located, and - once again - prejudiced Defendants' ability to prepare for the August Trial.  Defendants, who have diligently prepared and asked all the right questions, have been stymied by a game of Server hide and seek coupled with the willful  refusal to answer legitimate questions and, apparent misrepresentations.

### D.     Gross Revenue Documents.

28.     Separately, on February 18, 2010, WAUSA served its Third Request for Production and, *inter alia,* requested in Requests 9 and 10, all documents showing BSI's annual gross revenues and BSI's annual gross revenues attributable to settlements or judgments.

29.     On June 23, 2010, WAUSA filed its Motion to Compel Production of Documents Responsive To Third Request For Production, still seeking the gross revenue and annual revenue documents.  *See* DE 298.

30.     At the February 16, 2011 hearing, the Court granted the Motion to Compel Production of Documents Responsive to Third Request For Production, issued sanctions against BSI, and instructed BSI to produce its federal and state tax returns for the period from January 1, 2003 to date.  *See* DE 603, attached as Exhibit 12.  The Court stated:

> THE COURT: I still think that it goes, as counsel has indicated, to Judge Messitte's evaluation as to whether or not this is a litigation mill. Now, it may be that there's a tension there. Can you be a litigation mill as well as an entity entitled to recovery under the act? That's for Judge Messitte. But as that issue is framed up now, I find it discoverable.

MR. RING: Your Honor, we are offering to produce, if the court is going in that direction, an Excel spreadsheet that essentially contains all the revenues and expenditures of BSI and it can be for whatever time period you require.

THE COURT: Is that acceptable to the defense?

MR. SAUNDERS: Your Honor, I'd like to take a look at it, but I don't know what the backup is. I don't know how it's produced, et cetera. It's a little dangerous for me to say I'm just going to take their word for it on a summary document.

THE COURT: That does sound a little fishy to me. I was just trying to see if you wanted it or not.

I'm going to require the tax documents unless you can produce all the documents as required by this document request, which reflect the annual gross revenues for each year from 2003 to present. That's No. 9. And No. 10, the portion of annual gross revenues for each year from 2003 to present attributable to settlements or judgments obtained.

Now, you don't have to prepare anything. To the extent that these documents exist, you have to produce them. I think the tax documents probably get us a long way with respect to No. 9. I don't know if that's true with No. 10. But the simple import of both of these requests is produce all documents.

MR. RING: Your Honor, just for clarification, because I asked counsel this yesterday, all documents reflecting the revenues would include my deposit of settlement checks into my trust account and deposit tickets, things like that. I mean, there's a fringe that is very unclear. If Your Honor is directing tax returns, I would ask are they federal or state or both and

THE COURT: Both.

MR. RING: -- that's income tax returns, I assume?

THE COURT: Yes.

MR. RING: Federal and state?

THE COURT: Um-hm.

MR. RING: And then as to revenues, I don't know what documents those are. I don't know precisely what documents they are. We have to guess and then we'll guess and we'll give them something

and they'll say it's not right, it's not enough. The lack of precision is the problem here.

THE COURT: I don't know that there's a problem. If somebody is going to generate revenue, it's a bad business if they don't know whether they have documents in their possession, custody or control which reflects that revenue that was generated.

MR. RING: Well, they certainly do have and it includes, for instance, the litigation documents.

THE COURT: And what's wrong with that?

MR. RING: There's a room full of each case. I mean, there's a lot of documents.

THE COURT: If it's revenue, it's revenue. That's why I was trying to get it to a more manageable level, but there's nothing offensive about the request here as it informs Judge Messitte's decision with respect to litigation mill or not. So, I'll grant both of those requests.

*See* Ex. 9, excerpt of February 16, 2011 hearing, p. 52, lines 7-25, p. 53, p. 54, lines 1-17.

31.     Instead of producing the tax returns as clearly ordered, after waiting 49 days, BSI produced some type of unspecified "summary" documents, unverified by any underlying primary source backup materials.  The Court specifically prohibited BSI from so limiting its production at the February 16, 2011 hearing and explicitly stated that the production of the Excel document that BSI offered would be inadequate and ordered BSI to produce the federal and state tax returns.  *See* Ex. 9 ("That does sound a little fishy to me").  The document that BSI produced was the very Excel document that the Court rejected, as is clearly shown by the .xls extension on the top of the summary BSI it produced.  *See* Figure 1 below (screen shot of Excel spreadsheet produced by BSI).



32.     After once again disobeying a federal court Order by engaging in an expressly prohibited discovery tactic and forcing Defense counsel to address the misconduct on multiple occassions, on Tuesday, April 21st, BSI produced federal tax returns for the period of 2003 to 2009 (stating that 2010 was not available) that contained at least one unauthorized redaction. *See* excerpt attached as Exhibit 17.  To date, BSI has offered no explanation for the redaction, e.g., it has not produced a related privilege log.

## II.     <u>LEGAL STANDARD.</u>

The purpose of civil contempt is "to coerce obedience to a court order or to compensate the complainant for losses sustained as a result of the contumacy." *In re General Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995) (*citing Connolly v. J.T. Ventures,* 851 F.2d 930, 932 (7th Cir. 1988)).   Those losses include all losses "germinating from [the] misconduct." *Id*. at 259. A finding of civil contempt requires a showing, by clear and convincing evidence, of (1) the

existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's "favor"; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had at least constructive knowledge of such violations; and (4) that the movant suffered harm as a result. *See, e.g., Ashcroft v. Conoco, Inc.,* 218 F.3d 288, 301 (4th Cir. 2000). Willfulness is not an element of civil contempt. *General Motors,* 61 F.3d at 258.

"Civil contempt is an appropriate sanction if we can point to an order of this Court which 'set[s] forth in specific detail an unequivocal command' which a party has violated." *Id.* (citing *Project B.A.S.I.C. v. Kemp,* 947 F.2d 11, 16 (1st Cir. 1991) ("[C]ivil contempt will lie only if the putative contemnor has violated an order that is clear and unambiguous.")).

Once civil contempt is found, the only remaining issue is one of remedy. The appropriate remedy for civil contempt is within the court's broad discretion. *General Motors*, 61 F.3d at 259. District Courts are specifically granted great deference when civil contempt concerns a violation of the District Court's own order. *See JTH Tax, Inc. v. H&R Block Eastern Tax Serv., Inc.*, 359 F.3d 699, 704 (4th Cir. 2004) ("When a district court's decision is based on an interpretation of its own order, our review is even more deferential because district courts are in the best position to interpret their own orders.").

The Court has inherent power to issue a contempt order against a litigant who disobeys a discovery order, including issuance of judgments and dismissal. *In re: Howe*, 800 F.2d 1251, 1252-53 (4th Cir. 1986) (affirming district court order issuing a civil contempt order and monetary sanctions for each day that a litigant violated a discovery order by being late in answering interrogatories and a request for production); *PVD Plast Mould Industr., Ltd. v. Polymer Group, Inc.*, 31 Fed. Appx. 210, 2002 WL 229406, at *1, (4th Cir. 2002) (unpublished)

(affirming entry of judgment and award of sanctions against litigant who failed to comply with discovery orders); *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007, 1016-1019 (D.C. Cir. 1997) (affirming district court order holding litigant in contempt based on failure to produce documents ordered by court and awarding sanctions of $1,000 per day until documents were produced); *Steigerwald v. Bradley*, 229 F. Supp.2d 445, 448 (D. Md. 2002) (issuing default judgment against defendant that, *inter alia*, failed to produce tax returns required by court order); *Cobell v. Babbit*, 37 F. Supp.2d 6, 9-15 (D.D.C. 1999) (finding litigant in contempt of court and issuing sanctions for violation of discovery order).

## III.   ARGUMENT

### A.   BSI's Conduct Constitutes Repeated Civil Contempt

BSI has committed a minimum of four separate acts of civil contempt.[5]  First, it failed to produce the Game Plan Document, despite two Court Orders requiring its compliance.  *See* Exhibit 6 [DE 441]; Ex. 8 [DE 606]; Ex. 9 [February 16, 2011 excerpted transcript].  Second, BSI and Wagner submitted in violation of the rulings at the February 16, 2011 hearing a hybrid fact/expert report derived purely from litigation and referencing the other expert reports that the Court excluded.  *See* Ex. 9.  BSI then produced just last weekend new expert reports from the excluded experts, together with some of the same expert reports and exhibits already before Magistrate Judge Day when he issued his exclusion order on February 11, 2011.  Third, BSI concealed the location of Hypertouch, Inc.'s Servers in sworn Interrogatory Answers in September 2010 until after the deadline for premises inspections had passed in March 2011.  *See* Exhibit 13-15.  Hypertouch was complicit in withholding its disclosure of the June 2010 move of the Hypertouch Servers until April 2011, when the deadline for the premises inspections in this

---

[5] It may be most accurate to look at BSI's actions as six or seven separate acts of contempt, but for ease of reference they are broken down into four broad categories of contumacious conduct.

case had passed.  *See* Ex. 16.  Fourth, BSI failed to produce the federal and state tax returns, but instead produced the Microsoft Excel document that the Court had previously ruled was unacceptable, and later, a redacted copy of the returns.  *See* Figure 1 and Exhibit 17.

The first two elements of civil contempt are: 1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge and 2) that the decree was in the movant's "favor."  *See e.g., Ashcroft,* 218 F.3d at 301.

As the first elements of civil contempt requires, BSI had knowledge of the existence, the scope, and the meaning of the unambiguous Orders.  There are multiple Court Orders that specifically require the production of the Game Plan Document, the Expert Reports, the Supplemental Server Answers, and the federal tax returns.  *See* Exhibit 6 [DE 441]; Exhibit 8 [DE 606]; Exhibit 9 [excerpted transcript of February 16, 2011 hearing]; Exhibit 12 [DE 603]; Exhibit 14 [excerpt of September 23, 2010 hearing]; Exhibit 13 [DE 428].  BSI was acutely aware of the Court Orders, and BSI's President was present at the February 16, 2011 and September 23, 2010 hearings wherein certain of the Orders were entered.  *Id*.  Further, the Court Orders were in WAUSA's "favor" in that they compelled discovery from BSI regarding the Game Plan Document, the Expert Reports, the Supplemental Server Answers, and , the federal tax returns.  *Id*.

The third element of contempt requires that the alleged contemnor by its conduct violated the terms of the order, and had at least constructive knowledge of such violations.  *See, e.g., Ashcroft.,* 218 F.3d at 301.  BSI violated the Court Orders at DE 428, 441, 603, and 606, and the rulings made at the February 16, 2011 and September 23, 2010 hearings by failing to produce the Game Plan Document and the federal and state tax returns, submitting non-compliant Expert Reports, and submitting false Interrogatory Answers.

The fourth element of civil contempt requires that the movant suffered harm as a result of the contemptuous action. *Ashcroft,* 218 F.3d at 301.  As a result of BSI and Wagner's numerous and repeated contumacious conduct of DE 428, 441, 603, and 606, WAUSA was forced to incur a large amount of attorneys' fees and costs.  *See Folk v. Wallace,* 394 F.3d 240 (4th Cir. 1968) (holding attorneys' fees to be a valid remedy in a civil contempt action).

**B.    Severe Sanctions Are Warranted For these Multiple Acts of Contempt.**

This is not the first time BSI has flouted a Court Order.  BSI has already been sanctioned eight times.  *See* DE 441, 444, 468, 484, 502, 605 (twice), and 606.  Yet, BSI's serial motions for reconsideration of matters decided once, twice, and, in some cases, three or more times by this Court continue to pile up at an alarming pace.  *See* DE 217, 447, 449, 455, 496, 504, 565, 568, 611, 638.  Now, Defendants face outright defiance of the Court's Orders requiring production of the "Game Plan" document, limitation of the use of expert witnesses, timely revelation of the location of Hypertouch's servers so they could be inspected and filmed for trial, and production of the tax returns.

The Plaintiff has stepped over the line many times in this proceeding.  Monetary sanctions have had no effect.[6]  We are beyond potential behavior modification, because after being previously sanctioned on eight different occasions, the behavior has actually grown more defiant rather than more compliant.[7]  At this point, the Court should simply dismiss this case

---

[6] Plaintiff has yet to pay an actual sanction for its continued misconduct, and seems undeterred by the looming threat it will have to do so.

[7] For example, on February 16, 2011, the Court entered three sanctions awards.  *See* DE 605 (sanctions for BSI's Motion for Reconsideration on Third Set of Interrogatories); DE 605 (sanctions for BSI's Motion for Determination of Timeliness And Sufficiency of Initial Rule 26(a)(2) Expert Designations And/Or For Extension of Time [DE 214-filed 4/20/10]); DE 606 (sanctions for BSI's Motion for Reconsideration on WAUSA's Fourth Request for Production).  Notwithstanding the three February 16th sanctions Orders, BSI filed its next Motion for Reconsideration on March 2nd [DE 611] and again on the same issue on April 6th [DE 638].

with prejudice, and reserve jurisdiction award Defendants their reasonable attorneys' fees and costs.

In the alternative, if the Court deems a lesser sanction appropriate, the Court should hold BSI, Paul Wagner and Hypertouch in civil contempt, impose a fine for each day that any or all of them remain in violation of this Court's Orders, further order BSI to execute Form 4506 for the tax years 2003 - 2010 and allow counsel for Defendants to submit it to the IRS for delivery of copies of BSI's federal income tax returns directly to counsel for Defendants, withdraw with prejudice the Wager Expert Report and the new excluded experts' reports, award Defendants their reasonable attorneys' fees and costs incurred in once more having to compel compliance with all of these Court Orders, and further order Hypertouch to allow an immediate premises inspection of the newly revealed server location - and pay Defendant's costs for the previous inspection of the server-empty location.

If BSI cannot cure its contempt consistent with the foregoing alternative sanctions in time for the orderly completion of depositions and commencement of the August Trial, than BSI should be barred from raising related issues as proof  and adverse inferences should be drawn against it.

## IV.    CONCLUSION.

BSI has committed serial civil contempt.  BSI's failure to produce the Game Plan Documents constitutes a violation of two Court Orders and the Court's instructions at the February 16, 2011 hearing.  BSI flouted the Court's instructions regarding the Wagner Report and sought to rely on reports from experts that the Court already excluded.  BSI and Hypertouch also participated in a Server Shell Game.  In violation of the Court's instructions at the February 16th hearing, BSI also produced a redacted federal tax return after first trying to slip by with a

spreadsheet despite an explicit order to the contrary.  For the foregoing reasons the Court should dismiss BSI's claims with prejudice, or, in the alternative, impose the harsh sanctions outlined above until BSI purges its contempt.

Dated:  April 29, 2011.

Respectfully submitted,
*Attorneys for World Avenue USA, LLC*

GREENBERG TRAURIG, LLP

_____/s John L. McManus_____
Sanford M. Saunders, Jr., Esq.
USDC, MD #4734
saunderss@gtlaw.com
Nicoleta Burlacu, Esq.
BurlacuN@gtlaw.com
*Admitted Pro Hac Vice*
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone:  202-331-3100
Facsimile:  202-331-3101

--and--

Kenneth A. Horky, Esq.
Florida Bar No. 691194
horkyk@gtlaw.com
John L. McManus, Esq.
Florida Bar No. 0119423
mcmanusj@gtlaw.com
Admitted Pro Hac Vice
GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, FL 33301
Telephone: 954-765-0500
Facsimile:  954-765-1477